# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| STEVEN A. STENDER and INFINITY CLARK STREET OPERATING, on behalf of themselves and all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| | ) Case No. |
| v. | ) ) |
| JAMES A. CARDWELL, | ) |
| ERNEST A. GERARDI, JR., | ) Jury Trial Demanded |
| RUTH ANN M. GILLIS, | ) |
| NED S. HOLMES, | ) |
| ROBERT P. KOGOD, | ) |
| JAMES H. POLK III, | ) |
| JOHN M. RICHMAN, | ) |
| JOHN C. SCHWEITZER, | ) |
| R. SCOT SELLERS, | ) |
| ROBERT H. SMITH, | ) |
| STEPHEN R. DEMERITT, | ) |
| CHARLES MUELLER, JR., | ) |
| CAROLINE BROWER, | ) |
| MARK SCHUMACHER, | ) |
| ALFRED G. NEELY, | ) |
| ARCHSTONE-SMITH OPERATING TRUST, | ) |
| ARCHSTONE-SMITH TRUST, | ) |
| LEHMAN BROTHERS HOLDINGS, INC., and | ) ) |
| TISHMAN SPEYER DEVELOPMENT CORPORATION, | ) ) |
| | ) |
| Defendants. | ) |

## CLASS ACTION COMPLAINT

Plaintiffs Steven A. Stender ("Stender") and Infinity Clark Street Operating ("Infinity")

(hereinafter sometimes collectively referred to as "Plaintiffs"), by their attorneys, for their class

action complaint against Archstone-Smith Operating Trust, Archstone-Smith Trust, James A.

Cardwell, Ernest A. Gerardi, Jr., Ruth Ann M. Gillis, Ned S. Holmes, Robert P. Kogod, James H.

Polk III, John M. Richman, John C. Schweitzer, R. Scot Sellers, Robert H. Smith, Stephen R.

Demeritt, Charles Mueller, Jr., Caroline Brower, Mark Schumacher, Alfred G. Neely Lehman

Brothers Holding, Inc. ("Lehman Brothers") and Tishman Speyer Development Corporation

("Tishman Speyer"), (hereinafter sometimes collectively referred to as "Defendants"), allege

upon knowledge as to their own acts, and upon information and belief as to all other matters,

based upon the investigation conducted by and through their attorneys, which investigation

included, *inter alia*, reviewing Securities Exchange Commission ("SEC") filings, press releases,

analyst reports, news articles, communications from the corporate Defendants and other

materials, as follows:

## I.    NATURE OF THE ACTION

1.    Plaintiffs bring this action individually and as a class action on behalf of all

persons who owned Class A-1 Common Units of Archstone-Smith Operating Trust ("A-1 Unit

holders") as of the Merger (as defined hereinafter), for compensatory damages, contractual

damages and declaratory relief arising from the merger agreement among Archstone-Smith

Operating Trust (the "Archstone UPREIT"), Archstone-Smith Trust (the "Archstone REIT"),

Tishman Speyer and Lehman Brothers (Tishman Speyer and Lehman Brothers are referred to

collectively as the "Tishman-Lehman Partnership") to take the publically held Archstone REIT

private (the "Merger").

2.    The A-1 Unit holders of the Archstone UPREIT are former property owners, or

investors of former property owners, which contributed their properties (and/or equity in their

property holding companies) to the Archstone UPREIT, or its predecessor, Charles E. Smith

Residential Realty L.P. (the "Smith UPREIT), in exchange for limited partnership interests in the

Archstone UPREIT (or the Smith UPREIT) in the form of common units.  The objective of A-1

Unit holders in making such contributions was to obtain from the Archstone UPREIT (or the

Smith UPREIT) tax advantages, dividends and liquidity as specified in contribution agreements entered into at the time of their respective contributions.  Upon information and belief, none of the contribution agreements pursuant to which the A-1 Unit holders received their A-1 Units allow the Archstone REIT, Archstone UPREIT or any subsequent buyers or merger partners to eliminate or avoid the contractual tax benefits, liquidity rights and dividends bargained for by the A-1 Unit holders at the time they contributed their properties to the Archstone UPREIT.

3.      Given the magnitude of the tax liability A-1 Unit holders faced upon occurrence of a taxable event, the contractual tax liability protection afforded to the A-1 Unit holders by the Archstone UPREIT constituted an enormous potential liability to third parties interested in merging with or acquiring the Archstone UPREIT and the Archstone REIT.  In this case, as explained in greater detail below, that liability was factored into the $60.75 buyout price offered per A-1 Unit by the Tishman-Lehman Partnership to A-1 Unit holders, which had been lowered from $64.00 to $62.50 to $60.75 to account for the Archstone UPREIT's obligations to A-1 Unit holders.  However, even after lowering the offer price, the Defendants structured the Merger to disregard altogether the contractual tax, dividend and liquidity benefits owed to A-1 Unit holders.  The Tishman-Lehman Partnership has not compensated the A-1 Unit holders for the loss of these benefits and A-1 Unit holders have sustained and will continue to accrue significant damages as a result.

4.      More specifically, pursuant to the Merger Agreement, Plaintiffs and members of the Class (as defined hereinafter) have been coerced into:  (1) cashing-out their A-1 Units, which will result in millions of dollars of unprotected tax liabilities; or (2) converting their A-1 Units into new Series O Preferred units ("Series O Units") which are economically inferior to the A-1 Units.  While the Merger Agreement couches the cashing in of A-1 Units or conversion into

Series O Units as an "election," neither action as described in this Complaint was voluntary, but was coerced by Defendants.  Insofar as the terms "elect" or "election" are used in this Complaint, it is for convenience only and in reference to the terminology in the Merger Agreement and is not intended to concede that it was a voluntary act of any kind.

5.       As a result of the Merger Agreement, A-1 Unit holders who took the Tishman-Lehman Partnership's cash offer will have to recognize capital gain in an amount based on the amount of gain they originally deferred when their properties were contributed to the Archstone UPREIT.

6.        Alternatively, A-1 Unit holders whose A-1 Units were converted to Series O Units have lost the liquidity and dividends they enjoyed before the Merger.  Indeed, the Merger Agreement provides that Series O Unit holders will have to wait until the fifth anniversary of the Merger before they can redeem any or all of their Series O Units at a cash redemption price of $60.75 per unit plus all accumulated and unpaid distributions, if any, through the redemption date.  Moreover, the dividends previously regularly distributed to A-1 Unit holders have essentially been eliminated.

7.       Hence, many of the contractual tax protections, liquidity and long-term investment strategy benefits that hundreds, if not thousands of A-1 Unit holders enjoyed have been eliminated through the Merger by the unilateral breach of contract and breach of fiduciary duties by the Defendants.

8.       By entering into the Merger Agreement, the Individual Defendants, the Archstone REIT and Archstone UPREIT breached their fiduciary duties owed to A-1 Unit holders by failing to take all necessary steps to ensure that the unit holders will receive the maximum value realizable for their ownership interests and/or retain certain liquidity and dividend benefits and

tax protections they were guaranteed.  The Tishman-Lehman Partnership aided and abetted the other Defendants' breach of fiduciary duties and procured the breaches of contract detailed herein.

9. Because Defendants failed to protect the best interests of the Class and breached with Class members, this lawsuit seeks compensatory damages, contractual damages and injunctive relief for all A-1 Unit holders who were or will be injured by Defendants' wrongful conduct.

## II. PARTIES

10. Plaintiff Stender is a resident of Cook County, Illinois and has been an owner of A-1 Units at all relevant times described herein.  Because of the coercive nature of the Merger Agreement, Stender was forced to "elect" to cash-out his A-1 Units and receive $60.75 per A-1 Unit.

11. Plaintiff Infinity is an Illinois general partnership with its principal place of business in Chicago, Illinois.  Infinity is the successor in interest to Infinity Clark Street Operating, L.L.C., an Illinois limited liability company.  Infinity has been an owner of A-1 Units at all relevant times described herein.  Because of the coercive nature of the Merger Agreement, Infinity was forced to convert each Class A-1 Common Unit it owns to a newly issued Series O Preferred Unit on a one for one basis.

12. Defendant James A. Cardwell was a director/trustee of both the Archstone REIT and the Archstone UPREIT at all relevant times.

13. Defendant Ernest A. Gerardi, Jr. was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

14.     Defendant Ruth Ann M. Gillis was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

15.     Defendant Ned S. Holmes was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

16.     Defendant Robert P. Kogod was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

17.     Defendant James H. Polk III was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

18.     Defendant John M. Richman was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

19.     Defendant John C. Schweitzer was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

20.     Defendant R. Scot Sellers was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times, as well as the Chairman and Chief Executive Officer of the Archstone REIT and the Archstone UPREIT.  As an officer of the Archstone REIT and the Archstone UPREIT he will receive monetary benefits from the Merger in addition to the Merger consideration.

21.     Defendant Robert H. Smith was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

22.     Defendant Stephen R. Demeritt was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

23.     Defendant Charles Mueller, Jr. was the Chief Financial Officer of the Archstone REIT and the Archstone UPREIT at all relevant time.

24.     Defendant Caroline Brower was an Executive Vice President and General Counsel of the Archstone REIT and the Archstone UPREIT at all relevant times.

25.     Defendant Mark Schumacher was the Senior Vice President and Chief Accounting Officer of the Archstone REIT and the Archstone UPREIT at all relevant times.

26.     Defendant Alfred G. Neely was the Chief Development Officer and President of the Charles E. Smith Division of the Archstone REIT and the Archstone UPREIT at all relevant times

27.     The individual directors and officer Defendants are sometimes collectively referred to as the "Individual Defendants."

28.     The Individual Defendants, as officers, directors and trustees of the Archstone REIT and the Archstone UPREIT, owed fiduciary duties of care, candor, loyalty and good faith toward the A-1 Unit holders and were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of Archstone UPREIT, including, among other things, acting in good faith and with loyalty, due care, and candor towards A-1 Unit holders.

29.     Defendant Lehman Brothers is a corporation existing under the laws of the State of Delaware which, through affiliates: (1) owned and controlled River Holding LP, the party with which the Archstone REIT has merged; and (2) owned and controlled River Trust Acquisition (MD) LLC, an entity with which the Archstone UPREIT has merged.

30.     Defendant Tishman Speyer is a corporation existing under the laws of the state of Delaware which, through affiliates: (1) owned and controlled River Holding LP, an entity with which the Archstone REIT merged; and (2) owned and controlled River Trust Acquisition (MD) LLC, an entity with which the Archstone UPREIT merged.

31.     Defendant Archstone REIT was engaged primarily in the acquisition, development, redevelopment, operation and long-term ownership of apartment communities in the United States.  The Archstone REIT was organized under Maryland law and maintained its headquarters at 9200 E. Panorama Circle, Suite 400, Englewood, Colorado 80112.  The Archstone REIT owned approximately 89% of the Archstone UPREIT.  The Archstone REIT was the sole trustee of the Archstone UPREIT and its relation with the Archstone UPREIT was governed by the Declaration of Trust of the Archstone UPREIT.

32.     Defendant Archstone UPREIT was a limited partnership with its principal office at 9200 E. Panorama Circle, Suite 400, Englewood, Colorado 80112.  The Archstone UPREIT was organized under Maryland law.  Plaintiffs and members of the Class owned limited partnership interests known as A-1 Units in the Archstone UPREIT.

33.     By the acts, transactions, and courses of conduct alleged herein, Defendants, individually and as part of a common plan and scheme and/or aiding and abetting one another in total disregard of their fiduciary duties, are depriving Plaintiff and the Class of the true value of their investment in the Archstone UPREIT and/or the entity formed as a result of the Merger (the "Company").

34.     Each Director Defendant herein is sued individually, as a conspirator and aider and abettor, as well as in his or her capacity as an officer and/or director of the Archstone REIT and the Archstone UPREIT, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

### III.     JURISDICTION AND VENUE

35.     The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) in that the matter in controversy, upon information and belief, exceeds the sum of $5,000,000.00

exclusive of interest and costs, and is a class action in which members of the Class are citizens of states other than Colorado.

36.     Upon information and belief, at least one Class Member is a citizen of a state different than the Defendants.  Plaintiffs are seeking relief on behalf of a nationwide class and believe that Class Members reside in states throughout the country.

37.     Upon information and belief, more than two-thirds of the Class Members are not citizens of the state in which this action was filed.

38.     The principal injuries to the Class were incurred throughout the United States and were not principally incurred in the state where the action was originally filed.

39.     Upon information and belief, Colorado citizens do not comprise greater than one-third of the Plaintiff Class.

40.     Upon information and belief, Defendants are, for jurisdictional purposes, citizens of Colorado.  Defendants are not charitable organizations.

41.     This action does not satisfy the exemptions to jurisdiction found in 28 U.S.C. §§ 1332(d)(4)(A) and (B).

42.     This action does not satisfy the exemptions to jurisdiction found in 28 U.S.C. § 1332(d)(3).

43.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District.  Moreover, Defendants have received substantial compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Real Estate Investment Trusts

44.   A Real Estate Investment Trust ("REIT") is an entity that owns and manages income-producing real estate such as apartments, offices and industrial space.  Along with meeting additional criteria, to qualify as a REIT the entity must:

- pay at least 90% of its taxable income to its shareholders every year;

- have at least 100 shareholders;

- invest at least 75% of its total assets in real estate; and

- derive at least 75% of its income from rent or mortgage interest from properties in its portfolio.

45.   One of the most beneficial aspects of a REIT is the method in which taxes are handled.  A REIT may deduct the dividends paid to the shareholders from its corporate tax bill. Therefore, a REIT generally does not pay federal corporate income tax and taxes are only paid by the individual investor for the dividends received and any capital gains.

46.   REIT investors also enjoy the advantages of limited liability and transferability of shares (*i.e.,* liquidity) that a corporate structure offers, without incurring the costs of double taxation.  Thus, a REIT is essentially a combination of a corporation and a partnership in that it combines the benefits of a corporation with the tax pass-through nature of a partnership.

47.   An UPREIT is a partnership (Umbrella Partnership Real Estate Investment Trust). A typical UPREIT is created by a group of sponsors who form a limited partnership and contribute their property to the UPREIT in return for limited partnership interests in the UPREIT.  Simultaneously, a corporation, typically the REIT, contributes cash that it raised in a

public offering in return for a general partnership interest in the UPREIT.  The resulting partnership is called an UPREIT.

48.     The managing general partner of an UPREIT is usually a REIT.  Because the REIT is the managing general partner of the UPREIT, it is responsible for the strategic direction of the UPREIT, as well as the management and administration of the properties held by the UPREIT.

49.     By contributing real estate to an UPREIT, sponsors can mitigate the level of risk associated with the property they contributed by becoming equity holders in a much larger entity that owns a diverse portfolio of real estate assets.  Sponsors also avail themselves of the opportunity to eliminate the personal liabilities that encumber their contributed property by having the UPREIT assume these liabilities.

50.     In most UPREITs, the sponsors receive limited partnership interests that are easily convertible into common stock of the managing partner REIT.  As a result, the limited partnership interests are easily sellable on the open market.

B.     **Archstone-Smith Trust's and Archstone-Smith Operating Trust's Structure as an UPREIT**

51.     Archstone-Smith Operating Trust was structured as an UPREIT.

52.     Archstone-Smith Trust was a REIT with its common shares publicly traded on the New York Stock Exchange.  The Archstone REIT was the managing general partner of the Archstone UPREIT.  Because the Archstone REIT was the managing general partner of the Archstone UPREIT, it was responsible for the strategic direction of the UPREIT, as well as the management and administration of the properties held by the UPREIT.  Moreover, the Archstone REIT was the sole trustee and owned 88.2% of the Archstone UPREIT at December 31, 2006.

53.     As of December 31, 2006, the Archstone REIT and Archstone UPREIT (sometimes collectively referred to as the "Archstone Entities") owned or had an ownership position in 348 communities, representing 88,011 units, including units under construction.  The Archstone Entities were engaged primarily in the acquisition, development, redevelopment, operation and long-term ownership of apartment communities in the United States.

54.     In the Archstone UPREIT, like most UPREITs, the limited partners (here the A-1 Unit holders) received limited partnership interests that were convertible into common stock of the Archstone REIT.  The primary purpose of this feature was to give A-1 Unit holders liquidity in their investment.  Rather than being restricted to holding an illiquid limited partnership interest in the Archstone UPREIT, the A-1 Unit holders could redeem their interests for cash or convert their interests to common stock in the publicly traded Archstone REIT and then sell the stock in the open market.

55.     The Archstone UPREIT also offered valuable tax advantages to the A-1 Unit holders.  For example, generally transfers of appreciated property to a REIT are taxable events.  Thus, under the basic REIT form, a sponsor who contributes appreciated property to the REIT must recognize gain in an amount equal to the excess of the value of the stock received over the basis of the property contributed.  This tax ramification, however, applies only to corporations, not to partnerships.  By utilizing the Archstone UPREIT, A-1 Unit holders were able to contribute their property to the Archstone UPREIT, rather than to the Archstone REIT, with the result being tax deferred treatment of the transactions.

**C.    Plaintiffs and Members of the Class Were Afforded Significant Tax Protections and Liquidity Rights Upon Contributing Their Properties to the Archstone UPREIT**

56.     In the late 1990's, realizing the tax benefits and liquidity advantages of an UPREIT, many real estate investors, including partnerships Plaintiffs were investors in, agreed to

contribute their properties to various UPREITS in exchange for limited partnership interests ("Sponsors").

57.     Oftentimes, the Sponsors' real estate contribution agreements and partnership agreements with the UPREITS provided them with certain tax benefits, dividends and liquidity. For example, the Plaintiffs' contribution agreements with Charles E. Smith Residential Realty L.P. ("Smith UPREIT") provided that for a period of time following the closings of their real estate contributions, the Smith UPREIT could not dispose of any interest in the property contributed by Plaintiffs that resulted in them realizing a taxable gain.  If such a gain was triggered, the Plaintiffs were to be indemnified by the Smith UPREIT for any resulting tax liability.

58.     The Plaintiffs' contribution agreements also provided that they could redeem their UPREIT units for cash or tradable common stock of the Charles E. Smith, Inc. REIT.

59.     On October 31, 2001, the Smith UPREIT merged with and into the Archstone UPREIT.  The foregoing tax protections and liquidity provisions were all contained in binding contribution agreements assumed by the Archstone UPREIT and Archstone REIT as well the declaration of trust governing the Archstone UPREIT and Archstone REIT.

60.     Upon information and belief, Plaintiffs' tax protections and liquidity provisions were common in most real estate contribution and partnership agreements with UPREITS, including those with the Archstone UPREIT.

61.     Indeed, the Archstone UPREIT agreed in its Declaration of Trust, for the benefit of the hundreds, if not thousands of A-1 unit holders with tax and liquidity provisions virtually identical to those of the Plaintiffs, not to sell, exchange or otherwise dispose of, except in tax-free or tax-deferred transactions, any of the specifically enumerated properties that were held by

a wholly owned subsidiary of the Archstone UPREIT.  According to the Declaration of Trust, these restrictions were to be effective until January 1, 2022.

62.     Moreover, each A-1 Unit issued pursuant to contribution agreements with tax protections and liquidity provisions virtually identical to those contained in Plaintiffs' contribution agreements was subject to a unit redemption right at the option of the A-1 Unit holder.  This redemption right required the Archstone UPREIT to acquire the unit holder's A-1 Unit for the market price of Archstone REIT common shares.  The Archstone REIT, in its discretion, could elect to assume and directly satisfy the Archstone UPREIT's redemption obligation, in which case the Archstone REIT would pay the redeeming unit holder in Archstone REIT common shares, or their cash equivalent.

63.     In addition, the Archstone UPREIT was contractually obligated to maintain specified levels of borrowings outstanding with respect to the properties contributed by Plaintiffs and members of the Class, and A-1 Unit holders were to receive quarterly dividend distributions from the Archstone UPREIT.

64.     These provisions were intended to ensure that Plaintiffs and members of the Class would be able to continue to defer the gain that would otherwise be recognized by them for tax purposes: (i) upon a sale by the Archstone UPREIT of any of the properties contributed by Plaintiffs or the members of the Class; (ii) upon the sale by the Archstone UPREIT of any of its interest in a subsidiary owning the properties contributed by Plaintiffs or the members of the Class; or (iii) upon the repayment of borrowings relating to the properties contributed by Plaintiffs or the members of the Class.  If the Archstone UPREIT sold any of the properties contributed by Plaintiffs or members of Class, or any interest therein, without satisfaction of certain conditions, or repaid borrowings relating to the contributed properties, the Archstone

UPREIT was liable for the loss of tax benefits and could be liable for monetary damages for engaging in these undertakings.

1.  **The Archstone Entities' Merger Agreement With the Tishman-Lehman Partnership Circumvents the Benefits Provided to the Plaintiffs and Other A-1 Unit Holders**

       1.  *The Merger's Background*

65.     On April 30, 2007, an unidentified company submitted a non-binding written indication of interest to acquire the Archstone Entities for a cash purchase price of $64 per Archstone REIT common share and $64 per Archstone UPREIT common unit.

66.     On May 2, 2007, the Tishman-Lehman Partnership submitted a written indication of interest to acquire the Archstone Entities for a cash purchase price of $64 per Archstone REIT common share and $64 per Archstone UPREIT common unit.

67.     On May 15 and 16, 2007, the Archstone REIT's board of trustees became aware of concerns on the part of both bidders with respect to the "significant magnitude of the built-in gain associated with certain of [Archstone's] properties that are subject to tax protection agreements with operating trust unitholders and the magnitude of the increase in property taxes as a result of the transaction."  Archstone Smith Operating Trust Form 424B3, filed Aug. 9, 2007, at 56.

68.     On May 19 and 20, 2007, the Tishman-Lehman Partnership indicated to Morgan Stanley, the Archstone Entities' financial advisor, that "due to increased expected transaction costs resulting from their better understanding of the magnitude of the company's tax protection obligations and due to adverse changes in the debt markets, they were uncertain whether any offer that they were to submit would be at a price equal to their initial indication of $64.00 per common share and unit."  *Id.* at 58.

69.     On May 23, 2007, the Tishman-Lehman Partnership contacted Morgan Stanley and offered to acquire the Archstone Entities at a price of $60 per Archstone REIT common share and $60 per Archstone UPREIT common unit.  This offer represented a 6.25% decrease over a period of only three weeks, which Tishman-Lehman Partnership indicated "was primarily a result of information obtained in their confirmatory due diligence regarding, among other things, the magnitude and scope of our tax protection arrangements, the compression in returns that they could expect to realize from our development pipeline, and the deterioration of the debt capital markets." *Id.* at 59.  In addition, the Tishman-Lehman Partnership "indicated that they had determined that there were significant transaction costs exclusive of the impact on value associated with the Company's tax protection obligations." *Id.*  In response, the Archstone REIT's board of trustees instructed Morgan Stanley to present a counterproposal of $62 per common share and common unit.

70.     On May 24, the Tishman-Lehman Partnership increased its offer to $61 per common share and common unit.  Later that day, the Tishman-Lehman Partnership indicated that it was unwilling to pay $61 per common share and common unit unless the second quarter dividend was not paid.  In response, Archstone REIT's board of trustees instructed Morgan Stanley to inform the Tishman-Lehman Partnership that the board would accept a price of $60.75 per common share and common unit and pay the second quarter dividend of $0.4525 per common share and common unit.

71.     By the close of business on May 29, 2007, the Archstone REIT's shares traded at $61.45, a material premium to the Merger Agreement's consideration of $60.75 per share.  Furthermore, the Archstone REIT's common stock price traded well above the Merger Agreement's consideration as recently as January 30, 2007.  In fact, the Archstone REIT's

common shares have lost a considerable amount of their value between late January 2007, and the day prior to the announcement concerning the Merger Agreement were and are poised to enjoy significant gains as slumping house prices cause individuals to rent, rather than buy, properties in large commercial markets.

### 2.      *The Merger Agreement*

72.      On May 29, 2007, the Archstone REIT publicly announced that it signed a definitive merger agreement to be acquired by the Tishman-Lehman Partnership in a transaction valued at approximately $22.2 billion, including the assumption and refinancing of the Archstone REIT's outstanding debt and excluding transaction costs.

73.      Pursuant to the Merger Agreement, the Tishman-Lehman Partnership agreed to acquire all outstanding common shares of the Archstone REIT in exchange for $60.75 per share in cash.  The Archstone REIT reported that the purchase price per share represented a 22.7% premium over the share price on May 24, 2007, immediately before published reports regarding a potential acquisition.

74.      The Merger Agreement also provided that holders of A-1 Units were entitled to one newly issued Series O Unit for each existing A-1 Unit.  Alternatively, A-1 Unit holders could "elect" to receive: (a) $60.75 per A-1 Unit in cash, without interest and less applicable withholding taxes; or (b) a combination of the cash consideration and Series O Units.

75.       Moreover, pursuant to the Merger Agreement no additional quarterly dividend distributions would be paid to A-1 Unit holders prior to the completion of Merger.

76.      A-1 Unit holders were allowed until 11:59 P.M., EST, on September 10, 2007, to make an "election" for their common units, which deadline was later extended until September 18, 2007.

77.     Had the A-1 Unit holders been told that the Archstone REIT and Archstone UPREIT were engaged in negotiating a transaction that would eliminate their dividend, liquidity and tax benefits, the A-1 holders could have redeemed their A-1 Units before they were informed of the Merger, and at prices substantially higher than the $60.75 per unit Merger price.

### 3.     The A-1 Unit Holders' Tax Benefits Are Recognized as an Integral Part of the Archstone Entities' Economic Structure

78.     As indicated above, prior to the Merger Agreement being consummated, at least one additional unidentified company was involved in bidding on the acquisition of the Archstone UPREIT and the Archstone REIT.

79.     Interestingly, both the unidentified company and the Tishman-Lehman Partnership explained on numerous occasions that their offer prices to acquire the Archstone entities were based upon, among other things, the magnitude and scope of the Archstone UPREIT's tax protection arrangements with A-1 Unit holders.  All potential acquirers came to the same conclusion -- that the UPREIT's tax protection and other obligations were contractual obligations that would survive the Merger and therefore the potential acquirers felt that they needed to factor that liability into the acquisition price.  Accordingly the potential liability to the acquirers of the tax protection obligations caused the acquirers to lower the price to be offered which lowered the price at which A-1 unit holders could "elect" to cash out at the time of the Merger.  In fact, this factor ultimately led to the unidentified company's decision not to submit an offer to acquire the Archstone Entities.  Yet, despite the prospective buyers' lack of willingness to acquire the Archstone Entities at an adequate price, Defendants persisted on reaching a deal with the Tishman-Lehman Partnership, even if it meant that the A-1 Unit holders would suffer severe tax consequences or have the liquidity of their investments severely impaired.

80.     Moreover, even though Plaintiffs' and A-1 Unit holders' tax protection agreements were among one of the most significant factors in determining the lower final acquisition price of the Archstone UPREIT and the Archstone REIT, the Individual Defendants, the Archstone REIT, the Archstone UPREIT and the Tishman-Lehman Partnership refused to provide A-1 Unit holders with compensation for elimination of the tax protection agreements and refused to preserve a host of other contractual benefits contained in the contribution agreements for A-1 Unit holders.

### 4.     *The Negative Effects of the Merger on A-1 Unit Holders*

81.     The Merger has had negative financial consequences for both A-1 Unit holders that "elected" to receive the Tishman-Lehman Partnership's cash offer and A-1 Unit holders that "elected" to convert or otherwise had their A-1 Units converted to Series O Units.

82.     The A-1 Unit holders that were forced to accept the Tishman-Lehman Partnership's cash offer have had to recognize capital gain in an amount equal to the amount of gain they originally deferred when their properties were contributed to the Archstone UPREIT. Upon information and belief, such gains have resulted in millions of dollars of tax liability for many A-1 Unit holders.

83.     Alternatively, the A-1 Unit holders that were forced convert their units to Series O Units have been forced to forfeit the liquidity they enjoyed before the Merger and are now saddled with owning an investment in a private company that will likely be highly leveraged with debt.

84.     For example, the Merger Agreement provides that after five years Series O Unit holders can redeem any or all their units at a cash redemption of $60.75 per unit plus all accumulated and unpaid distributions, if any, through the redemption date.  Hence, the Series O

Units will be completely illiquid for a minimum of five years and the Series O Unit holders will be deprived of any increase in the value of the underlying properties.

85.     Yet, even after the expiration of the five-year redemption waiting period described above, Series O Unit holders may only gradually liquidate their investment because the Company will not be required to redeem more than one-third of the Series O Units outstanding in any twelve month period.  If the Company receives redemption notices for a number of Series O Units in excess of the limit, it will redeem the units in the order that it received the redemption notices rather than pro rata.

86.     Thus, Series O Unit holders will be forced to hold an almost completely illiquid asset for a minimum of five years since these units are not publicly traded in the market, and even after this five year period, the liquidity of these units will be severely limited and possibly eliminated altogether.  The Company, however, has the right to redeem all of the Series O units for cash at $60.75 per unit any time after the fifth anniversary of the Merger.

87.     Plaintiffs and members of the Class are also damaged by the Archstone UPREIT's failure to pay third quarter dividends to A-1 Unit holders, as well as the Company's failure to plan for the regular payment of dividends to Series O Unit holders.  Previously, Plaintiffs and members of the Class had available the distributions that they regularly received from the Archstone UPREIT to defray taxes on gains.  As a result of A-1 Unit holders not receiving their third quarter dividends, however, they will not be able to defray a significant portion of their tax liability.  Moreover, following the Merger, A-1 Unit holders will likely no longer be able to defray their taxes because the payment of the six percent dividend on Series O Units is discretionary and, according to a source at the Archstone REIT, the Company has no current plan to pay dividends and does not know when it will begin, if ever, paying them.  Thus, Plaintiffs

and members of Class will likely now be forced to pay taxes on "phantom income" allocated to them, but for which there are no cash distributions with which to pay the taxes.

88.     Yet, there are additional adverse consequences that the Merger has upon Plaintiffs and members of the Class, which include, but are not limited to the following:

a.      Before the Merger, A-1 Units were protected by anti-dilution measures in the Archstone UPREIT's governing documents.  After the Merger, these anti-dilution measures were eliminated.

b.      Before the Merger, A-1 Unit holders were entitled to their pro rata share of the proceeds of dissolution, liquidation, or winding up remaining after payment of the Archstone UPREIT's debts and satisfaction of the preferences of any class or series of units entitled to a preference in dissolution, liquidation, or winding up over the Archstone UPREIT's common units.  After the Merger, Series O Unit holders are only entitled to $60.75 per share plus any unpaid distributions.

c.      Before the Merger, the Archstone UPREIT was managed by the Archstone REIT, and the Archstone REIT could not take any action that was contrary to an express limitation or prohibition in the declaration of trust without an amendment to that provision adopted under the Archstone UPREIT Declaration of Trust.  After the Merger, the protection of allowing limited or prohibited action only after amendment of the Archstone UPREIT Declaration of Trust was eliminated.

d.      Before the Merger, the Archstone REIT was generally prohibited from, directly or indirectly, entering into or conducting any business other than in connection with the ownership, acquisition and disposition of its and the management of its business activities.  After the Merger the Company can engage in business activities in addition to those relating to the newly formed UPREIT, including business interests and activities that are in direct competition with newly formed UPREIT.

e.      Before the Merger, A-1 Unit holders received quarterly and annual financial reports.  After the Merger, Series O Unit holders will receive only annual financial reports.

89.     Hence, Plaintiffs and members of the Class have sustained and will continue to accrue significant damages as a result of the Merger.

## IV.     CLASS ACTION ALLEGATIONS

95.     Plaintiffs bring this action on their own behalf and as a class action pursuant to

Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all

Class A-1 Common Unit holders of Archstone-Smith Operating Trust at the time of the Merger

(the "Class").

96.     Subject to additional information obtained through further investigation and

discovery, the Class definition may be expanded or narrowed by amendment or amended

complaint.  Specifically excluded from the Class are Defendants, their officers, directors, agents,

trustees, parents, children, corporations, trusts, representatives, employees, principals, servants,

partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns,

or other persons or entities related to or affiliated with Defendants and/or their officers and/or

directors, or any of them; the Judge assigned to this action, and any member of the Judge's

immediate family.

97.     **Numerosity**.  Plaintiffs are informed and believe, and on that basis allege, that the

proposed Class contains hundreds, if not thousands of similarly situated A-1 Unit holders of

record scattered throughout the United States.  Upon information and belief, hundreds, if not

thousands of other A-1 Unit holders enjoyed similar, if not identical liquidity and tax benefits

through their agreements with the Archstone UPREIT.  The precise number of Class Members is

unknown to Plaintiffs.  The true number of Class Members is known by Defendants, however,

and thus, may be notified of the pendency of this action by first class mail, electronic mail, and

by published notice.

98.     **Existence and Predominance of Common Questions of Law and Fact**.

Common questions of law and fact exist as to all members of the Class and predominate over

any questions affecting only individual Class Members.  These common legal and factual

questions include, but are not limited to, the following:

     i.     Whether the Defendants have breached their fiduciary duties owed by them to Plaintiffs and the Class, and/or have aided and abetted in such breach, by virtue of their participation and/or acquiescence and by their other conduct complained of herein;

     ii.     Whether Defendants breached their contracts with Plaintiffs and members of the Class;

     iii     Whether Tishman Speyer and Lehman Brothers have tortiously interfered with the A-1 Unit holders contracts; and

     iv.     Whether Plaintiffs and members of the Class have sustained damages as a result of Defendants' conduct, and, if so, what is the appropriate measure of damages.

99.    **Typicality**.  Plaintiffs' claims are typical of the claims of the Class Members in

that Plaintiffs and each member of the Class are all A-1 Unit holders of the Archstone UPREIT

who have and will continue to suffer financial hardship and other damages as a result of

Defendants' conduct.

100.    **Adequacy of Representation**.  Plaintiffs will fairly and adequately protect the

interests of the members of the Class.  Plaintiffs have retained counsel experienced in complex

class action litigation, and Plaintiffs intend to prosecute this action vigorously.  Plaintiffs have no

adverse or antagonistic interests to those of the Class.

101.    **Superiority**.  A class action is superior to all other available means for the fair

and efficient adjudication of this controversy.  The damages or other financial detriment suffered

by individual members of the Class is relatively small compared to the burden and expense that

would be entailed by individual litigation of their claims against the Defendants.  It would thus

be virtually impossible for the members of the Class, on an individual basis, to obtain effective

redress for the wrongs done to them.  Furthermore, even if members of the Class could afford such individualized litigation, the court system could not.  Individualized claims brought by members of the Class would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

102.     The requirements for maintaining this action as a class action under Rules 23(b)(1) and (b)(2) are also satisfied:

a.     Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants.  Alternatively, adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests, particularly in light of the fact that Plaintiffs seek to obtain relief on behalf of all A-1 Unit holders; and

b.     Defendants have acted and/or failed to act, on grounds generally applicable to the Class, thereby making appropriate monetary relief, final injunctive and other equitable relief with respect to the Classes as a whole.

## COUNT I

### BREACH OF CONTRACT
**(Against the Archstone UPREIT and the Archstone REIT)**

103.    Plaintiffs repeat and reallege the previous paragraphs as if fully set forth herein.

104.    Plaintiffs and members of the Class executed enforceable property contribution agreements and partnership agreements with the Archstone UPREIT.

105.    Under the contribution agreements and partnership agreements, the Archstone UPREIT and the Archstone REIT agreed not to enter into any transactions or dispose of any interest in the property contributed by the A-1 Unit holders that resulted in them realizing a taxable gain and to provide A-1 Unit holders with the ability to liquidate their units by receiving cash or converting them to common shares in the publicly traded Archstone REIT.

106.    The Archstone UPREIT and the Archstone REIT, as the general managing partner of the Archstone UPREIT, failed to perform their duties under the contribution and partnership agreements and statutory and common law partnership principles, and thereby breached their contractual obligations by failing to honor certain liquidity provisions in the contribution and partnership agreements and by failing to act independently so that the interests of A-1 Unit holders would be protected.

107.    Instead, the Archstone REIT and the Individual Defendants have accepted the Merger Agreement, which subjects Plaintiffs and members of the Class either to adverse tax consequences or completely strips them of their liquidity rights, in violation of the contribution and partnership agreements.

108.    The Archstone Entities' failure to perform their duties under the contribution and partnership agreements have and will continue to cause financial and other damage to Class A-1 Common Unit holders.

109.    The Archstone Entities' failure to perform their duties under the contribution and partnership agreements is material in nature thereby discharging any and all obligations Plaintiffs and the members of the Class owe to the Archstone Entities under the contribution and partnership agreements.

110.    Plaintiffs and the members of the Class have performed all conditions precedent to enable them to recover the relief sought herein, or such conditions have been excused or waived.

## COUNT II

### BREACH OF FIDUCIARY DUTIES - MAJORITY OPPRESSION
### OF THE MINORITY A-1 UNIT HOLDERS
**(Against the Archstone REIT and against the Individual Defendants
and Tishman-Lehman Partnership for the aiding and abetting thereof)**

111.    Plaintiffs repeat and reallege the previous paragraphs as if fully set forth herein.

112.    At all relevant times, the Archstone REIT was the majority owner of the Archstone UPREIT, owning of over 89% of the equity of the Archstone UPREIT.

113.    As majority owner, the Archstone REIT owed a fiduciary duty to the minority A-1 Unit holders to avoid using its majority ownership in bad faith or in reckless disregard of its duties as trustee to oppress the minority owners.

114.    The actions of the Archstone REIT in negotiating, formulating and voting in favor of the Merger of Archstone Entities with the Tishman-Lehman Partnership, however, were committed in bad faith and with reckless disregard of its duties as trustee and constitute oppression of the minority by the majority and have resulted in damage and loss to Plaintiffs and members of the Class.

115.    More specifically, the Merger proceeded without a vote of Plaintiffs and members of the Class, thereby disenfranchising the A-1 Unit holders.  The Archstone REIT approved the Merger pursuant to a written consent dated and effective as of August 31, 2007.

116.    As a result of the Merger, Plaintiffs and the members of the Class were entitled to receive one newly issued Series O Unit per each existing A-1 Unit.  Alternatively Plaintiffs and the members of  the Class were offered an "election" to receive in exchange for their A-1 Units either $60.75 per unit in cash, without interest and less applicable withholding taxes or a combination of the cash consideration and Series O Units.

117.    Plaintiffs and the members of the Class were also forced to forgo any dividends owed to them by the Archstone UPREIT for the third quarter of fiscal year 2007.

118.    The Archstone REIT used its majority power in bad faith and with reckless disregard to its duties as trustee to: (1) disenfranchise the minority; (2) coerce the minority into converting their A-1 Units for cash with less than the fair value of the allocable share of the equity, assets and earnings of the Archstone UPREIT; (3) deprive the minority A-1 Unit holders of the financial benefits of the dividends and tax agreements; and (4) destroy the liquidity of the A-1 Units.

119.    The Individual Defendants and the Tishman-Lehman Partnership separately and jointly acted to intentionally force an entirely unfair transaction on the minority A-1 Unit holders with knowledge that the Archstone REIT and the Archstone UPREIT owed fiduciary duties to the A-1 Unit holders and with knowledge that the Archstone REIT was breaching its fiduciary duties to Archstone UPREIT and the A-1 Unit holders.

## COUNT III

### BREACH OF FIDUCIARY DUTIES – SELF DEALING
**(Against the Archstone REIT and the Individual Defendants
and against the Tishman-Lehman Partnership for the aiding and abetting thereof)**

120.    Plaintiffs repeat and reallege the previous paragraphs as if fully set forth herein.

121.    At all relevant times, the Individual Defendants and the Archstone REIT, as the sole trustee and majority owner of Archstone UPREIT, had:  (1) a fiduciary duty to the minority A-1 Unit holders to, in good faith, act in the best interests of all A-1 Unit holders; (2) a fiduciary duty not to act in reckless disregard of its duties as trustee; (3) a duty not to self-deal with the Archstone UPREIT on terms that were more beneficial to the Archstone REIT, its directors and officers, or any of its affiliates than to the minority holders; (4) a fiduciary duty to deal at arms length with the Archstone UPREIT and in such dealings to eliminate all conflicts of interests; and (5) a fiduciary duty to ensure that in all dealings with the Archstone UPREIT were maintained an "entire fairness" standard, meaning that any transactions between the Archstone REIT and Archstone UPREIT must be achieved, if at all, through a fair process at a fair price.

122.    The Archstone REIT breached its fiduciary duties by, *inter alia*:  (1) refusing to allow A-1 Unit holders to vote on the Merger; (2) refusing to appoint an independent committee to act on behalf of the Archstone UPREIT; (3) refusing to require that any transaction between Archstone REIT (and any affiliates thereof) and Archstone UPREIT be approved by a majority vote of the A-1 and A-2 Unit holders voting separately as a class; and (4) refusing to allow the Archstone UPREIT to engage investment and legal advisers to advise on the fairness of any transactions, from a procedural and financial view to the minority holders.

123.    As a result of the Archstone REIT's and the Individual Defendants' self-dealing and reckless disregard of their duties as trustees and officers of the trust, and the aiding and

abetting thereof by the Tishman-Lehman Partnership, Plaintiffs and the Class have sustained loss and damage to the value of their A-1 Units.

124.    The Tishman-Lehman Partnership separately and jointly acted to intentionally force an entirely unfair transactions on the minority A-1 Unit holders with knowledge that the Archstone REIT and the Individual Defendants owed fiduciary duties to Archstone UPREIT and the Class A-1 Unit holders and with knowledge that the Archstone REIT and Archstone UPREIT were breaching their fiduciary duties to A-1 Unit holders.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  November 30, 2007

**STEVEN A. STENDER and INFINITY CLARK STREET OPERATING, on behalf themselves and all others similarly situated,**

s/Gerald L. Bader, Jr.
    Gerald L. Bader, Jr.
    Renée B. Taylor
    **BADER & ASSOCIATES, LLC**
    14426 East Evans Avenue
    Suite 200
    Denver, Colorado  80014
    Telephone:  303-534-1700

    Kenneth A. Wexler
    Edward A. Wallace
    Christopher J. Stuart
    Andrae P. Reneau
    **WEXLER TORISEVA WALLACE LLP**
    55 West Monroe Street
    Suite 3300
    Chicago, Illinois  60603
    Telephone:  312-346-2222

Lee Squitieri
**SQUITIERI & FEARON, LLP**
32 East 57th Street
2nd Floor
New York, New York  10022
Telephone:  212-421-6492

Plaintiffs' addresses:

Steven A. Stender
900 Elm Place
Glencoe, Illinois 60022

Infinity Clark Street Operating
20 North Wacker Drive
Suite 1725
Chicago, Illinois 60606