IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 07–cv–02503–EWN–MJW


STEVEN A. STENDER, and
INFINITY CLARK STREET OPERATING, on behalf of
themselves and all others similarly situated,

      Plaintiffs,

v.

ERNEST A. GERARDI, JR.,
RUTH ANN M. GILLIS,
NED S. HOLMES,
ROBERT P. KOGOD,
JAMES H. POLK III,
JOHN C. SCHWEITZER,
R. SCOT SELLERS,
ROBERT H. SMITH,
STEPHEN R. DEMERITT,
CHARLES MUELLER JR.,
CAROLINE BROWER,
MARK SCHUMACHER,
ALFRED G. NEELY,
ARCHSTONE-SMITH OPERATING TRUST,
ARCHSTONE-SMITH TRUST,
LEHMAN BROTHERS HOLDINGS, INC., and
TISHMAN SPEYER DEVELOPMENT CORPORATION,

      Defendants.

---

**ORDER AND MEMORANDUM OF DECISION**

---

This is a putative class action lawsuit sounding in contract and tort. Plaintiffs Steven A. Stender ("Stender") and Infinity Clark Street Operating ("Infinity") (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, allege that Defendants Archstone Smith Operating Trust ("Archstone UPREIT") and Archstone Smith Trust ("Archstone REIT") (collectively the "Archstone Entities"), and their individual directors, officers, and/or trustees (collectively the "Individual Defendants"), breached various contractual provisions with and fiduciary duties owed to Plaintiffs by entering into a merger with Defendants Lehman Brothers Holdings, Inc. ("Lehman"), and Tishman Speyer Development Corporation ("Tishman") (collectively the "Lehman-Tishman Partnership"). Plaintiffs also allege that the Lehman-Tishman Partnership aided and abetted the Archstone Entities' and Individual Defendants' breaches of fiduciary duties owed to Plaintiffs.

This matter is before the court on: (1) "Defendants' Motion to Stay or to Dismiss in Favor of Arbitration and to Dismiss for Failure to State a Claim," filed January 29, 2008; (2) "Plaintiffs' Motion to Strike Section I.B of Defendants' Reply Memorandum in Further Support of Defendants' Motion to Stay or Dismiss in Favor of Arbitration and to Dismiss for Failure to State a Claim or, in the Alternative, to Grant Plaintiffs Leave to File a Sur-Reply to Section I.B," filed March 14, 2008; and (3) "Motion and Memorandum of Law in Support of Plaintiffs' Motion for Class Certification," filed February 15, 2008. Jurisdiction is purportedly proper pursuant to satisfaction of the prerequisites for diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).

# FACTS

## 1.     *Factual Background*

The following facts relevant to Defendants' motion to dismiss are taken from Plaintiffs' class action complaint and presumed true for the purposes of this motion.

### a.     *Real Estate Investment Trusts ("REITs") and Umbrella Partnership Real Estate Investment Trusts ("UPREITs")*

A REIT is an entity that owns and manages income-producing real estate such as apartments, offices, and industrial space.  (Class Action Compl. ¶ 44 [filed Nov. 30, 2007] [hereinafter "Compl."].)  To qualify as a REIT, an entity must, *inter alia*: (1) pay at least ninety percent of its taxable income to its shareholders every year; (2) have at least 100 shareholders; (3) invest at least seventy-five percent of its assets in real estate; and (4) derive at least seventy-five percent of its income from rent or mortgage interest from properties in its portfolio.  (*Id.*)  Amongst the most beneficial aspects of qualifying as a REIT are the tax consequences; a REIT may deduct the dividends paid to its shareholders from its corporate tax bill.  (*Id.* ¶ 45.)  As a consequence, REITs generally do not pay federal corporate income tax, and taxes are only paid by the individual investors for dividends received and capital gains.  (*Id.*)

REIT investors enjoy the advantages of limited liability and liquidity of their shares offered by the REIT's corporate structure, but do not incur the costs of double taxation.  (*Id.* ¶ 46.)  Accordingly, a REIT is essentially a combination of a corporation and a partnership in that it combines the benefits of a corporation with the tax pass-through nature of a partnership.  (*Id.*)

An UPREIT is typically created by a group of sponsors who form a limited partnership and contribute their property to the UPREIT in exchange for limited partnership interests in the UPREIT. (*Id.* ¶ 47.) Simultaneously, a corporation, usually the REIT, contributes cash that it raises in a public offering in return for a general partnership interest in the UPREIT. (*Id.*) The resulting partnership is called an UPREIT, and the managing general partner of the UPREIT, responsible for its strategic direction and the management and administration of its properties, is usually a REIT. (*Id.* ¶¶ 47–48.)

By contributing real estate to an UPREIT, sponsors can mitigate the level of risk associated with the property they contribute by becoming equity holders in a much larger entity that owns a diverse portfolio of real estate assets. (*Id.* ¶ 49.) Sponsors can also eliminate personal liabilities encumbering their contributed properties by having the UPREIT assume such liabilities. (*Id.*) In most UPREITs, the sponsors receive limited partnership interests that are easily convertible into common stock of the managing partner REIT. (*Id.* ¶ 50.) Thus, limited partnership interests in UPREITs are easily sellable on the open market. (*Id.*)

Sponsors who contribute property to UPREITs, as opposed to REITs, also generally enjoy the benefits of deferred taxation. (*See id.* ¶ 55.) Specifically, while transfers of appreciated property to REITs are generally taxable events, requiring the sponsors who contribute such property to recognize gains in the amount of the excess value of the stock received over the basis of the property contributed, this tax ramification does not apply to UPREITs, which are not corporations. (*Id.*) Instead, sponsors who contribute properties to UPREITs generally enjoy tax deferred treatment of their transactions. (*See id.*)

Realizing the tax benefits and liquidity advantages of UPREITs, many real estate investors in the late 1990s — including partnerships in which Plaintiffs were investors — began contributing their properties to various UPREITs in exchange for limited partnership interests. (*Id.* ¶ 56.)

### b.     *Archstone REIT and Archstone UPREIT*

Archstone REIT was organized under Maryland law and engaged primarily in the acquisition, development, redevelopment, operation, and long-term ownership of apartment communities in the United States. (*Id.* ¶ 31.) Archstone REIT's common shares publically traded on the New York Stock Exchange. (*Id.* ¶ 52.) Archstone UPREIT was a limited partnership organized under Maryland law, and issued limited partnership interests known as A-1 Units.[1] (*Id.* ¶ 32.) The above-captioned Individual Defendants were all simultaneously directors, officers, and/or trustees of both Archstone Entities. (*See id.* ¶¶ 12–28.)

Archstone REIT owned approximately eighty-nine percent of Archstone UPREIT. (*See id.* ¶¶ 31, 52.) Archstone REIT was the sole managing general partner and sole trustee of Archstone UPREIT, and it was responsible for the strategic direction of the UPREIT, as well as

_____

[1]As discussed below, Archstone UPREIT was governed by a Declaration of Trust defining the entity as a REIT, not a limited partnership, under Maryland law. (*See, e.g.*, Defs.'s Br., Ex. A-1 Part 1 at 6 [Decl. of Trust] [defining Archstone UPREIT as a "Maryland real estate investment trust . . . formed under Title 8 of the Corporations and Associations Article of the Annotated Code of Maryland"].) Accordingly, despite Plaintiffs' contention that Archstone UPREIT was a limited partnership, I may disregard this contention because it constitutes an erroneous legal conclusion. *See, e.g.*, *GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997) ("Mere legal conclusions and factual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true.").

the management and administration of its properties.  (*Id.* ¶ 52.)  Archstone REIT's relation with

Archstone UPREIT was governed by Archstone UPREIT's Declaration of Trust.  (*Id*. ¶ 31.)  As

of December 31, 2006, the Archstone Entities owned or had an ownership position in 348

communities, representing 88,011 units, including units under construction.  (*Id.* ¶ 53.)

The limited partners in Archstone UPREIT received limited partnership interests — the

A-1 Units — that were convertible into common stock of Archstone REIT.  (*Id.* ¶ 54.)  The

primary purpose of this feature was to give A-1 Unit holders liquidity in their investment; rather

than being restricted to illiquid equity holdings in Archstone UPREIT, the A-1 Unit holders

could redeem their interests for cash, or convert them into easily sellable Archstone REIT

common stock.  (*See id.*)  Moreover, by utilizing Archstone UPREIT, A-1 Unit holders were able

to contribute their property to this entity, rather than to Archstone REIT, with resultant tax

deferred treatment of their transactions.  (*Id.* ¶ 55.)

### c.    *Plaintiffs and All Others Similarly Situated*

Plaintiff Stender is an individual and former owner of A-1 Units.  (*Id.* ¶ 10.)  Plaintiff

Infinity is a general partnership and also a former owner of A-1 Units.  (*Id.* ¶ 11.)  Plaintiffs'

contribution agreements with Charles E. Smith Residential Reatly L.P. ("Smith UPREIT"), an

UPREIT which merged with and into Archstone UPREIT in 2001, provided that, for a period of

time following closings of their real estate contributions, Smith UPREIT could not dispose of

any interest in the property contributed by Plaintiffs that resulted in them realizing a taxable

gain.  (*Id.* ¶ 57.)  If such a gain were triggered, Smith UPREIT would indemnify Plaintiffs for

any resulting tax liability.  (*Id.*)  Plaintiffs' contribution agreements also provided that they could

redeem their UPREIT units for cash or tradable common stock of the Charles E. Smith, Inc., REIT. (*Id.* ¶ 58.) Plaintiffs' tax protection and liquidity provisions were common in most real estate contribution and partnership agreements with UPREITs, including those with Archstone UPREIT. (*Id.* ¶ 60.)

Following Smith UPREIT's merger into and with Archstone UPREIT in 2001, the tax protection and liquidity provision in Plaintiffs' contribution agreements were assumed by the Archstone Entities, and also contained in Archstone UPREIT's Declaration of Trust. (*Id.* ¶ 59.) Archstone UPREIT agreed in its Declaration of Trust, for the benefit hundreds, if not thousands, of A-1 Unit holders with tax protection and liquidity provisions virtually identical to Plaintiffs', not to sell, exchange, or other dispose of, except in tax-free or tax-deferred transactions, any of the specifically enumerated properties that were held by a wholly owned subsidiary of Archstone UPREIT. (*Id.* ¶ 61.) Such restrictions were to be effective until January 1, 2022. (*Id.*) Moreover, each A-1 Unit issued pursuant to contribution agreements virtually identical to Plaintiffs' was subject to a unit redemption right at the option of the A-1 Unit holder requiring Archstone UPREIT to acquire the unit holder's A-1 Units for the market price of Archstone REIT common shares. (*Id.* ¶ 62.) Archstone REIT could elect to assume and directly satisfy Archstone UPREIT's redemption obligation by paying the redeeming unit holder in Archstone REIT common shares, or their cash equivalent. (*Id.*) In addition, Archstone UPREIT was contractually obligated to maintain specified levels of borrowings outstanding with respect to contributed properties, and A-1 Unit holders were to receive quarterly dividend distributions from Archstone UPREIT. (*Id.* ¶ 63.) If Archstone UPREIT sold any of the contributed

properties, or any interest therein, without satisfaction of certain conditions, or repaid borrowings relating to the contributed properties, Archstone UPREIT would be liable for any loss of tax benefits to Plaintiffs' and other sponsors and could be liable for monetary damages for engaging in such undertakings.  (*Id.* ¶ 64.)

### d.  *The Merger*

On April 30, 2007, an unidentified company submitted a non-binding written indication of interest to acquire the Archstone Entities at a cash purchase price of $64.00 per Archstone REIT common share, and $64.00 per Archstone UPREIT common unit.  (*Id.* ¶ 65.)  On May 2, 2007, the Lehman-Tishman Partnership submitted a similar indication of interest reciting the same price.  (*Id.* ¶ 65.)  Defendant Lehman and Defendant Tishman are Delaware corporations that own and control River Holding LP, the entity with which Archstone REIT ultimately merged, and River Trust Acquisition (MD), LLC, the entity with which Archstone UPREIT ultimately merged (collectively the "Successor Entities").  (*Id.* ¶¶ 29–30.)

In the middle of May 2007, Archstone REIT's board of trustees became aware of concerns on the part of both bidders regarding the Archstone Entities' tax protection agreements with A-1 Unit holders pertaining to such unit holders' contributed property.  (*See id.* ¶¶ 67–68.)  On May 23, 2007, the Lehman-Tishman Partnership offered to acquire the Archstone Entities at $60.00 per Archstone REIT common share and Archstone UPREIT common unit, and indicated that its reduced offer price "'was primarily a result of information obtained in [its] confirmatory due diligence regarding, among other things, the magnitude and scope of [the Archstone Entities'] tax protection arrangements . . . .'"  (*Id.* ¶ 69 [quoting a subsequent Securities and

Exchange Commission filing by Archstone UPREIT].)  Following further proposals and

counterproposals, Archstone REIT publically announced on May 29, 2007, that it had signed a

definitive merger agreement to be acquired by the Lehman-Tishman Partnership.  (*See id.* ¶¶

70–72.)

Pursuant to the merger agreement, the Lehman-Tishman Partnership agreed to acquire all

outstanding common shares of Archstone REIT at a price of $60.75 per share in cash.  (*Id.* ¶ 73.)

The agreement also provided that A-1 Unit holders were entitled to one newly issued Series O

Unit for each existing A-1 Unit, or, alternatively, could elect to receive: (1) $60.75 per A-1 Unit

in cash; or (2) a combination of the cash consideration and Series O Units.  (*Id.* ¶ 74.)  The

agreement provided that no additional quarterly dividend would be paid to the A-1 Unit holders

prior to the completion of the merger.  (*Id.* ¶ 75.)

### e. *Effects of the Merger Upon Plaintiffs and All Others Similarly Situated*

The merger has had negative financial consequences for A-1 Unit holders who elected to

receive the cash buyout price, and those who elected to convert their A-1 Units to Series O

Units.  (*Id.* ¶ 81.)  A-1 Unit holders like Plaintiff Stender who elected to take the cash buyout

price have had to recognize capital gains in the amount they originally deferred when their

properties were contributed to Archstone UPREIT.  (*Id.* ¶¶ 10, 82.)  Conversely, A-1 Unit

holders like Plaintiff Infinity who elected to convert their units to Series O Units have lost their

former liquidity because they now own equity in a private company that will likely be highly

leveraged with debt.  (*Id.* ¶ 83.)  Moreover, such Series O Unit holders may only redeem their

units at a cash redemption value of $60.75 plus all accumulated and unpaid distributions, if any,

after five years, and only then if the total number of redemption notices the Successor Entities receive in any twelve month period does not exceed one-third of the outstanding Series O Units. (*Id.* ¶¶ 84–85.)

The merger has also negatively affected the dividend distributions A-1 Unit holders previously enjoyed. (*See id.* ¶ 87.) Specifically, all A-1 Unit holders lost a final quarterly dividend distribution that Archstone UPREIT would otherwise have paid during the pendency of the merger, but which was suspended by the merger agreement. (*See id.* ¶¶ 75, 87.) Moreover, A-1 Unit holders who elected to convert their units to Series O Units will likely not receive further dividend distributions. (*See id.* ¶ 87.) Specifically, the six percent dividend on Series O Units provided under the merger agreement is discretionary and, "according to a source at the Archstone REIT, the [Successor Entities] ha[ve] no current plan to pay dividends and do not know when [they] will begin, if ever, paying them." (*Id.*)

Finally, the adverse consequences of the merger upon former A-1 Unit holders include: (1) elimination of anti-dilution measures that formerly protected A-1 Units; (2) less favorable terms to Series O Unit holders upon dissolution, liquidation, or winding up of the Successor Entities; (3) elimination of various limitations upon managerial discretion previously embodied in Archstone UPREIT's Declaration of Trust; and (4) the less frequent issuance of financial reports to Series O Unit holders. (*Id.* ¶ 88.)

## 2. *Procedural History*

On November 30, 2007, Plaintiffs filed a class action complaint in this court stating three counts for relief. (*See* Compl.) Count one alleges breach of contract against the Archstone

Entities premised upon the theory that, under contribution and partnership agreements with A-1 Unit holders, the Archstone Entities agreed: (1) not to enter into any transactions or dispose of any interest in property that such holders had contributed to Archstone UPREIT resulting in these sponsors realizing a taxable gain; and (2) to provide such unit holders with the ability to liquidate their units by receiving cash or Archstone REIT common shares. (*Id.* ¶¶ 103–10.) Plaintiffs allege that, by accepting the merger agreement, the Archstone Entities have breached such contracts by "subject[ing] Plaintiffs . . . to adverse tax consequences or completely strip[ping] them of their liquidity rights." (*Id.* ¶ 107.)

Count two alleges breach of fiduciary duty against Archstone REIT and the Individual Defendants, and against the Lehman-Tishman Partnership for aiding and abetting thereof, premised upon the theory of majority oppression of the minority. (*Id.* ¶¶ 111–19.) Specifically, this count alleges that, as majority owner of Archstone UPREIT common units, Archstone REIT owed a fiduciary duty to not act in bad faith or oppress the minority owners, and that it breached this duty by voting for the merger despite the impairment to the liquidity, dividend, and tax deferral benefits of A-1 Unit holders the merger caused. (*Id.*) In addition, count two purports to state the same breaches of fiduciary duty against Archstone REIT acting in its capacity as sole trustee of Archstone UPREIT. (*See id.* ¶¶ 113–14.)

Count three alleges breach of fiduciary duty against Archstone REIT and the Individual Defendants, and against the Lehman-Tishman Partnership for aiding and abetting thereof, premised upon the theory of self-dealing. (*Id.* ¶¶ 120–24.) Specifically, this count alleges that as both sole trustee and majority owner of Archstone UPREIT, Archstone REIT had fiduciary

duties to: (1) act in good faith; (2) not act in reckless disregard of its duties as trustee; (3) not self-deal with Archstone UPREIT on terms more beneficial to itself than to the minority unit holders; (4) deal at arms-length with Archstone UPREIT; and (5) ensure that all dealings with Archstone UPREIT satisfied an "entire fairness" standard.  (*Id.* ¶ 121.)  Plaintiffs allege Archstone REIT breached these duties by, *inter alia*: (1) refusing to let A-1 Unit holders vote on the merger; (2) refusing to appoint an independent committee to act on behalf of Archstone UPREIT; (3) refusing to require separate voting on the merger by A-1 and A-2 Unit holders; and (4) refusing to allow Archstone UPREIT to engage investment and legal advisors to advise on the fairness of the merger from the A-1 Unit holders' perspective.  (*Id.* ¶ 122.)

On January 29, 2008, Defendants moved to stay this action in favor of arbitration, or to dismiss for failure to state a claim.  (Defs.' Mot. to Stay or to Dismiss in Favor of Arbitration and to Dismiss for Failure to State a Claim [filed Jan. 29, 2008] [hereinafter "Defs.' Br."].) Specifically, Defendants argued that: (1) count one should be stayed or dismissed in favor of arbitration pursuant to an arbitration clause in Archstone UPREIT's Declaration of Trust; (2) counts two and three should be dismissed due to lack of standing, exculpation clauses in Archstone UPREIT's Declaration of Trust, Maryland's business judgment rule, and provisions in Archstone UPREIT's Declaration of Trust permitting the merger; and (3) if any count is not stayed or dismissed, the court should stay the entire action in light of the arbitrable issues.  (*Id.*) On February 19, 2008, Plaintiffs responded.  (Pls.' Mem. in Opp'n to Defs.' Mot. to Stay or to Dismiss in Favor of Arbitration and to Dismiss For Failure to State a Claim [filed Feb. 19, 2008] [hereinafter "Pls.' Resp."].)  On March 10, 2008, Defendants replied.  (Reply Mot. in Further

Supp. of Defs.' Mot. to Stay or to Dismiss in Favor of Arbitration and to Dismiss for Failure to State a Claim [filed Mar. 10, 2008] [hereinafter "Defs.' Reply"].)

On February 15, 2008, Plaintiffs moved to certify their putative class. (Mot. and Mem. of Law in Supp. of Pls.' Mot. for Class Certification [filed Feb. 16, 2008] [hereinafter "Pls.' Class Certification Br."].)

On March 14, 2008, Plaintiffs moved to strike a section of Defendants' reply on the grounds that this section raised new arguments not raised in Defendants' opening brief. (Pls.' Mot. to Strike Section I.B. of Defs.' Reply Mem. in Further Supp. of Defs.' Motion to Stay or Dismiss in Favor of Arbitration and to Dismiss For Failure to State a Claim or, in the Alternative, to Grant Pls. Leave to File a Sur-Reply to Section I.B. [filed Mar. 14, 2008] [hereinafter "Pls.' Strike Br."].) On March 19, 2008, Defendants responded. (Defs.' Opp'n to Pls.' Mot. to Strike Section I.B of Defs.' Reply Mem. or, in the Alternative, to Grant Pls. Leave to File a Surreply to Section I.B [filed Mar. 19, 2008] [hereinafter "Defs.' Strike Resp."].) On March 31, 2008, Plaintiffs replied. (Pls.' Reply in Further Supp. of Their Mot. to Strike Section I.B. of Defs.' Reply Br. or, in the Alternative, for Leave to File a Sur-Reply [filed Mar. 31, 2008] [hereinafter "Pls.' Strike Reply"].) These matters are fully briefed and ripe for review.

## ANALYSIS

### 1.    *Legal Standard*

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6) (2008). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that

the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted). Thus, all well-pleaded factual allegations in a complaint are accepted as true and construed in the light most favorable to the plaintiff. *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).

Prior to the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007), dismissal of a complaint was appropriate only when it appeared the plaintiff could prove "no set of facts" in support of the claims that would entitle him to relief. *See, e.g.*, *Coosewoon v. Meridian Oil Co.*, 25 F.3d 920, 924 (10th Cir. 1994). In *Bell Atlantic*, the Supreme Court articulated a new "plausibility" standard, under which a complaint must include "enough facts to state a claim to relief that is plausible on its face." 127 S. Ct. at 1974. *Bell Atlantic* did not, however, mark a sea change. As the Court explained in a case decided two weeks after *Bell Atlantic*, "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* (quoting *Bell Atlantic*, 127 S. Ct. at 1964); *see Alvarado*, 493 F.3d at 1215 n.2 (stating that *Bell Atlantic* and *Erickson* suggest "courts should look to the specific allegations in the complaint to determine whether they plausibly support a legal claim for relief"); *see also Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (stating that courts must take

as true "all plausible, non-conclusory, and non-speculative" facts alleged in a plaintiff's complaint).

## 2.    *Evaluation*

Defendants argue that: (1) Plaintiffs' first count should be stayed or dismissed in favor of arbitration or should be dismissed for failure to state a claim; (2) Plaintiffs' second and third counts should be dismissed due to lack of standing, exculpation clauses in Archstone UPREIT's Declaration of Trust, Maryland's business judgment rule, and provisions in Archstone UPREIT's Declaration of Trust permitting the merger; and (3) if any count is not stayed or dismissed, the court should stay the entire action in light of the arbitrable issues.  (Defs.' Br.; Defs.' Reply.)  Plaintiffs deny that dismissal or referral to arbitration are appropriate, and moreover contend that Defendants' argument for dismissal of count one premised upon failure to state a claim must be stricken from Defendants' briefing, or in the alternative, that Plaintiffs should be granted leave to file a surreply on this issue.  (Pls.' Resp.; Pls.' Strike Br.; Pls.' Strike Reply.)  Plaintiffs also move to certify their putative class.  (Pls.' Class Certification Br.)

I analyze Plaintiffs' motion to strike first, and then assess each of Defendants' arguments for stay or dismissal of each of Plaintiffs' claims.  I analyze Plaintiffs' motion to certify their putative class only if I find that any of Plaintiffs' counts survive dismissal or should not be referred to arbitration or stayed.

### a.    *Motion to Strike*

Plaintiffs move to strike section I.B of Defendants' reply brief in support of their motion to stay or to dismiss upon the theory that this section raises new arguments not originally

contained in Defendants' opening brief.  (Pls.' Strike Br.)  Alternatively, Plaintiffs request leave

to file a surreply on the issues raised in this section.  (*Id.*)  Defendants respond that this section

raised no new arguments that were not contained in their opening brief, and that their expanded

argumentation in this section responded to arguments in Plaintiffs' response.  (Defs.' Strike

Resp.)  For the following reasons, I agree with Defendants, and deny Plaintiffs' request to file a

surreply.

Arguments not raised in an opening brief are deemed abandoned and waived.  *See*

*Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1288 (10th Cir. 2003) (citation omitted).

However, if a district court "relies on new materials or new arguments in a reply brief, it may not

forbid the nonmovant from responding to these new materials."  *Pippin v. Burlington Res. Oil &*

*Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006) (citations omitted).  If a district court does

preclude a surreply, then the court can avoid error by not relying on new materials and

arguments in the movant's reply brief.  *Id.* (citation omitted).  Finally, although courts generally

do not review issues raised for the first time in a reply brief, they make an exception when the

new issues argued in reply are offered in response to arguments advanced in a response brief.

*See Beaudry v. Corr. Corp. of Am.*, 331 F.3d 1164, 1166 n.3 (10th Cir. 2003); *see also Home*

*Design Services, Inc., v. B&B Custom Homes*, 509 F. Supp. 2d 968, 971 (D. Colo. 2007)

("'[R]eply briefs reply to arguments made in the response brief — they do not provide the

moving party with a new opportunity to present yet another issue for the court's consideration.'"

[citation omitted]).

In the instant case, I find that Defendants' arguments pertaining to Plaintiffs' failure to state a claim in count one were raised in its opening brief, and hence were not "new arguments" in their reply brief requiring that I grant Plaintiffs' request to file a surreply to avoid error. *Cf. Pippin*, 440 F.3d at 1192. In their opening brief, Defendants argued that:

> Plaintiffs complain about supposed "other" contract rights — mentioning "liquidity," "dividends," "levels of borrowings," and "financial reports," — but they nowhere cite, quote nor attach any provision of any agreement demonstrating any continuing right on the part of any plaintiff to any of the foregoing benefits following the merger. These conclusory assertions *fail to state any cognizable basis for relief*, and must be disregarded.

(Pl.'s Br. at 7 [emphasis added].) In support of this argument, Defendants cited, *inter alia*, *Connolly v. Mitsui O.S.K. Lines (America), Inc.*, No. 04–5127, 2007 WL 4207836 (D.N.J. Nov. 21, 2007), and *Parrish v. NFL Players Association*, 534 F. Supp. 2d 1081 (N.D. Cal. 2007), both of which stand for the proposition that claims for breaches of contract may be dismissed where the plaintiffs fail to allege which provisions of which contracts are allegedly breached. (*See* Defs.' Br. at 8.) In their response brief, Plaintiffs addressed the sufficiency of the statement of their breach of contract claim under the subject heading, "Plaintiffs' Allegations Regarding Breach of Contract State a Basis for Relief." (Pls.' Resp. at 17.) Plaintiffs therein acknowledged that "Defendants also argue that the Court should reject certain allegations in the Complaint because they . . . '*fail to state any cognizable basis for relief*.'" (Pls.' Resp. at 17 [emphasis added].) Plaintiffs nonetheless failed to address *Connolly* or *Parrish*. (*See id.* at 17–18.) I accordingly find that Defendants' arguments pertaining to Plaintiffs' failure to state a claim in count one were not "new arguments" in their reply brief, and that their invocation of *Connolly* or

*Parrish* in this reply was not the invocation of "new materials" necessitating that I grant

Plaintiffs' request to file a surreply. *Cf. Pippin*, 440 F.3d at 1192. Moreover, I find Plaintiffs'

contention that Defendants' arguments pertaining to Plaintiffs' alleged failure to state a claim

were new to their reply because they were subsumed within a section of Defendants' opening

brief discussing the arbitrability of count one to be borderline frivolous, and note that this

contention is in any event insufficient to absolve Plaintiffs from their duty to timely respond to

Defendants' arguments. (*See, e.g.*, Pls.' Strike Br. at 2 [incorrectly claiming that Defendants'

motion to dismiss only argued that count one should be stayed or dismissed in favor of

arbitration].)

      In addition, I find that Defendants' invocation of new authority in its reply brief relating

to Plaintiffs' alleged failure to state a claim does not constitute invocation of "new materials"

because this authority properly responded to arguments in Plaintiffs' response. *Cf. Pippin*, 440

F.3d at 1192; *see also Beaudry*, 331 F.3d at 1166 n.3. Responding to Defendants' argument that

count one should be referred to arbitration pursuant to an arbitration clause in Archstone

UPREIT's Declaration of Trust, Plaintiffs argued in part that their breach of contract claim

related to "the abrogation of the Declaration of Trust in its entirety" under the merger. (Pls.'

Resp. at 6.) In reply, Defendants proffered authority showing that the termination provisions in

the Archstone UPREIT's Declaration of Trust are lawful, and that lawful termination of a

contract cannot constitute breach. (*See* Defs.' Reply at 8–9.) I find that such authority was

properly proffered in response to Plaintiffs' arguments, and thus does not require granting

Plaintiffs' request to file a surreply. *See Beaudry*, 331 F.3d at 1166 n.3 (considering an issue

first raised in a reply brief where the issue was offered in response to an argument in a response); *see also Home Design Services*, 509 F. Supp. 2d at 971 ("'[R]eply briefs reply to arguments made in the response brief . . . .'" [citation omitted]). Moreover, as demonstrated below, because I do not rely upon Defendants' new authority to support my holdings pertaining to count one, and I find Plaintiffs' request for leave to file a surreply on this issue is particularly unavailing. *See Pippin*, 440 F.3d at 1192 (noting that district court may avoid error by not relying on new materials in the movant's reply brief).

### b.      Stay or Dismissal of Count One in Favor of Arbitration, or Dismissal of Count One for Failure to State a Claim

Defendants invoke a provision of Archstone UPREIT's Declaration of Trust to prove that Plaintiffs' breach of contract claim must be stayed or dismissed for arbitration under the Federal Arbitration Act ("FAA"), and also argue that this count should be dismissed for failure to state a claim. (Defs.' Br. at 3–5; Defs.' Reply at 2–9.) I address each issue in turn.

### i.      Stay or Dismissal of Count One in Favor of Arbitration

The FAA provides in relevant part that "a written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (2006). The FAA further provides that, upon being satisfied that an issue is referable to arbitration under a written arbitration agreement, "the court . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms

of the agreement." *Id.* § 3.  Although there appears to be a circuit split upon the issue, the Tenth

Circuit holds that upon a party's proper application for a stay under section three of the FAA,

district courts must stay rather than dismiss an arbitrable case.  *See Adair Bus Sales, Inc. v. Blue*

*Bird Corp.*, 25 F.3d 953, 955 (10th Cir. 1994) (calling a district court's dismissal of an arbitrable

case when the request to dismiss was made under section three a "procedural error").

In the instant case, Defendants invoke a provision of Archstone UPREIT's Declaration of

Trust to prove that Plaintiffs' breach of contract claim must be dismissed or stayed in favor of

arbitration.  (*See* Defs.' Br. at 3–8.)  In response, Plaintiffs both deny that their dispute falls

within the scope of this arbitration agreement, and hint that other contracts may be the source of

their alleged breach of contract claim.  (*See* Pls.' Resp. at 11–18.)  At the outset, I note that at

least to the extent that Archstone UPREIT's Declaration of Trust is the source of Plaintiffs'

breach of contract claim, I may properly consider provisions in this Declaration in connection

with Defendants' motion to dismiss without converting this motion into one for summary

judgment.  *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir.

1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint,

but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant

may submit an indisputably authentic copy to the court to be considered on a motion to

dismiss.")  Plaintiffs neither dispute the authenticity of Defendants' proffered Declaration of

Trust, nor dispute that the terms contained therein apply to them.  (*See* Pls.' Resp. at 11–18;

Defs.' Br. at 5 n.2, Ex. A Part 1 at 21 [Decl. of Trust] ["This <u>Annex A</u> constitutes not only an

integral part of the Declaration of Trust but also a separate agreement among all holders of Units

. . . of the Trust, each of whom is identified on the books and records of the Trust. Each holder of Untis on the Effective Date . . . shall become a party to this agreement without further action required on the part of any such holder." (emphasis in original)].)

The arbitration clause of the Declaration of Trust provides that if any Unit holders fail to resolve their disputes with Archstone UPREIT through good faith negotiation:

> [T]he Trust and the [Unit holder] shall jointly retain a nationally recognized independent public accounting firm ("an Accounting Firm") to act as an arbitrator to resolve as expeditiously as possible all points of any such disagreement (including, without limitation, whether a breach of any of the covenants set forth [in] Section 2 . . . has occurred and, if so, the amount of damages to which the [Unit holder] is entitled as a result thereof, determined as set forth in Section 4(a)). All determinations made by the Accounting Firm with respect to the resolution of any breach or violation of any of the covenants set forth in Section 2 . . . and the amount of damages payable to the [Unit holder] under Section 4(a) shall be final, conclusive, and binding on the Trust and the [Unit holder].

(Defs.' Br., Ex. A Part 4 at 21 [Decl. of Trust].) Section 2(a) provides in relevant part that:

> The Trust agrees for the benefit of each [Unit holder], for the term of the Protected Period, not to directly or indirectly sell, exchange, transfer, or otherwise dispose of any Protected Property or any interest therein . . . to the extent that such disposition would cause a [Unit holder] to recognize part or all of the gain that would have been recognized for federal income tax purposes upon a fully taxable disposition of one or more Protected Properties . . . . Without limiting the foregoing, the term "sale, exchange, transfer or disposition by the Trust shall be deemed to include, and the prohibition shall extend to, (i) any disposition by any Subsidiary of the Trust of any Protected Property or any interest therein . . . .

(*Id.*, Ex. A Part 4 at 14 [Decl. of Trust].) "Protected Properties" refers to properties contributed by Unit holders, and the "Protected Period" extends until January 1, 2022. (*See id.*) Finally, Section 2(c) further provides:

> Any merger or consolidation involving the Trust or any Subsidiary of the Trust, whether or not the Trust is the surviving entity in such merger or consolidation,

that results in [a Unit holder] being required to recognize part or all of part of the gain that would have been recognized for federal income tax purposes upon a fully taxable disposition of one or more Protected Properties . . . shall be deemed to be a disposition of the Protected Properties for the purposes of Section 2(a).

(*Id.*, Ex. A Part 4 at 16 [Decl. of Trust].)

I find that, at least to the extent count one alleges a breach of the tax deferral provisions of Archstone UPREIT's Declaration of Trust, it must be stayed for arbitration under the above-cited language. Count one alleges that under "property contribution agreements and partnership agreements" between Plaintiffs and Archstone UPREIT, the Archstone Entities "agreed not to enter into any transactions or dispose of any interest in the property contributed by the A-1 Unit holders that resulted in them realizing a taxable gain . . . ." (Compl. ¶¶ 104–05.) In addition, count one incorporates by reference every preceding paragraph of the complaint. (*Id.* ¶ 103.) Discussing the tax deferral provisions provided in their contribution agreements with Smith UPREIT, Plaintiffs represent in earlier paragraphs of the complaint that such provisions were "assumed by . . . the declaration of trust governing the Archstone UPREIT and Archstone REIT." (*Id.* ¶ 59.) Moreover, Plaintiffs represent that:

[T]he Archstone UPREIT agreed in its Declaration of Trust, for the benefit of hundreds, if not thousands of A-1 unit holders with tax and liquidity provisions virtually identical to those of the Plaintiffs, not to sell, exchange or otherwise dispose of, except in tax-free or tax-deferred transactions, any of the specifically enumerated properties that were held by a wholly owned subsidiary of the Archstone UPREIT. According to the Declaration of Trust, these restrictions were to be effective until January 1, 2002.

(*Id.* ¶ 61.)

While the source of Plaintiffs' alleged contractual rights relating to tax deferral are thus unclear — Plaintiffs appear to argue that the source is either their contribution agreements with Smith UPREIT, or the reiteration of the provisions in such agreements in Archstone UPREIT's Declaration of Trust, or both — I find that, at least to the extent that count one alleges breach of the tax deferral provisions of Archstone UPREIT's Declaration of Trust, it must be stayed for arbitration. A claim for breach of contract relating to the tax deferral provisions of the Archstone UPREIT's Declaration of Trust premised upon the effects of the merger falls squarely within Section 2(a) of the Declaration of Trust because, under Section 2(c), a merger causing a Unit holder such as Plaintiff Stender to recognize a taxable gain that would otherwise have been deferred is deemed to be "a disposition of the Protected Properties" that triggers Section 2(a)'s indemnification provisions. (*See* Defs.' Br., Ex. A Part 4 at 14, 16 [Decl. of Trust].) Moreover, under the Declaration's arbitration clause, Archstone UPREIT and the unit holder must retain an accounting firm to arbitrate "whether a breach of any of the covenants set forth [in] Section 2 . . . has occurred." (*Id.*, Ex. A Part 4 at 21 [Decl. of Trust].) Accordingly, I find that, at least to the extent that it claims a breach of the tax deferral provisions of Archstone UPREIT's Declaration of Trust, count one must be stayed for arbitration. *See, e.g., Nat'l Am. Ins. Co. v. SCOR Reinsurance Co.*, 362 F.3d 1288, 1290 (10th Cir. 2004) (determining whether arbitration is required by "look[ing] to the scope of [the] agreement and then determin[ing] whether [a plaintiff's] claims fall within the scope").

In so holding, I note Plaintiffs' argument that their dispute is not arbitrable because it does not constitute a sale, exchange, transfer, or other disposition of their contributed property

within the meaning of Section 2(a) ignores the clear language of Section 2(c), and suggests that Plaintiffs are either intentionally trying to mislead the court, or have failed to completely read the Declaration. (*Compare* Pls.' Resp. at 12–17 [claiming that "(t)he express language of Section 2 clearly shows that the subject matter of this provision relates only to a taxable gain that is recognized by a (unit holder) as a result of the Trust disposing of protected property"], *with* Defs.' Reply at 2–6 [quoting Section 2(c), which expands the purview of Section 2(a) into mergers].) Additionally, I find Plaintiffs' suggestion that arbitration may be inappropriate because Section 2 only applies to Plaintiffs and other putative class members who contributed their property to Smith UPREIT, as opposed to all putative class members, to be without merit as: (1) Plaintiffs have cited no law to this effect; (2) Defendants have cited persuasive law to the contrary; (3) Plaintiffs allege that their breach of contract claim relating to tax deferral provisions in the Declaration of Trust pertains to "hundreds, if not thousands of A-1 unit holders;" (4) and — as discussed next — Plaintiffs have failed to state a claim for breach of any contribution agreement, thus obviating my need to determine whether such claims are properly before me, or must instead be referred to arbitration. (*See* Pls.' Resp. at 2 n.2; Defs.' Reply at 3 n.3 [citing *Robey v. Shapiro, Marianos & Cejda, LLC*, 434 F.3d 1208, 1213 (10th Cir. 2006) (finding dismissal of class-action allegations prior to class certification proper where the class representative failed to state a claim on his own behalf)]; Compl. ¶ 61.) Finally, I note that, despite Defendants' request to either dismiss or stay Plaintiffs' breach of contract claim in favor of arbitration, they have only moved for relief under section three of the FAA, and I accordingly lack the authority to dismiss rather than stay count one. (*See* Defs.' Br. at 6); *cf. Armijo v.*

*Prudential Ins. Co. of Am.*, 72 F.3d 793, 796–97 & n.3 (10th Cir. 1995) (intimating that dismissal of claims under the FAA is appropriate where a party both invokes section four of the FAA and requests dismissal).

Based on the foregoing, I find that count one must be stayed for arbitration to the extent that it alleges breach of the tax deferral provisions in Archstone UPREIT's Declaration of Trust.

### ii.     *Dismissal of Count One for Failure to State a Claim*

As indicated above, the source of Plaintiffs' alleged contractual rights relating to tax deferral are unclear; such rights could either allegedly arise from the putative class members' contribution agreements with Smith UPREIT, Archstone UPREIT's Declaration of Trust, or class members' contribution agreements with other entities with which Archstone UPREIT previously merged.  (*See* Compl. ¶¶ 56–64; 103–10.)  More specifically, in addition to its allusions to breach of tax deferral covenants, count one refers to breach of contractual provisions in unspecified "contribution agreements and partnership agreements" that allegedly "provide A-1 Unit holders . . . with the ability to liquidate their units by receiving cash or converting them to common shares in the publically traded Archstone REIT."  (*Id.* ¶ 105.)  Moreover, in their response to Defendants' motion to dismiss, Plaintiffs argue that their breach of contract claim derives from the loss of liquidity and dividend rights for class members like Plaintiff Infinity that were allegedly "contractually guaranteed pursuant to [their] contribution and partnership agreements," and the recognition of taxable gain for class members like Plaintiff Stender who elected to cash out their A-1 Units.  (Pls. Resp. at 14.)  Plaintiffs nonetheless acknowledge that

their complaint "did not specifically cite the contribution and partnership agreements that are referenced." (*Id.* at 18.)

I find that, to the extent not arbitrable, count one must be dismissed for failure to state a claim. The Supreme Court holds that the statement of a claim must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson*, 127 S. Ct. at 2200 (quoting *Bell Atlantic*, 127 S. Ct. at 1964). In the instant case, because Plaintiffs fail to cite any contractual language from contribution and partnership agreements that were allegedly breached — or even to specify whether these contribution and partnership agreements, as opposed to their reiteration in Archstone UPREIT's Declaration of Trust, form the basis of their alleged breach of contract claim as it relates to tax deferral rights — I find that they have not given Defendants fair notice of what their claim is, and the grounds upon which it rests. *See, e.g.*, *Connolly*, 2007 WL 4207826, at *10 (dismissing breach of contract claim for failure to state a claim where a plaintiff "fails to allege or submit any contractual terms in her" complaint); *Parrish*, 534 F. Supp. 2d at 1094 (dismissing complaint where, *inter alia*, "[c]opies of any agreements actually signed by plaintiffs, or recitations of terms contained therein, [were] conspicuously absent from the complaint"). In contrast to the arbitrable issue of whether Archstone UPREIT must indemnify Plaintiff Stender and others similarly situated for taxable gains they incurred by electing the cash consideration option during the merger, I find that Plaintiffs have not adequately alleged breach of contract relating to alleged liquidity or dividend rights because they have not adequately indicated which provisions of which contracts allegedly contain such rights. (*See* Compl. ¶¶ 56–64; 103–10.) Instead, throughout both the complaint

and their briefing on all matters before me, Plaintiffs studiously avoid specifying the alleged contractual source of their dividend and liquidity rights, instead schizophrenically implying that these rights derive from unspecified "contribution and partnership agreements," the Archstone UPREIT's Declaration of Trust, some mysterious combination — or abrogation — of these two sources, or abstract legal principles. (*See, e.g.*, Compl. ¶¶ 104–06 [alleging that their liquidity and dividend rights arise from "contribution and partnership agreements" and "statutory and common law partnership principles"]; Pls.' Resp. at 2 [arguing that their "contract claim arises solely from Defendants' wholesale and wrongful abrogation of the Declaration of Trust through the Merger"], 14 [claiming that their liquidity and dividend rights arise from "contribution and partnership agreements"]; Pls.' Class Certification Br. at 4 [asserting that Archstone UPREIT's Declaration of Trust "preserved all of the tax and liquidity provisions of the original agreements applicable to all class members"].) Because I find that such ambiguity in Plaintiffs' complaint, only muddied by the "explanation" in their briefing, deprives Defendants of a fair opportunity to respond to Plaintiffs' complaint after determining whether the allegedly breached covenants even exist, or are subject to arbitration or potential pre-litigation defenses, I find that this count must be dismissed for failure to state a claim. Alternatively, I note that, even if I had found that Plaintiffs state a claim for breach of contract, I would still have been unable to certify their putative class because the ambiguity in both their complaint and their class certification motion precludes me from meaningfully assessing whether they share common questions of law or fact with the putative class members in relation to this claim. *See* Fed. R. Civ. P. 23(a)(2) (2008)

(stating that "questions of law or fact common to the class" are a prerequisite for maintenance of a class action).

Based on the foregoing, I find count one must be dismissed for failure to state a claim to the extent that it alleges breach of any alleged contractual tax deferral, dividend, or liquidity rights derived from any source other than Archstone UPREIT's Declaration of Trust, or breach of any alleged dividend or liquidity provisions of the Declaration of Trust.

### c. Dismissal of Counts Two and Three for Lack of Standing, Exculpation Clauses in Archstone UPREIT's Declaration of Trust, Maryland's Business Judgment Rule, and Provisions in the Declaration of Trust Permitting the Merger

Counts two and three allege breaches of fiduciary duties by Archstone REIT acting through the Individual Defendants, and aided and abetted by the Lehman-Tishman Partnership, arising from Archstone REIT's majority ownership of Archstone UPREIT, and from its role as "sole trustee" of Archstone UPREIT. (Compl. ¶¶ 111–24.) Because fiduciary duties arising from managerial control of corporations differ from fiduciary duties owed from majority shareholders to minority shareholders, I address these two categories of fiduciary duties separately despite the unfortunate intermingling of allegations in Plaintiffs' complaint. (*See, e.g.*, *id.* ¶ 113 [alleging that "[a]s majority owner, the Archstone REIT owed a fiduciary duty to the minority A-1 Unit holders to avoid using its majority ownership in bad faith or in reckless disregard of its duties as trustee to oppress the minority owners"].) At the outset, I note that both parties apparently agree that Maryland law controls Plaintiffs' breach of fiduciary duty claims. (*See* Compl. ¶¶ 31–32 [representing that both Archstone REIT and Archstone UPREIT were "organized under Maryland law"]; Defs.' Br. at 8 & nn.3–4 [asserting that Maryland law

controls Plaintiffs' claims under the internal affairs doctrine]; Pls.' Resp. at 18–34 [arguing that counts two and three assert breaches of fiduciary duties under Maryland law]); *Great W. Producers Co-Op v. Great W. United Corp.*, 613 P.2d 873, 875 & n.2, 878 & n.4 (Colo. 1980) (applying corporate law of a defendant's state of incorporation to assess "the responsibility of [its] board of directors").

      **i.**     ***Archstone REIT's Fiduciary Duties as "Sole Trustee" of Archstone UPREIT***

Although in largely conclusory fashion, both counts two and three allege breaches of fiduciary duty by Archstone REIT — presumably acting through the Individual Defendants — in its capacity of "sole trustee" of Archstone UPREIT. (*See* Compl. ¶¶ 111–24.) The allegedly offending acts, moreover, all relate to Archstone REIT's exercise of managerial control over Archstone UPREIT preceding and during the merger.[2] (*See, e.g.*, *id.* ¶¶ 114 [alleging breach of fiduciary duties based upon Archstone REIT's "negotiating, formulating and voting in favor of the Merger"], 122 [alleging breach of fiduciary duties based upon Archstone REIT's refusal: (1) to allow A-1 Unit holders to vote on the merger; (2) to appoint an independent committee to act on behalf of Archstone UPREIT; (3) to allow A-1 Unit holders to vote separately as a class upon

---

[2]I note in this regard that although Plaintiffs purport to represent that Archstone REIT had direct managerial control over Archstone UPREIT as "sole trustee" by virtue of its majority ownership, it appears from both Archstone UPREIT's Declaration of Trust and Maryland law controlling REITs that Archstone REIT only had *indirect* managerial control over this entity by virtue of *electing* its "sole trustee" — the equivalent of a corporate director — by voting its majority A-2 units. (*See, e.g.*, Defs.' Br., Ex. A Part 1 at 11 [Decl. of Trust] [stating that "(o)nly Class A-2 Common Unitholders shall have the right to vote in the election of Trustees"]); MD. CODE ANN., CORPS. & ASS'NS § 8–202(b)(1)(v)–(vi) (2008) (providing for election of trustees by shareholders).

the merger; and (4) to allow Archstone UPREIT to engage investment and legal advisors to advise on the fairness of the merger from the A-1 Unit holders' perspective].)  At the outset, I note that neither party addressed the issue of how fiduciary duties might allegedly flow from Archstone REIT — or even the Individual Defendants in their capacities as directors, officers, and/or trustees of this entity — to Plaintiffs, who are unit holders of a separate entity, Archstone UPREIT.  Nonetheless, rather than unravel this mystery, I may assume without deciding that such fiduciary duties might flow from this entity to Plaintiffs because, for the reasons explained below, I find that claims for breach of fiduciary duty premised upon mismanagement of the merger are derivative claims that must be brought by, or on behalf of, Archstone REIT. Alternatively, I note that, despite Plaintiffs' exceedingly confused presentation of their own claims, their statement of counts two and three against the Individual Defendants might be construed as alleging claims against these defendants in their capacities as directors, officers, and/or trustees of Archstone UPREIT.  (*See* Compl. at 26, 28, ¶¶ 12–28 [alleging the Individual Defendants were all simultaneously directors, officers, and/or trustees of both Archstone Entities].)  To the extent that the complaint should properly be so read, the same result ultimately obtains because claims for breaches of fiduciary duty against even the Individual Defendants in their capacities as agents for Archstone UPREIT would be derivative claims for the same reasons explained below.  Finally, I note that both parties agree that if Plaintiffs lack standing to assert counts two and three against Archstone REIT and the Individual Defendants directly, their claims against the Lehman-Tishman Partnership must also fail.  (*See* Defs.' Br. at 10–11, Pls.' Resp. at 7 n.7); *see also, e.g.*, *Feldman v. Cutaia*, — A.2d —, 2007 WL 5211892, at *12 (Del.

Ch. 2007) (stating the "unsurprising proposition that an aiding and abetting claim premised upon a derivative cause of action is necessarily derivative itself").

In challenging Plaintiffs' statement of breach of fiduciary duty claims against Archstone REIT in its capacity as "sole trustee" of Archstone UPREIT, Defendants argue that counts two and three should be dismissed due to: (1) lack of standing; (2) exculpation clauses in Archstone UPREIT's Declaration of Trust; (3) Maryland's business judgment rule; and (4) provisions in Archstone UPREIT's Declaration of Trust permitting the merger. (Defs.' Br. at 9–17.) For the reasons demonstrated below, I need only reach Defendants' first argument.

Although counts two and three are vague about the alleged source of the fiduciary duties flowing from Archstone REIT to Plaintiffs, claiming only that such duties arise because Archstone REIT is "sole trustee . . . of Archstone UPREIT," Plaintiffs clarify in their briefing that such duties allegedly arise "by virtue of being trustees of a trust owned by Unit holders." (Pls.' Resp. at 23; *see also* note 1, *supra*.) While the missing subject or subjects of this phrase — who or what are allegedly trustees of which trust? — highlights the ambiguity in Plaintiffs' argument regarding the capacity in which Archstone REIT and the Individual Defendants allegedly owe fiduciary duties to Plaintiffs, this argument at least establishes that the alleged fiduciary duties flow from these defendants' exercise of managerial control *as trustee(s)* over Archstone UPREIT.[3] Reinforcing this conclusion, Plaintiffs invoke as the apparent basis for

---

[3]Plaintiffs' complete representation is as follows: "The complaint alleges, as required [a] fiduciary relationship arising out of contractual relation and by virtue of being trustees of a trust owned by Unit holders and by virtue of majority ownership . . . ." (Pls.' Resp. at 23.) I analyze below the sufficiency of Defendants' alleged breach of fiduciary duties arising from Archstone

their alleged fiduciary duty claims a provision of the Maryland corporate code reciting that

directors of a corporation must comply with the duties of good faith, loyalty, and care in their

performance of managerial functions. (*See* Pls.' Resp. at 23 & n.9 [citing MD. CODE ANN.,

CORPS. & ASS'NS § 2-405.1(a) and case law construing this provision].)  Because this provision

is the only alleged source of fiduciary duties flowing from Archstone REIT in its capacity as

"sole trustee" of Archstone UPREIT referenced in Plaintiffs' briefing, and because I am unaware

of any other source of fiduciary duties applicable to Archstone REIT or the Individual

Defendants beyond the duties owed by majority shareholders to minority shareholders discussed

below, I analyze Plaintiffs' standing to bring counts two and three under Maryland law

construing this provision.

Section 2-405.1(a) of the Maryland corporate code establishes duties of good faith, care,

and loyalty on the part of corporate directors.  *See* MD. CODE ANN., CORPS. & ASS'NS § 2-

405.1(a) (2008); *see also, e.g.*, *Werbowsky v. Collomb*, 766 A.2d 123, 133 (Md. 2000)

(observing that directors' duties to act in good faith, in the best interest of the corporation, and

with due care derive from section 2-405.1[a]).  Nonetheless, section 2-405.1(g) limits the means

of enforcing the statutory duties created in this section by stating: "Noting in this section creates

---

REIT's "majority ownership" of Archstone UPREIT.  (*See* Analysis § 2[b][ii], *infra*.)  Moreover, I note that the complaint contains no well-pled allegations suggesting "a fiduciary relationship arising out of contractual relation[s]" between Plaintiffs and Archstone REIT or the Individual Defendants, and note that such a claim would, in any event, be non-cognizable under Tenth Circuit law.  *See, e.g.*, *Foodbrands Supply Chain Services v. Terracon, Inc.*, No. Civ.A 02–2504–CM, 2003 WL 23484633, at *6 (D. Kan. Dec. 8, 2003) ("[T]he Tenth Circuit [has] consistently refused to allow tort claims to co-exist with breach of contract claims when the two are grounded in the same facts." [citations omitted]).

a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation." *Id.* § 2–405.1(g).  Construing these provisions separately or together, at least three Maryland trial courts have held that actions for breaches of fiduciary duty can only be brought derivatively, not directly, or that such duties only run only to the corporation and not to shareholders. *See In re Laureate*, No. 24–C–07–000664, at *3 (Md. Cir. Ct. June 26, 2007) (slip op.) (calling the language of section 2–405.1[g] "clear and unambiguous" and holding that it bars a direct claim by shareholders for breach of fiduciary duties); *Carley v. Kopko*, No. 03–C–06–008836, at *4 (Md. Cir. Ct. Apr. 2, 2007) (slip op.) ("[P]ursuant to Maryland law, a claim for breach of fiduciary duty against a corporate officer or director may only be pursued as a derivative, not a direct, action." [citations omitted]); *Patterson v. Patterson*, 2006 WL 990998, at *5 (Md. Cir. Ct. Jan. 31, 2006) (construing section 2-405.1[g], and stating that "[b]ecause it is Plaintiff . . . who has brought this suit on his own behalf, and he is not suing in the right of the Corporation for any injury done to the corporation, the Defendant directors have no duty to Plaintiff under this section").  Although in slightly ambiguous language, the Maryland Court of Appeals appears to hold that directors' fiduciary duties under section § 2-405.1(a) run to the corporation, not to its shareholders. *See Werbowsky*, 766 A.2d at 133 (describing fiduciary duties under section § 2-405.1[a], and stating "[t]hat obligation runs, however, to the corporation and not, at least directly, to the shareholders").

I find that the language of section 2-405.1(g) is clear and unambiguous, and that it bars direct claims for breaches of fiduciary duty premised upon Archstone REIT's and the Individual Defendants' alleged acts of mismanagement as "sole trustee[s]" for Archstone UPREIT. *See*

MD. CODE ANN., CORPS. & ASS'NS § 2-405.1(g) (2008). Although Maryland statutory law is ambiguous regarding whether the fiduciary duties applicable to corporate directors even apply to REIT trustees, it is unambiguous in stating that statutory limitations placed thereupon clearly do. Specifically, section 8–601.1 of the Maryland corporate code, which addresses trustee liability under Maryland REIT law, states that "[s]ections . . . 2-405.1(d) through (g) . . . of this article shall apply to real estate investment trusts." *Id.* § 8-601.1. Thus, while Maryland REIT law does not explicitly incorporate by reference the statutory duties applicable to corporate directors codified in section 2-405.1(a), it does explicitly incorporate the statutory limitations placed thereupon, namely the limitation that "[n]othing in [section 2-405.1] creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation." *Id.* § 2-405.1(g). Accordingly, I find that section 2-405.1(g) of the Maryland corporate code, incorporated by reference through section 8-601.1 of Maryland REIT law, restricts claims for breach of fiduciary duties premised upon trustee mismanagement to derivative, rather than direct, actions. *See id.* §§ 2–405.1(g), 8–601.1; *see also, e.g.*, *In re Laureate*, No. 24–C–07–000664, at *3. Moreover, because Plaintiffs have failed to include any allegations that they either made a demand upon Archstone REIT's (or Archstone UPREIT's) board of trustees to redress their grievances before filing the instant action, or that such demand would have been futile, I find they have failed to satisfy both the pleading and substantive prerequisites for a derivative action brought in federal court under Maryland law. *See* Fed. R. Civ. P. 23.1(b)(3)(A)–(B) (2008) (requiring a complainant in a derivative action to "state *with particularity* . . . any effort made . . . to obtain the desired action from the directors or

-34-

comparable authority . . . [or] the reasons for . . . not making the effort" [emphasis added]); *Werbowsky*, 766 A.2d at 133–35 (discussing the requirement of pleading demand or futility under Maryland substantive law).

In arguing against the conclusion above, Plaintiffs advance two arguments that merit discussion. (*See* Pls.' Resp. at 19–22 & n.8.) First, Plaintiffs proffer Maryland cases reciting that, the above-cited authority notwithstanding, corporate directors' fiduciary duties run to *both* the corporation *and* its shareholders. (*See, e.g.*, *id.* at 20 [quoting, *e.g.*, *Mona v. Mona Elec. Group, Inc.*, 934 A.2d 450, 463 (Md. Ct. Spec. App. 2007) ("The directors of a corporation stand in fiduciary relation to the corporation and to its stockholders.")].) I find such authority unavailing because, even assuming it is reconcilable with the Maryland Court of Appeals' recitation in *Werbowsky* that directors' fiduciary duties "run[] . . . to the corporation and not, at least directly, to the shareholders," the existence of duties running simultaneously to *both* the corporation *and* the shareholders proves nothing about the proper vehicle for redressing alleged breaches thereof. *See Werbowsky*, 766 A.2d at 133. Specifically, the existence of fiduciary duties running simultaneously to both the corporation and its shareholders is perfectly reconcilable with the Maryland General Assembly's determination that "[n]othing in [section 2–405.1] creates a duty of any director of a corporation *enforceable* otherwise than by the corporation or in the right of the corporation." *Id.* § 2–405.1(g) (emphasis added). In other words, even assuming that corporate directors owe direct fiduciary duties to shareholders under Maryland law, such duties run alongside duties owed to the corporation, and the Maryland

Assembly has unambiguously directed that all such duties may only be enforceable by, or on behalf of, the corporation.  *See id.*

Second, Plaintiffs invoke Maryland common law discussing when shareholders' claims may be brought directly, rather than derivatively, and thereby suggest that their breach of fiduciary duty claims are appropriately brought directly.  (*See* Pls.' Resp. at 22 n.8.)  For the following reasons, I disagree.  First, I find common law discussing when claims are appropriately brought directly versus derivatively irrelevant in light of the Maryland Assembly's unambiguous determination that claims for breach of fiduciary duties created by section 2–405.1(a) may only be brought derivatively.  *See id.*  Second, and alternatively, I find for the following reasons that, even assuming such law is relevant, or that some source other than section 2–405.1(a) creates fiduciary duties on the part of Archstone REIT and the Individual Defendants acting as "sole trustee" of Archstone UPREIT, counts two and three are still derivative claims under Maryland common law, and thus fail for lack of allegations relating to demand or futility in Plaintiffs' complaint.

"In deciding whether a shareholder may bring a direct suit, the question Maryland courts ask is not whether the shareholder suffered injury; if a corporation is injured those who own the corporation are injured too.  The inquiry, instead, is whether the shareholders' injury is 'distinct' from that suffered by the corporation."  *Struogo v. Bassini*, 282 F.3d 162, 170 (2d Cir. 2002) (citing *Tafflin v. Levitt*, 608 A.2d 817, 820 [Md. 1992].)  In addition, "[w]ith respect to corporate governance issues, Maryland courts often look to Delaware caselaw."  *Jolly Roger Fund LP v. Sizeler Prop. Investors, Inc.*, No. Civ. RBD 05–841, 2005 WL 2989343, at *3 & n.10 (D. Md.

-36-

Nov. 3, 2005) (citations omitted).  Construing Delaware law, the Maryland Court of Appeals has

stated that "[t]he test to distinguish between derivative and direct harm is whether the plaintiff

suffered a 'special injury.'" *Pasowitz v. Wohlstadter*, 822 A.2d 1272, 1277 (Md. 2003) (citations

omitted).  More specifically, the plaintiff in a direct action "must allege either an injury which is

separate and district from that suffered by other shareholders, or a wrong involving a contractual

right of a shareholder, such as the right to vote, or to assert majority control, which exists

independently of any right of the corporation."  *Id.* (citations and internal quotation marks

omitted).

I find that, to the questionable extent Maryland or Delaware common law is applicable at

all, such law defines counts two and three as derivative claims.  In both counts, the gravamen of

Plaintiffs' complaint is that Archstone REIT's and the Individual Defendants' actions preceding

and during the merger caused Plaintiffs to receive inadequate consideration for their A-1 Units.

(*See, e.g.*, Compl. ¶¶ 3 [claiming that the $60.75 consideration price was inadequate in light of

the alleged tax deferral, liquidity, and dividend rights lost during the merger], 118 [alleging that

Plaintiffs were "coerc[ed] . . . into converting their A-1 Units for cash with less than fair value"],

123 [alleging that Plaintiffs "have sustained loss and damage to the value of their A-1 Units"].)  I

find that such alleged injuries are not "'distinct' from that suffered by the corporation" because

they derive from injury to the corporation itself — *i.e.*, from diminution in value of Archstone

UPREIT's equity.  *Struogo*, 282 F.3d at 170 (citation omitted).  Similarly, under persuasive

Delaware law, I find Plaintiffs' alleged injury is not direct because it is not "an injury which is

separate and distinct from that suffered by other shareholders."  *Pasowitz*, 822 A.2d at 1277.  On

the contrary, Plaintiffs' alleged injury is identical to the injuries allegedly sustained by all A-1 Unit holders, as ironically highlighted by Plaintiffs' outstanding motion to certify their class. (*See* Pls.' Class Certification Br. at 14–15 [arguing that Plaintiffs' alleged injuries are typical of the putative class members].)

Both counts two and three also allege injuries related to Plaintiffs': (1) inability to vote on the merger; (2) inability to vote as a class; and (3) Archstone REIT's refusal to appoint investment or legal advisors to consult on interests of A-1 Unit holders. (*See* Compl. ¶¶ 118, 122.) As such, these counts might state wrongs "involving a contractual right of a shareholder, such as the right to vote, or to assert majority control." *See Pasowitz*, 822 A.2d at 1277. In turn, such counts, if properly pleaded, could state direct claims against Archstone REIT, at least under Delaware law. *See id.* Nonetheless, such claims would sound in contract, not tort, and are thus not properly included under counts two and three. *See, e.g.*, *Terracon*, 2003 WL 23484633, at *6 ("[T]he Tenth Circuit [has] consistently refused to allow tort claims to co-exist with breach of contract claims when the two are grounded in the same facts." [citations omitted]). Even if I considered these claims separately as contract claims, I would still find they fail to state a claim for relief because, as with Plaintiffs' alleged breach of contract claim relating to alleged tax deferral, liquidity, and dividend rights, Plaintiffs nowhere cite any contractual provisions conferring upon A-1 Unit holders the right to vote on the merger, the right to vote by class, or the right to have Archstone REIT appoint an independent committee or investment or legal advisors to consult on the merger. *See, e.g.*, *Erickson*, 127 S. Ct. at 2200; *Connolly*, 2007 WL 4207826, at *10; *Parrish*, 534 F.Supp. 2d at 1094. On the contrary, Archstone UPREIT's

-38-

Declaration of Trust appears to affirmatively disclaim most, if not all, of these alleged "rights." For example, the Declaration recites that mergers need only be approved "by the Unitholders holding at least a majority of the then outstanding Units *(including any Units held by the Trustee)*," thus foreclosing the argument that Plaintiffs had a contractual right to vote by class on the merger. (*See* Pls.' Br., Ex. A. Part 3 at 17 [Decl. of Trust] [emphasis added]); *see also* MD. CODE ANN., CORPS. & ASS'NS §§ 8–202(c), 8–501(g) (2008) (granting REITs the power to define in their declarations of trust the voting power of various classes in relation to mergers). Similarly, the Declaration recites in a section entitled, "No Obligation to Consider Separate Interests of Other Unitholders," that absent bad faith "the Trustee is under no obligation to consider the separate interests of the other Unitholders (including, without limitation, the tax consequences to the other Unitholders) in deciding whether to cause the Trust to take (or decline to take) any actions." (*Id.*, Ex. A Part 3 at 5 [Decl. of Trust].) As discussed below, I find there are no well-pled allegations of bad faith in Plaintiffs' complaint. (*See* Analysis § 2[b][ii], *infra.*) In short, to whatever extent counts two and three properly allege breaches of contract rather than breaches of fiduciary duty, I find they fail to state a claim, and would in any event likely be foreclosed by the affirmative disclaimers in the Declaration of Trust.

Based on the foregoing, I find Plaintiffs lack standing to bring counts two and three to the extent that these counts allege breaches of fiduciary duty by Archstone REIT acting in its capacity of "sole trustee" of Archstone UPREIT.

### ii. *Archstone REIT's Fiduciary Duties as Majority Unit Holder of Archstone UPREIT*

As indicated above, counts two and three also allege breaches of fiduciary duty by Archstone REIT arising from its majority ownership of Archstone UPREIT. (Compl. ¶¶ 111–24.) Nonetheless, despite the styling of Plaintiffs' second count as "BREACH OF FIDUCIARY DUTIES — MAJORITY OPPRESSION OF THE MINORITY A-1 UNIT HOLDERS," (Compl. at 26), the only alleged act recited in either counts two or three committed by Archstone REIT in its capacity as majority shareholder — as opposed to as "sole trustee" of Archstone UPREIT— is "voting in favor of the [m]erger." (*Id*. ¶ 114.) Although they do not dispute that Plaintiffs may have standing to bring majority oppression claims directly rather than derivatively, Defendants argue that Plaintiffs have failed to state a claim for majority oppression of the minority. (Defs.' Br. at 17–19; Defs.' Reply at 16–18); *see also Twenty Seven Trust v. Realty Growth Investors*, 533 F. Supp. 1028, 1039 n.22 (D. Md. 1982) (applying Maryland law, and noting that under persuasive authority, claims for majority oppression of the majority may be brought directly, not derivatively). For the following reasons, I agree with Defendants.

"Maryland common law recognizes that minority shareholders are entitled to protection against fraudulent or illegal action of the majority." *Mona*, 934 A.2d at 464. "Especially in closely held corporations, the majority shareholder owes a fiduciary duty to the minority shareholder (or shareholders) not to exercise their control to the disadvantage of minority stockholders." *Id.* (citation and internal quotation marks omitted).

Despite this broad recitation of majority fiduciary duty principles, the Maryland Court of Appeals has directly addressed the duties majority shareholders owe to minority shareholders in a transaction remarkably similar to the one at bar. In *Homer v. Crown, Cork & Seal Company*, the court addressed the duties owed by majority to minority shareholders where a dissenting minority shareholder filed a bill in equity seeking to enjoin a shareholder meeting called to authorize the sale of all of a corporation's assets. 141 A. 425 (1928). The court stated:

> [T]he gravamen of the complaint is inadequacy of price. The fundamental difference between the majority and minority stockholders on this record is simply whether the value of the assets for the purpose of a sale in their entirety is the market value of the shares of the stock or their book value. It is not perceived how holding to either view is practicing a fraud. . . . Aside from the fraud to be imputed from the price to be paid, there has been found no well-pleaded allegations from which fraud affirmatively appears. . . .
>
> Unless acting ultra vires, illegally, or in bad faith, the directors of a corporation of the prescribed class have a statutory right to approve a sale of all its assets as an entirety at a given price, and the stockholders owning two-thirds of all the stock outstanding and entitled to vote may approve of such sale, and it will then be made. This is a property right of which the shareholders, while acting in good faith, may not be deprived, no matter the motives nor the folly and consequences of their action.

*Id.* at 434–44.

In the instant case, I find that Plaintiffs fail to state a claim for breach of fiduciary duty in counts two and three premised upon the theory of majority oppression of the minority because, as in *Homer*, the gravamen of their complaint is that Archstone REIT's actions in voting for the merger caused Plaintiffs to receive inadequate consideration for their A-1 Units. (*See, e.g.*, Compl. ¶¶ 3, 118, 123.) To be sure, counts two and three also allege injuries arising from Plaintiffs' alleged disenfranchisement, and Archstone REIT's refusal to appoint investment or

-41-

legal advisors, but such allegations: (1) relate to Archstone REIT's actions in its managerial capacity as "sole trustee" of Archstone UPREIT; (2) properly sound in contract; and (3) fail to state a claim, as discussed above. (*See* Compl. ¶ 118, 122); *see also* Analysis § 2[b][i], *supra*.) Accordingly, unless Archstone REIT was acting "ultra vires, illegally, or in bad faith" by voting for the merger, I find it had a property right to vote for the merger regardless of the "folly and consequence" of this vote, *i.e.*, any diminution in value of the A-1 Units. *Homer*, 141 A. at 434–44. Plaintiffs essentially concede that Archstone REIT had a right to vote for the merger absent evidence of bad faith, but string cite to six paragraphs of their complaint that purportedly demonstrate bad faith. (*See* Pls.' Resp. at 24, 28, 30 [citing paragraphs 3, 8, 12, 79, 112 and 114 of the complaint].) Plaintiffs proffer no argumentation that Archstone UPREIT acted ultra vires or illegally in voting for the merger. (*See id.*) Upon review of Plaintiffs' string-cited paragraphs, I find that: (1) two recite bare legal conclusions, (*see* Compl. ¶¶ 8, 114); (2) one irrelevantly recites that a single Individual Defendant is a director/trustee of both Archstone Entities, (*see id.* ¶ 12); (3) one irrelevantly recites that Archstone REIT was 89% owner of Archstone UPREIT, (*see id.* ¶ 112); and (4) two claim that the $60.75 merger consideration was inadequate in light of the tax deferral, liquidity, and dividend rights that were allegedly lost during the merger, (*see id.* ¶¶ 3, 79). Because none of these paragraphs discusses Archstone REIT's purportedly ulterior motive in voting for the merger — instead merely discussing the *effects* of this merger upon Plaintiffs — I find that none suggests that Archstone REIT voted for the merger in bad faith. *See, e.g.*, *Homer*, 141 A. at 433 (noting on similar facts that "[a]side from the fraud imputed from the price to be paid, there has been found no well-pleaded

allegations from which fraud affirmatively appears"); *Cooperative Milk Serv. v. Hepner*, 81 A.2d 219, 224 (Md. 1951) (stating that majority shareholders become fiduciaries when they "use their voting power for . . . for some ulterior purpose adverse to the interests of the corporation"); *Patterson*, 2006 WL 990998, at *5 (granting motion to dismiss where complaint contained "no statement of fact as to what the ulterior motives are . . ." [emphasis in original]).

Based on the foregoing, I find that Plaintiffs have also failed to state claims in counts two and three for breaches of fiduciary duties allegedly arising from Archstone REIT's majority ownership of Archstone UPREIT. The statement of these claims against the Lehman-Tishman Partnership also fail for lack of an underlying tort. *See Alleco Inc. v. Harry & Jeanette Weinberg Found.*, 665 A. 1038, 1050 (Md. 1995) ("[C]ivil aider and abettor liability . . . requires that there exist underlying tortious activity in order for the alleged aider and abettor to be held liable.").

### 3. Conclusion

Based on the foregoing it is therefore ORDERED that:

1.  PLAINTIFFS' motion to strike (#54) is DENIED.

2.  DEFENDANTS' motion (#29) to dismiss or stay in favor of arbitration is GRANTED; the case is STAYED for arbitration to the extent that count one alleges breach of the tax deferral provisions in Archstone UPREIT's Declaration of Trust but is otherwise DISMISSED.

3.  PLAINTIFFS' motion to certify class (#39) is DENIED as MOOT.

4.  Any final judgment entered at the conclusion of the case shall reflect a judgment in favor of Defendants and against Plaintiffs, dismissing Plaintiffs' second and

third counts for relief with prejudice. Any final judgement shall also reflect a

judgment in favor of Defendants and against Plaintiffs, dismissing Plaintiffs' first

count for relief with prejudice to the extent that this count alleges breach of any

alleged contractual tax deferral, dividend, or liquidity rights derived from any

source other than Archstone UPREIT's Declaration of Trust, or breach of any

alleged dividend or liquidity provisions of the Declaration of Trust.

5.      The case shall be ADMINISTRATIVELY CLOSED pursuant to

D.C.COLO.L.Civ.R. 41.2, subject to reopening for good cause.

Dated this 30th day of September, 2008.

                                        BY THE COURT:



                                        s/ Edward W. Nottingham
                                        EDWARD W. NOTTINGHAM
                                        Chief United States District Judge