**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No. 07-CV-02503-WJM-MJW

STEVEN A. STENDER, HAROLD SILVER and INFINITY CLARK STREET OPERATING, L.L.C., on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

ARCHSTONE-SMITH OPERATING TRUST, ARCHSTONE-SMITH TRUST, ERNEST A. GERARDI, JR., RUTH ANN M. GILLIS, NED S. HOLMES, ROBERT P. KOGOD, JAMES H. POLK III, JOHN C. SCHWEITZER, R. SCOT SELLERS, ROBERT H. SMITH, STEPHEN R. DEMERITT, CHARLES MUELLER, JR., CAROLINE BROWER, MARK SCHUMACHER, ALFRED G. NEELY, TISHMAN SPEYER DEVELOPMENT CORPORATION, RIVER HOLDING, LP, RIVER ACQUISITION (MD), LP RIVER TRUST ACQUISITION (MD), LLC, ARCHSTONE MULTIFAMILY SERIES I TRUST, ARCHSTONE ENTERPRISE LP, ARCHSTONE, INC., LEHMAN BROTHERS HOLDINGS, INC., ERP OPERATING LIMITED PARTNERSHIP, EQUITY RESIDENTIAL, AVALONBAY COMMUNITITES, INC., and JOHN DOES 1-8,

Defendants.

---

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT**

Plaintiffs Steven A. Stender, Harold Silver and Infinity Clark Street Operating, LLC ("Plaintiffs") respectfully submit this single opposition to Defendants' two motions to dismiss, purportedly brought by different sets of Defendants, the so-called "2007 Defendants" and "2013 Defendants." Docket ##288, 289. The fact is, in their supporting memorandum, the "2013 Defendants," consisting Archstone Enterprise LP, Archstone Inc., Lehman Brothers Holdings, Inc., ERP Operating Limited Partnership, Equity Residential, and AvalonBay Communities, Inc. joined in the motion brought by "2007 Defendants." *See* Docket #289 at 2, n.1. This is not surprising, since these Defendants are successors-in-interest to the "2007 Defendants" and thus are liable for all claims in the SAC for breach of fiduciary duty; breach of contract, and aiding and abetting those breaches against which the "2007 Defendants" have moved. For purposes of this Response, therefore, Plaintiffs believe it is appropriate and will refer to the motion styled as being brought by the "2007 Defendants" as the "Breach Motion," and will refer to the Defendants collectively as "Defendants," unless specificity is otherwise necessary.

The second motion, brought by the "2013 Defendants" against the claims for fraudulent transfer, is referred to as the "Fraudulent Transfer Motion." As explained in greater detail below, the Fraudulent Transfer Motion is moot and should be denied.

**PRELIMINARY STATEMENT IN REGARD TO THE BREACH MOTION**

A motion to dismiss tests the sufficiency of the allegations of a complaint—here, the Second Amended Class Action Complaint ("SAC"). The Breach Motion, however, largely ignores the allegations in the SAC. In fact, the Breach Motion essentially invents

allegations that do not appear in the pleading, characterizing the SAC as seeking damages under the Tax Protection Agreement ("TPA"). Except for purposes of preserving it for appeal, if necessary, that claim is not in the case. Rather, the TPA claim is the very claim Defendants asserted needed to be arbitrated (Docket #29 at 4-6), was ordered to arbitration (Docket #114 at 12), and was arbitrated (Docket #243 at 6, 9). The claim is simply no longer before the Court.

The SAC consists of wholly-independent claims for breaches of contract terms and fiduciary duties that are not subject to arbitration and, *a fortiori,* could not have been part of the arbitration. In addition to being non-arbitrable, and thus exempt from arbitration (*e.g.*,Docket #114 at 12), the claims in the SAC seek an entirely different measure of damages, *i.e.*, damages that are not tied to the formula on which a breach of Section 2(c) would be limited pursuant to the TPA. Declaration of Trust ("DOT"), Annex A, Exhibit D, Section 4. In short, the notion that the SAC is attempting to re-litigate the *one* arbitrable issue in the DOT is patently false, and all of Defendants' arguments that flow from that concept must fail.

Not one of the claims in the SAC turns on the answer to the single question that the arbitrator considered, *i.e*., whether the 2007 Merger caused a breach of Section 2(c) of the TPA. His conclusion that the Merger did not require the Claimants in the arbitration to recognize taxable gain as contemplated by Section 2(c) has nothing to do with whether Defendants' (most of which were not parties to the arbitration) acts breached other, non-arbitrable provisions of the DOT, violated independent fiduciary duties, or constituted conspiracy or aiding and abetting of various wrongful conduct. To

hold otherwise would mean the arbitrator decided issues he had no right to decide, either pursuant to the governing documents, the arbitration agreement, or the Federal Arbitration Act. An arbitrator may only act within the scope of the arbitration agreement. *See Air Methods Corp. v. Opeiu*, Civil Action No. 07-cv-02025, 2008 U.S. Dist. LEXIS 101956, at *13-20 (D. Colo. Oct. 15, 2008). If, as it seems, Defendants are arguing that the arbitrator decided the claims now pending in this Court, they are admitting he exceeded his authority and the Court should vacate its order confirming the award.[1] *Id.* *See also* 9 U.S.C. §10(a)(4).

Defendants ignore the plain language of the allegations regarding the Archstone REIT's fiduciary duties as sole Trustee and attempt to recast that claim as the breach of fiduciary duty claim that this Court previously dismissed with prejudice. *E.g.*, Docket #114 at 6-9. The dismissed claim, however, pertained to Maryland corporate law, not trust law. Docket #114 at 6-9 (dismissing breach of fiduciary duty claim based on Md. corporate law); Breach Motion at 18-19 (referring to Md. Corporate law and previous dismissal).[2] Here, however, Causes of Action I and II of the SAC are based on Maryland trust law, not corporate law. Trust law clearly provides that a trustee has a fiduciary duty of loyalty to the beneficiaries of the trust. *See, e.g., Bd. Of Trustees v. Mayor of Baltimore*, 317 Md. 72, 562 A.2d 720 (Md. 1989) (trustee charged with a duty

[1] The Court has already clarified that the arbitration award must not be read to contain any rulings beyond the single question the arbitrator was asked to adjudicate. Docket #243 at 9-10 ("Archstone cannot argue that the Arbitrator decided any issue related to Section 9.2B").

[2] Plaintiffs included, for preservation purposes only, the fiduciary duty claims that have been dismissed as Causes of Action XIV and XV of the SAC. Ignoring the differences between Causes of Action I/II and XIV/XV, the Breach Motion's argument for dismissal of Causes of Action I-II of the SAC is limited to the notion that the narrow ruling in arbitration "guts" the basis for the breach of fiduciary duty claims. Breach Motion at 16-18. Whether or not Plaintiffs were presented with a "Hobson's Choice" is not the basis for Plaintiffs' fiduciary duty claims, however. *See infra* at 19-21.

of utmost loyalty to the interests of the beneficiaries). Plaintiffs have alleged Archstone's breach of that duty as the sole Trustee of the Archstone-Smith Operating Trust ("ASOT") (and the aiding and abetting thereof). Thus, by relying on a decision involving corporate law, Defendants have made no argument (nor can they now) supporting dismissal Causes of Action I and II for failure to state a claim pertaining to trust law.

Defendants' arguments for dismissal of the breach of contract-related claims (Causes of Action V-VII) invert what the Court must do on a motion to dismiss: construe well-pled allegations of the SAC in Plaintiffs' favor. *See, e.g., David v. City & Cnty. of Denver*, 101 F.3d 1344, 1352 (10th Cir. 2007). Instead, Defendants suggest that the Court should construe all allegations, as well as their interpretation of the DOT, in *their* favor. The question, which Defendants never address, is simply: whether, construing all allegations in Plaintiffs' favor, they have set forth a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007). Here, Causes of Action V, VI and VII do so and Defendants have given no legal basis to conclude otherwise.

Only with regard to Causes of Action III and IV do Defendants even attempt to assert that Plaintiffs have failed to state claims, but those arguments are not well-founded and should be denied. Cause of Action III states a claim for breach of fiduciary duty based on majority oppression, and Cause of Action IV states a claim for aiding and abetting that breach. Defendants assert that Plaintiffs merely allege that Archstone did nothing more than vote for the Merger. Breach Motion at 5-6, 19-21. Defendants

further maintain that no conduct is alleged to distinguish Archstone's acts as a majority owner from its acts as Trustee. *Id*.

These arguments belie the well-pled allegations of the SAC, which are replete with both the factual and legal predicates for a valid claim for majority oppression. SAC, ¶¶174-90. Moreover, Defendants provide no authority for the proposition that Plaintiffs must distinguish between acts "attributable to Archstone as majority owner" and those taken as "Trustee" when the Archstone REIT was both the majority owner *and* the sole Trustee. They are two different causes of action with different elements to prove; if some of the same facts state a claim for both causes of action, that is no basis on which to assert that one of those claims should be dismissed.

With regard to the unjust enrichment claim, the notion that it is barred by the statute of limitations is easily dispensed with. The claim is based on the same conduct set out in the original pleading and, therefore, the cause of action relates back to the date of the filing of those claims—mere months, at most, into the statutory period. Fed. R. Civ. P. 15(c)(1)(B).

For these reasons, more fully addressed below, the Breach Motion should be denied in its entirety.

**BACKGROUND**

The Court is well-familiar with the underlying allegations of the SAC. A brief summary follows.

Plaintiffs contributed properties to what became ASOT, an umbrella partnership real estate investment trust ("UPREIT"), in exchange for partnership interests known as

A-1 Units. SAC, ¶4. A-1 Units had a number of valuable attributes, including liquidity, receipt of quarterly distributions, rights guarantees and protections, and tax protection. SAC, ¶¶5, 88, 111-14, 116-17, 119-21. ASOT was a trust, Plaintiffs were among its beneficiaries, and the Trustee was the Archstone REIT, a publicly-traded, real estate investment trust or REIT. SAC, ¶¶5, 6, 83, 87. The Archstone REIT held a majority of the interests in ASOT, in the form of A-2 Units, common units which did not have the same contractual rights and attributes as the A-1 Units. SAC, ¶¶7, 45, 84. As the Trustee, and the majority owner, the Archstone REIT was responsible for the strategic direction of ASOT and the management and administration of the properties it held. SAC, ¶83, 84.

ASOT was governed by a contract/trust agreement aptly known as the Declaration of Trust ("DOT," attached to SAC as Ex. B). SAC, ¶¶5, 73. Under the DOT, A-2 Unitholders (only the Archstone REIT held A-2 Units) had the exclusive power to elect the REIT's Trustee. SAC, ¶85. As the sole holder of A-2 Units, the Archstone REIT elected itself the Trustee of ASOT, providing itself with direct control over ASOT and its majority beneficiary. *Id.* Both as the majority owner, and Trustee, the Archstone REIT owed fiduciary duties to A-1 Unitholders, minority owners and beneficiaries. SAC, ¶86.

The DOT expressly limited the authority of the Archstone REIT. SAC, ¶88. It was precluded from taking any action that contravened any prohibition or limitation in the DOT without adhering to the DOT's amendment provisions. *Id.* Depending on the action to be taken, the DOT required that the Archstone REIT obtain approval of either a

majority of the A-1 Unitholders or of each adversely affected unitholder. *Id.* The DOT contained provisions guaranteeing A-1 Unitholders' economic rights to liquidity, distributions and tax protection, whether the Archstone REIT continued as a public company, or was taken private. SAC, ¶¶111-14. These rights could not be disturbed without obtaining A-1 Unitholders' consent. *E.g.*, SAC, ¶¶119-20.

The DOT also provided A-1 Unitholders protections in the event that the Trustee, here the Archstone REIT, transferred its interest in ASOT. SAC, ¶116. Specifically, Section 9.2.B states that, in the case of a "Termination Transaction," *i.e.* one involving a disposition of all or substantially all of the Trustee's interest in the Trust, certain conditions must be met: (i) the Termination Transaction must be approved by at least a majority of the then outstanding units (including A-2 Units); (ii) the assets of the surviving entity must consist of units; (iii) all unitholders will receive, or have the right to elect to receive, for each unit, an amount of cash, securities, or other property, equal to the greatest amount of cash, securities, or other property paid to a holder of shares corresponding to such unit; *and* (iv) any successor to the Trustee must execute and deliver a counterpart to the DOT in which the successor agrees to be fully bound by all of its terms. SAC, ¶¶116-17.

Article 12 of the DOT established the process for amendments to the DOT. Section 12.3 required the approval of outstanding A-1 Units for amendments to certain sections of the DOT, including 2.2.1, 3.1.E, 5.3.B, 5.5, 5.6, 5.8, 6.5, 9.2, 11.1, and 12.3. SAC, ¶119. Section 12.4 required the approval of *each adversely affected* unitholder for certain amendments, including, but not limited to, amendments to Sections 5.3.A,

Articles 3 or 4, except as specifically provided, 6.6, 9.3, 9.4, and 12.4. SAC, ¶120. These amendment limitations related to the essential characteristics of the A-1 Units, like liquidity and distributions. SAC, ¶121.

In the spring of 2007, the Archstone REIT negotiated a deal with Tishman Speyer Development Corporation ("Tishman") and pre-bankruptcy Lehman Brothers Holdings, Inc. ("LBHI") (together referred to as the "Tishman-Lehman Partnership"), through which the Archstone REIT would be taken private. SAC, ¶¶92-101. During the negotiations, the Tishman-Lehman Partnership raised concerns with respect to the "significant magnitude of the built-in gain associated with certain of [Archstone's] properties that are subject to tax protection agreements with operating trust unitholders and the magnitude of the increase in property taxes" that would result from the transaction.[3] SAC, ¶93. These concerns led the Tishman-Lehman Partnership to reduce its offer price from $64/unit, ultimately, to $60.75/unit, and an agreement that the Archstone REIT would withhold the third quarter dividend, thereby allowing the Tishman-Lehman Partnership to retain for itself at least hundreds of millions of dollars.[4] SAC, ¶¶92, 96, 99. The transaction was memorialized by a May 29, 2007 Merger Agreement by which the Tishman-Lehman Partnership acquired the Archstone REIT. SAC, ¶¶100, 101.

The Merger Agreement eliminated the A-1 Units, in name and in form, by requiring A-1 Unitholders to accept either $60.75 per unit, the same per unit price as the

[3] Claimants learned what this magnitude was during the arbitration, but Plaintiffs could not plead or advise the Court of it because of the protective order entered in the arbitration (the "Arbitration Protective Order"). Among other reasons, this is why Plaintiffs have objected to Magistrate Judge Watanabe's order denying Plaintiffs' request that the Arbitration Protective Order be set aside. Docket #275.

[4] Plaintiffs are prevented by the Arbitration Protective Order from pleading and thus advising the Court of the precise amount.

A-2 Units, despite the fact that the A-1 Units had significant and valuable characteristics that that A-2 Units did not have, or a newly-created Series O Preferred Unit (on a one for one basis), which was economically inferior to the A-1 Unit. SAC, ¶¶101-102, 105, 122. The DOT prohibited fundamental changes to the essential characteristics of the A-1 Units, and the parties to the Merger Agreement were well-aware of these prohibitions. SAC, ¶107-9, 121.[5] Nonetheless, Defendants agreed to not only change, but eliminate the A-1 Units altogether, ignoring the DOT requirements that would have ensured continued preservation of Plaintiffs' bargained-for contractual benefits. SAC, ¶122.

On February 27, 2013, at the direction of Defendant LBHI, Defendant Archstone Enterprise, LP, a successor-in-interest to the Archstone REIT and ASOT, sold all of its assets to Defendants ERP Operating Limited Partnership, Equity Residential (together "EQR") and AvalonBay Communities, Inc. ("AVB"). SAC, ¶¶22, 139, 145. Along with Archstone's assets, EQR and AVB also acquired Archstone's liabilities, through the asset sale. SAC, ¶139. Based on their purchase of all of Archstone's assets and liabilities, EQR and AVB are successors-in-interest to the Archstone entities in which Plaintiffs held, or in the case of Series O Unitholders hold, interests. SAC, ¶¶139-140.

In addition to pleading the liability of EQR and AVB as successors-in-interest to the Defendants engaging in the 2007 Merger, Plaintiffs allege that the 2013 Asset Sale will result in a fraudulent transfer because after Archstone sold all of its assets to EQR and AVB, it would not retain any proceeds of the sale. SAC, ¶¶138-41, 145. The SAC

[5] Plaintiffs are prevented by the Arbitration Protective Order from pleading or telling the Court facts conclusively demonstrating Defendants' knowledge that they could not do what they did without A-1 Unitholders' consent.

alleges that, following the sale, Archstone would not be the beneficial owner of the proceeds of the sale—LBHI would be, and LBHI is subject to the Modified Third Amended Joint Chapter 11 Plan (the "Plan"). *Id*. EQR and AVB knew that Archstone was not going to retain the proceeds of the sale of its assets, but provide them to LBHI, and EQR and AVB also knew that LBHI was subject to the Plan. SAC, ¶¶141-42. Plaintiffs are not beneficiaries of the Plan. SAC, ¶143.

## <u>ARGUMENT</u>

### I. The Legal Standard Requires the Court to "Cautiously Study" Defendants' Motion to Dismiss

Defendants focus a great deal of their motion on the lengthy history of this action,[6] offering a simple solution to dispose of this case after several procedural steps have delayed substantive adjudication of all but a single contract claim: dismissal, because "[i]t is now time to end this case." Breach Motion at 6. Though expedient, dismissal would hardly be just and expedience is not the standard for dismissing a case. In reviewing a motion to dismiss, a court "accept[s] all the well-pleaded allegations of the complaint as true" and "construe[s] them in the light most favorable to the plaintiff." *David v. City & Cnty. of Denver*, 101 F.3d 1344, 1352 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007)). As the Defendants correctly assert, the complaint will survive a motion to dismiss if well-pleaded facts state a claim to relief that is "plausible on its face." Breach Motion at 15. And while the facts alleged "must be enough to state a claim for relief that is plausible, not merely speculative," *Gilles v. Ford*

[6] Plaintiffs respectfully invite the Court to refer to Exhibit B to Plaintiffs' Memorandum Opposing Archstone's Motion to Confirm Arbitration Award and Seeking an Order Vacating Award (Docket #221) for an accurate depiction of the procedural history of this case.

*Motor Co.*, No. 13-cv-00357, 2014 U.S. Dist. LEXIS 17732, at *15-16 (D. Colo. Feb. 12, 2014), "[t]he plausibility standard is not akin to a probability requirement, but asks for more than a sheer possibility that" the alleged claim might have occurred. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted).

Moreover, "[g]ranting a motion to dismiss 'is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice.'" *Gomez v. Kroll Factual Data, Inc.*, No. 13-cv-0445, 2013 U.S. Dist. LEXIS 172653, at *5 (D. Colo. Dec. 6, 2013) (Martinez, J.) (quoting *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009)). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* Actual proof supporting Plaintiffs' claims is quite probable—but, for now, all Plaintiffs are required to do is state plausible claims for relief. They have and therefore the Breach Motion must be denied.

## II. Causes of Action I-IV State Plausible Claims for Relief

Plaintiffs have more than sufficiently stated claims for relief for breach of fiduciary duty based on trust law and majority oppression. Moreover, Defendants' efforts to assert the law of the case doctrine with respect to Causes of Action I and II must fail.

### A. Plaintiffs have Stated Claims for Breach of Fiduciary Duty and the Aiding and Abetting Thereof Under Maryland Trust Law

Causes of Action I and II have never before been considered by this Court. Maryland law imposes on trustees fiduciary duties for the benefit of trust beneficiaries. *See* George G. Bogert, *The Law of Trusts and Trustees* § 541 (2d ed. rev. 1993)

(trustees are subject to common law duties and equitable principles). "Perhaps the most fundamental duty of a trustee is that he must display throughout the administration of the trust complete loyalty to the interests of the beneficiaries and must exclude all selfish interest and all consideration of the interests of third persons." *Id*. § 543; *see also Board of Trustees v. Mayor of Baltimore*, 317 Md. 72, 109, 562 A.2d 720, 738 (1989) ("The general duty of loyalty is well-established in Maryland law."), *cert. denied*, 493 U.S. 1093 (1990). A trustee must represent beneficiaries' interests and is liable for acting to their detriment if such conduct fails to conform to the standard of care applicable to trustees administering trusts. *Bd. of Trustees*, 317 Md. at 90, 562 A.2d at 728; Bogert, § 541. A "trustee's duty of loyalty extends beyond a prohibition against self-dealing and conflict of interest . . . . Even if the trustee has no personal stake in a transaction, the duty of loyalty bars him from acting in the interest of third parties at the expense of the beneficiaries." *Bd. of Trustees*, 317 Md. at 109, 562 A.2d at 738. Moreover, conflicts of interest, arising from the general inability of the same person to act fairly in two capacities and on behalf of two interests at the same time, impair a trustee's ability to represent beneficiaries with the independence and disinterest required in the administration of the trust. Bogert, § 543. Whether a conflict exists is a factual question and therefore should not be determined on a motion to dismiss. *Attorney Grievance Comm'n v. Kent*, 337 Md. 361, 379, 653 A.2d 909, 918 (1995).

Judge Nottingham's original dismissal order did not consider any of these principles of law, and instead cited and analyzed Maryland law regarding fiduciary duties flowing from corporate directors to the corporation, concluding that any such

claims would be derivative in nature and therefore could not be brought directly by shareholders. Docket #76 at 32-34. Similarly, the subsequent orders from Judge Blackburn neither considered nor applied Maryland trust law to Plaintiffs' allegations. *See* Docket #101; Docket #114 at 5-7.[7] Defendants have not made any arguments that Plaintiffs have insufficiently asserted a claim under Maryland trust law (*see* Breach Motion at 18-19), which they cannot both because the SAC sets forth a plausible claim for relief and because any such argument in the reply brief, if made, must be stricken. *See Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1288 (10th Cir. 2003) (arguments not raised in an opening brief are deemed abandoned and waived). Furthermore, because the Court has never considered the application of trust law in this case, there is no law of the case that could bar Causes of Action I and II. *See Atkinson v. Ortiz*, Civil Case No. 06-cv-01725, 2009 U.S Dist. LEXIS 90168, at *14 (D. Colo. Sept. 29, 2009) (when a court enunciates a rule of law in a case, it is generally applicable throughout the case).

Plaintiffs have alleged a breach of fiduciary duty under Maryland law. *See Ins. Co. of North Am. et al. v. Miller et al*, 362 Md. 361, 379 (Md. Ct. App. 2001). Plaintiffs have identified the particular fiduciary duty at issue—that which the Trustee owes to the trust beneficiaries (Plaintiffs), and that the Archstone REIT breached its fiduciary duty as Trustee by eliminating Plaintiffs' beneficiary position in ASOT, eliminating Plaintiffs' A-1 Units and their benefits, aided in the unjust enrichment of the Tishman-Lehman

[7] Plaintiffs attempted to obtain reversal of the decision on Count III of the original complaint (of which the Breach Motion asserts Causes of Action I and II of the SAC is duplicative and barred by the law of the case) based on a change in Maryland corporate law in *Shenker v. Laureate Education, Inc.*, 983 A.2d 408 (Md. 2009), which effort the Court denied. Docket #114 at 8-10.

Partnership, and forced Plaintiffs to accept one of two options that were inferior to and diminished their interests.in the trust. SAC, ¶¶157-60. As a direct and proximate result of these breaches, Plaintiffs were damaged. SAC, ¶¶163-64.

Defendants' motion to dismiss Causes of Action I and II, based on either law of the case or failure to state a claim (to the extent such an argument is considered even though Defendants did not make it), should be denied.

### B. The SAC States Claims for Breach of Fiduciary Duty by Majority Oppression, and the Aiding and Abetting Thereof

Plaintiffs also allege that the Archstone REIT violated fiduciary duties that a majority shareholder has to minority shareholders. SAC, ¶¶176-88. A majority stockholder owes a fiduciary obligation to minority shareholders and may be liable for a breach of that duty by exercising that control to the disadvantage of the minority. *Lerner v. Lerner Corp.*, 132 Md. App. 32, 53 (Md. Ct. Spec. App. 2000). For example, "when majority stockholders use their voting power for their own benefit, for some ulterior purpose adverse to the interests of the corporation and its stockholders as such, they thereby become fiduciaries and violate their fiduciary obligations." *Coop. Milk Serv. v. Hepner*, 198 Md. 104, 114 (Md. Ct. App. 1951). Furthermore, "[b]ecause of the 'predicament' a minority shareholder is in when a freeze out occurs, courts have looked at a majority shareholder's alleged 'oppressive' conduct, in terms of the 'reasonable expectations held by minority shareholders in committing their capital to the particular enterprise.'" *Edenbaum v. Schwarcz-Osztreicherne*, 165 Md. App. 233, 258 (Md. Ct. Spec. App. 2005) (internal citation omitted). "Oppressive Conduct" is "burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company

to the prejudice of some of its members; or a visual departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely." *Id.* at 378 (citation omitted). "Oppression" can be found where the majority shareholder's conduct "substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner's decision to join the venture." *Id.* at 379 (citation omitted). Courts have also considered the fairness to minority shareholders of both price and of dealing of challenged mergers. *Lerner*, 132 Md. App. at 53.

Where, as here, a majority shareholder takes actions that essentially extinguish the rights and interests of the minority, through unfair dealing and in a transaction involving an unfair price, the majority shareholder has breached its fiduciary duties. For example, in *Twenty Seven Trust v. Realty Growth Investors*, 533 F. Supp. 1028, 1039 (D. Md. 1982), the court held that minority shareholders stated a claim for breach of fiduciary duty where they alleged a majority shareholder's merger with a wholly owned subsidiary was meant to deprive the minority of a tax loss carry forward. In *Birnbaum v. SL & B Optical Centers, Inc.*, 905 F. Supp. 267, 270 (D. Md. 1995), the court held that the plaintiff minority shareholder sufficiently pled oppressive conduct against defendant majority shareholder to sustain an action for dissolution[8] where defendant doctored records to provide itself with preferential treatment in the event of sale or liquidation. Likewise, the court in *Edenbaum* found that terminating a minority shareholder's

[8] "[S]hareholder oppression under the dissolution statutes . . . is often defined in the same terms as the fiduciary duty between shareholders[.]" *Hollis v. Hill*, 232 F.3d 460, 470 (5th Cir. 2000).

employment in a close corporation was oppressive because it defeated the minority shareholder's expectations upon investing in the corporation. *Edenbaum*, 165 Md. App. at 258.

In this case, Plaintiffs contributed their properties to the Archstone UPREIT with the understanding that they would defer taxable gain while maintaining liquidity in their investment and securing the distributions REITs are required to make. SAC, ¶8. Plaintiffs allege that, notwithstanding knowing that its interests conflicted with A-1 Unitholders' interests, the Archstone REIT agreed to the Merger, structured the way it was, so as to eliminate A-1 Units without obtaining the required consent. *Id.*, ¶¶119-21, 177-79. It is difficult to conceive of an outcome more "substantially defeating" of A-1 Unitholders' expectations than the elimination of their interests.

Moreover there are abundant factual allegations in the SAC to compel the inference that the objective of the Merger was to enhance the majority's interests at the expense of the minority. The SAC alleges that, participating on both sides of the Merger transaction, the Archstone REIT oppressed minority A-1 Unitholders by: (i) refusing to allow independent bankers or other financial advisors to be retained on behalf of the A-1 Unitholders; (ii) refusing to allow an appraisal of the value of the assets held by ASOT for the benefit of the A-1 Unitholders; (iii) refusing to obtain a Fairness Opinion for the transaction forced upon the A-1 Unitholders; (iv) affirmatively disregarding the qualitative and value differences between common stock in the Archstone REIT and A-1 Units; (v) refusing to provide A-1 Unitholders with an estimate of the fair value of the A-1 Units; (vi) refusing to provide sufficient information to A-1

Unitholders from which they could ascertain for themselves the fair value of the A-1 Units; (vii) retaining Morgan Stanley as investment advisor for the Archstone REIT when Morgan Stanley or its affiliates owned 5.3% of the Archstone REIT's common shares; (viii) retaining Morgan Stanley to give a fairness opinion limited to the consideration for common shares in the Archstone REIT; and (ix) incentivizing Morgan Stanley to complete the Merger by agreeing to pay it $24 million if the Merger was completed, and just $1 million if it was not. SAC, ¶183. Without any protections for A-1 Unitholders, Defendants did not fulfill their fiduciary duties to A-1 Unitholders. *See Reis v. Hazelett Strip-Casting Corp*., 28 A.3d 442, 464 (Del. Ch. 2011) (finding no fairness of dealing where "[p]rocedural protections were not implemented, and no one bargained for the minority.").

In addition, Plaintiffs also allege that Defendants offered inadequate consideration to minority shareholders for their A-1 Units and why the price was unfair given the valuable economic features of the A-1 Units, not shared by other units or shares. SAC ¶¶ 13-15, 122, 126-33. Defendants undertook these actions in bad faith, *ultra vires*, with gross negligence and with reckless disregard of its duties as majority owner of ASOT. SAC, ¶¶18, 109, 127-31, 135-36, 186.

Defendants ignore these allegations and argue that the only act attributable to the Archstone REIT as the majority owner was "approving" the Merger. Breach Motion at 19-21. Defendants appear to be taking the position that because only the Archstone REIT needed to approve the Merger (because it was the majority holder), then that is its

only conduct as majority holder that can form the basis for a majority oppression claim. *Id.* Not surprisingly, Defendants cite no authority supporting this convoluted position.

The Archstone REIT *was* the majority unitholder, and that position gave rise to a fiduciary duty not to, through its control over the entity (in whatever role that happened to be), engage in oppressive conduct toward minority interests. All of the Archstone REIT's actions controlling the Archstone UPREIT must be considered in light of this duty. Fiduciary duties are not diluted by multiple roles. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). A majority fiduciary simply cannot justify a breach of its duties by claiming that its actions were permissible under some other role it also held. The SAC pleads ample facts supporting breach of the majority holder's duties, beyond any right the Archstone REIT had to vote on the transaction. SAC, ¶¶ 177-83.

Moreover, whether the Archstone REIT was authorized by the agreement to manage ASOT or to vote to approve the Merger, whether the Merger was permitted under the DOT, or whether the Merger was in compliance with Section 9.2B of the DOT is not dispositive of the question of whether the Archstone REIT breached its fiduciary duty. For example, citing majority oppression cases in application to a partnership agreement, the Maryland Court of Special Appeals held that:

> Nevertheless, courts have widely recognized that a general partner's exercise of management authority with the goal of putting coercive financial pressure on a limited partner may amount to a squeeze-out in breach of the general partner's fiduciary duties, even though that exercise of authority is explicitly permitted by the partnership agreement. [W]hether a technical breach has occurred is not the sole consideration because actions taken in accordance with a partnership agreement can still be a breach of fiduciary duty if partners have improperly taken advantage of their position to obtain financial gain.

*Alloy v. Wills Family Trust*, 179 Md. App. 255, 304 (Md. Ct. Spec. App. 2008) (internal citations and quotations omitted).

Defendants nonetheless attempt to make much out of the fact that the Archstone REIT was contractually permitted to engage in and vote on the Merger.. Breach Motion at 21-22. However, as the SAC alleges, the Archstone REIT's authority was not without limitations. SAC, ¶¶88-91. Moreover, the SAC contains numerous allegations relating to the Archstone REIT's bad faith and reckless disregard for A-1 Unitholders in entering into the Merger. *See, e.g.,* SAC, ¶¶18, 109, 127-31, 135, 136, 186. Reading the SAC as a whole, as the Court must, Plaintiffs have sufficiently alleged bad faith for purposes of a majority oppression claim. *Cf. Health Grades, Inc. v. Robert Wood Johnson Univ. Hosp., Inc.*, 634 F. Supp. 2d 1226, 1246 (D. Colo. 2009) (read complaint as a whole in the light most favorable to the claimant to determine whether claim has been stated).

Plaintiffs have stated a claim for breach of fiduciary duty based on majority oppression and for aiding and abetting that breach. The Breach Motion with respect to Causes of Action III and IV must be denied.

### C. The Arbitration Award is Not Law of the Case that would Bar Any of the Claims in the SAC

Defendants urge the application of the law of the case doctrine to argue that the limited arbitration ruling that Archstone did not breach Section 2(c) of the TPA means that none of the Defendants could have engaged in any other tortious acts. Breach Motion at 16-19. The law of the case doctrine only applies to rules of law set forth in a particular case. *Atkinson*, 2009 U.S. Dist. LEXIS 90168, at *14. Here, Defendants have grossly exaggerated the nature and extent of the arbitration award (Docket #184-1,

"Award"), applicable only to fifteen claimants (not even all of the named Plaintiffs, much less all of the members of the proposed class), and disingenuously argued that the limited holding that the Merger did not result in A-1 Unitholders being required to recognize gain means that none of the Plaintiffs can state any other claims.

With respect to the arbitration, the "law of the case" applies only to those claims which were determined to be arbitrable and actually arbitrated between the parties to the arbitration—not to allegations contained in a complaint that are not and were not subject to arbitration. *Sathianathan v. Smith Barney, Inc.*, No. C 04-2130, 2005 U.S. Dist. LEXIS 34409, at *8-9 (N.D. Cal. June 6, 2005) (law of the case did not preclude plaintiff's claims which were not subject to an arbitration award). The only question the arbitration answered (with regard to fifteen Claimants) is whether the Archstone REIT breached Section 2(c) of the TPA. *See* Docket #243 at 9 ("The Arbitrator reiterated that 'the Opinion's sole conclusion is clear and unambiguous and needs no clarification: 'Claimants were not required to recognize taxable gain as a result of the merger and therefore Respondent did not breach Section 2 of the [DOT].'" Award at 5-6, 9, 12. The answer to that question does not answer any questions relating to whether the Archstone REIT breached any fiduciary duties, or whether any of the other Defendants contributed to such breaches.

As discussed above, Plaintiffs' fiduciary duty claims are based on two theories. First, under Maryland trust law, a trustee owes to its beneficiaries duties of loyalty and care. SAC, ¶159. *See Bd. of Trs. v. Mayor & City Council of Balt. City*, 562 A.2d 720, 729 (Md. Ct. App. 1989) ("It is true that, like ordinary trustees, the persons administering

Baltimore's retirement funds are charged with fiduciary duties of loyalty and care toward the systems' beneficiaries."). Plaintiffs have alleged, and Defendants cannot deny, that the Archstone REIT was the sole Trustee of the trust, ASOT, and that Plaintiffs were beneficiaries of that trust. SAC, ¶¶157-58. Further, the SAC alleges that the Archstone REIT breached its duties as Trustee by: (i) unilaterally eliminating A-1 Unitholders' beneficiary position in ASOT; (ii) eliminating A-1 Units, and any and all financial benefits associated with the A-1 Units specifically provided for in the DOT; (iii) aided in the unjust enrichment of the TIshman-Lehman Partnership at the expense of the A-1 Unitholders; and (iv) forcing the A-1 Unitholders to either: (a) cash-out their Units for less than their fair market value, causing them to incur substantial damages; or (b) accept an inferior investment vehicle devoid of the financial advantages A-1 Unitholders specifically bargained for upon initially investing in the ASOT, likewise incurring financial damage. SAC, ¶160. Only (iv) relates to the forced choice between cash and Series O Units and that says nothing about whether that imposition by the Archstone REIT was in violation of the duties of loyalty and care.

Second, the Award's determination that the Merger did not violate Section 2(c) of the TPA has nothing to do with whether the Arhcstone REIT breached its fiduciary duty as majority unitholder (Causes of Action III and IV). SAC, ¶176. The structure and implementation of the Merger failed to account for the value of the A-1 Units. SAC, ¶¶178-82. Plaintiffs allege at least nine oppressive acts by the Archstone REIT (SAC, ¶183) and, despite Defendants' assertion that this is all the SAC is about, none of them are that Plaintiffs were faced with a "Hobson's Choice."

Defendants' law of the case arguments with regard to the fiduciary duty claims (I-IV) are nothing more than willful ignorance to the SAC's allegations and the claims stated, and a gross exaggeration of the meaning of the arbitration Award. The Breach Motion on this basis must be denied.

## III. The SAC States Claims for Breach of Contract, Tortious Interference with Contract and Civil Conspiracy

Cause of Action V alleges that the Archstone REIT breached non-arbitrable provisions of the DOT, including Sections 5.3A, 12.3, 12.4 and 9.2B. SAC, ¶¶198-206. Defendants do not even address these provisions of the DOT. Instead, they argue that these claims are nothing but a repackaged version" of "Plaintiffs' original claim that they had a right to vote on the 2007 Merger,"[9] and then again claiming "law of the case," citing the portion of Judge Nottingham's 2008 Order stating that mergers only needed to be approved by a majority of the holders of outstanding units. Breach Motion at 24. These arguments are unavailing.

There can be no doubt that Plaintiffs had contractual rights under the DOT or that the SAC alleges that the certain Defendants breached the DOT in a number of ways SAC, ¶¶196-206. Defendants' one-sentence assertion that the alleged breaches are a "repackaged version" of a claim that A-1 Unitholders had a right to vote on the Merger is wholly insufficient to dispose of the claims. Apparently, Defendants believe that the Archstone REIT's asserted (though by no means established at this point) compliance with one provision of the DOT excuses compliance with every other provision in the

[9] Again, the Arbitration Protective Order has prevented Plaintiffs from pleading facts that would demonstrate Defendants' knowledge that the Merger eviscerated economic rights when that could not be done without A-1 Unitholder consent. Defendants' assertion is an obvious attempt to take advantage of Plaintiffs' inability to fully plead what they know to be true.

DOT. The law does not support the parsing of a contract in this way, particularly not on a motion to dismiss when the Court must accept well-pled allegations as true. *See, e.g., Maxtena, Inc. v. Marks*, Civil Action No. DKC 11-0945, 2013 U.S. Dist. LEXIS 159420, at *27-8 (D. Md. Nov. 7, 2013) (contracts to be read as a whole to give effect to all provisions so as not to render any provision mere surplus); *HSK v. UNUMProvident Corp.*, Civil Action No. CCB-12-3373, 2013 U.S. Dist. LEXIS 133930, at *7-8 (D. Md. Sept. 19, 2013) (disregarding portions of a contract is a "result abhorred by the Court of Appeals of Maryland" and contracts must be considered in their entirety to give effect to each provision therein) (internal citations omitted). Cause of Action V is well-pleaded and the Breach Motion to dismiss it should be denied.

Cause of Action VI alleges a claim for tortious interference with contract and Cause of Action VII alleges a civil conspiracy claim. SAC, ¶¶209-218. Defendants again rely on the unsupported and unsupportable argument that the DOT's provision that allowed the Archstone REIT to vote on the Merger means that no other DOT obligations exist to defeat Causes of Action VI and VII. For the reasons provided above, Plaintiffs have sufficiently stated the aforementioned claims.

Because Defendants' argument on Causes of Action VI and VII is limited to the position that the failure of the breach of contract claim dooms the tortious interference and conspiracy claims, a finding that Plaintiffs have stated a breach of contract claim resolves the Breach Motion with respect to Causes of Action VI and VII in Plaintiffs' favor. Nonetheless, Plaintiffs note that the SAC includes allegations relating to each of the elements of tortious interference with contract and civil conspiracy, so there is no

other basis upon which to grant dismissal. *See, e.g., Hugh v. E Tech Holdings, Inc.,* Civil Action No. 8:13-cv-01197, 2013 U.S. Dist. LEXIS 120657, at *4-5 (D. Md. Aug. 26, 2013) (denying motion to dismiss; elements of tortious interference with contract under Maryland law "(1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff.") (internal citations omitted); *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 696 (D. Md. 2012) (Maryland elements of civil conspiracy are “(i) a confederation of two or more persons by agreement or understanding; (ii) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and (iii) actual legal damage resulting to the plaintiff.”).

The SAC alleges that certain Defendants knew that the Archstone REIT had contractual duties to Plaintiffs, that those Defendants interfered with those obligations through the negotiations and formulation of the Merger resulting in the Archstone REIT’s breach of the DOT, and damages resulted. SAC, ¶¶210-13. The SAC further alleges that certain Defendants conspired to tortiously interfere with the DOT. SAC, ¶¶216-18. Consequently, the Breach Motion, with respect to Causes of Action VI and VII, must be denied.

**IV. Plaintiffs have Stated a Claim for Unjust Enrichment**

Citing Colorado law, Defendants argue that Plaintiffs’ unjust enrichment claims are barred by a three-year statute of limitations because the motion for leave to file the

amended complaint was not filed until November 13, 2013, more than six years after the 2007 transaction closed. Breach Motion at 26-27. The insincerity of this argument is threefold. First, Plaintiffs were barred from bringing any such motions prior to November, 2013, based on previous orders of this Court—many of which were entered as a result of positions asserted by Defendants themselves. Second, Defendants fail to even attempt to argue why such a claim would not relate back to the filing of the original complaint (it would), filed mere months *at most* after the statute arguably began to run. Finally, the SAC contains allegations that plausibly assert a claim for unjust enrichment.

Federal Rule of Civil Procedure 15(c)(1)(B) provides that an "amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Perhaps the reason that Defendants ignore this rule is that it so clearly applies:

> The rationale behind Rule 15(c)(1)(B) is that "a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." As long as there is a "factual nexus" between the original and amended complaints, the amended claim "is liberally construed to relate back to the original complaint if the defendant had notice of the claim and will not be prejudiced by the amendment."

*Gorsuch, Ltd. v. Wells Fargo Nat'l Bank Ass'n,* Civil Action NO. 11-cv-00970, 2013 U.S. Dist. LEXIS 174681, at *22-23 (D. Colo. Sept. 16, 2013) (internal citations omitted). Defendants could not (and do not) argue with a straight face that the factual allegations that underlie the unjust enrichment claim do not have a "nexus" to the original complaint—all of the claims are based on the negotiations for and consummation of the

2007 Merger. The unjust enrichment claim is unquestionably related to the same transaction that was the basis for the original complaint, therefore it relates back.

Further, Plaintiffs have sufficiently alleged the elements of a cause of action for unjust enrichment. *See Ninth Dist. Prod. Credit Ass'n v. Ed Duggan, Inc.*, 821 P.2d 788, 795 (Colo. 1991) (elements of unjust enrichment are "(1) that a benefit was conferred on the defendant by the plaintiff, (2) that the benefit was appreciated by the defendant, and (3) that the benefit was accepted by the defendant under such circumstances that it would be inequitable for it to be retained without payment . . . ."). Plaintiffs allege that, after the diligence period leading up to the Merger, the Tishman-Lehman Partnership submitted a written indication of interest to acquire the Archstone REIT and ASOT for $64 per share/unit. SAC, ¶222. After further diligence, the Tishman-Lehman Partnership expressed concern over the magnitude of built-in gain associated with properties subject to tax protection agreements and, consequently, lowered their offer. SAC, ¶223. The parties ultimately agreed on $60.75 per share/unit. SAC, ¶225. The Tishman-Lehman Partnership refused, as a condition of the deal, to permit the payment of third-quarter dividends to Plaintiffs and all A-1 Unitholders. SAC, ¶224. The SAC alleges that the benefit conferred on the Tishman-Lehman Partnership was unjustly accepted and retained (the hundreds of millions of dollars worth of discount that was negotiated under the auspices that it was to be used to cover the tax protection obligations that the Tishman-Lehman Partnership would assume through the Merger) without equitable payment of its value. SAC, ¶¶227, 229.

Defendants' arguments that Plaintiffs cannot plead that the "price decrease came at their expense" (Breach Motion at 28) or that the TPA bars any unjust enrichment claims (*id.*) are unavailing. Evidence adduced during the arbitration, which Plaintiffs are precluded from describing due to the Arbitration Protective Order, demonstrates otherwise. Even without it, the SAC clearly alleges that the price decrease and Tishman's subsequent retention of that money was at Plaintiffs' expense. *See, e.g.,* SAC, ¶¶227, 229. Plaintiffs have not claimed they were entitled to an "outright $64 payout" (Breach Motion at 28), but that Tishman knew of the value of the A-1 Units and lowered the Merger price because of the obligations attendant to those units, and failed to then account to Plaintiffs for that value.

Defendants' argument that an adequate remedy-at-law precludes an unjust enrichment claim ignores the fact that Plaintiffs have no contract action against Tishman, which was not a party to the DOT. *See Robert W. Thomas & Anne McDonald Thomas Trust v. Inland Pacific Colorado, LLC*, Civil Action No. 11-cv-03333, 2012 U.S. Dist. LEXIS 82312, at *12-13 (D. Colo. June 14, 2012) (denying motion to dismiss unjust enrichment claim because claim was against a non-party to contract). Defendants' argument, therefore, must be rejected.

Plaintiffs have stated a claim for unjust enrichment and the Breach Motion with regard to that claim should be denied.

## V. The "2013 Defendants' Motion to Dismiss The Second Amended Complaint For Failure to State a Claim" Should be Denied as Moot

The SAC includes three causes of action that arise from the sale of Archstone's assets, which sale closed February 27, 2013. SAC, ¶¶231-248. In Causes of Action X

(Fraudulent Transfer), XI (Civil Conspiracy – Fraudulent Transfer), and XII (Aiding and Abetting Fraudulent Transfer), Plaintiffs allege that the terms of the 2013 Asset sale, through which all of Archstone's assets were sold to EQR and AVB, resulted in a fraudulent transfer because the proceeds of the asset sale were to be transferred from the Archstone entity to the post-bankruptcy LBHI, and thereafter those proceeds would be subject to the Plan. SAC, ¶¶3, 21-25, 138-148. Plaintiffs allege that through these transfers, Archstone would be left an empty shell, unable to satisfy either a judgment in this case or its obligations to Series O Unitholders. SAC, ¶¶147-148, 247.

Defendants filed the Fraudulent Transfer Motion, asserting that the APA, which governed the 2013 Asset Sale, and the February 18, 2014 Backstop Agreement sufficiently protect Plaintiffs' interests. Fraudulent Transfer Motion at 3. Plaintiffs never knew of and were not given the Backstop Agreement until February 18, 2014, well-after the filing of the SAC.[10] Both prior to and following receipt of it, Plaintiffs' counsel made good faith efforts to discuss the effect of the Plan, the APA, and the Backstop Agreement, receiving, in Plaintiffs' view, at least incomplete responses from Defendants. Nonetheless, simultaneously with this opposition brief, and for the reasons stated therein, Plaintiffs have filed a motion seeking an order permitting dismissal without prejudice of these claims, by way of amending the SAC to remove Causes of Action X, XI, and XII. ("Voluntary Dismissal Motion"). Defendants' counsel has consented to the dismissal without prejudice of those causes of action. Therefore, the Fraudulent Transfer Motion should be denied as moot.

---

[10] The Backstop Agreement, dated February 18, 2014, is attached as Exhibit A-1 to the Declaration of Jonathan Polkes, which was submitted with the Fraudulent Transfer Motion. Docket #289.

In the event the Court denies Plaintiffs' Voluntary Dismissal Motion, the Fraudulent Transfer Motion should still be denied. Taking the allegations of the SAC as true, as the Court must, none of Defendants' arguments resolve the underlying issue that Plaintiffs raise—that the proceeds of the sale will not remain with Archstone, but will be transferred to LBHI and thereby be subject to the Plan. SAC, ¶¶144-48.

Defendants' suggestion that the SAC fails to plead fraudulent transfer with the specificity required by Federal Rule of Civil Procedure 9(b) is disingenuous. Fraudulent Transfer Motion at 11-12. Although heightened, the Rule 9(b) standard does not require more than that which is necessary to put Defendants on notice of the claims, such that they can assert a defense. *See, e.g., Catalan et al. v. Vermillion Limited Partnership et al.*, Civil Action No. 06-cv-01043, 2007 U.S. Dist. LEXIS 567, at *14-15 (D. Colo. Jan. 4, 2007) (Rule 9(b) does not require that a complaint set forth detailed evidentiary matter, just notice of what the defendant is charged with). The SAC makes very clear the source of the allegations supporting the claim for fraudulent transfer and the Defendants' contributions thereto, and Defendants cannot plausibly say they have no notice of the claims against them. SAC, ¶¶138-48; 231-48. Not only that, Defendants sought and obtained a "Backstop Agreement" to address the very concerns raised by Plaintiffs in Counts X, XI and XII of the SAC.

Plaintiffs have alleged they are "creditors" with "claims" against the "debtor" Archstone's successor-in-interest, as required by C.R.S. §§38-8-101. SAC, ¶¶232-34. *See Thuringer v. Trafton*, 144 P. 866, 867 (1914) (plaintiff was a "creditor" because he held a tort claim against defendant); *cf. Walk-In Medical Centers, Inc. v. Breuer Capital*

*Corp.*, 778 F. Supp. 1116 (D. Colo. 1991) (under Colorado fraudulent conveyance statute, plaintiff was entitled to creditor status from the date of breach of the underlying agreement). The fact that Plaintiffs have "no right to enforce payment of these monies until the trial court enter[s] the award…is immaterial." *Sands v. New Age Family Partnership*, 897 P.2d 917, 921 (Colo. Ct. App. 1995).

The SAC also alleges that if the proceeds are transferred out of Archstone's successor to LBHI, LBHI will, pursuant to the Plan, be required to distribute them to its creditors, which do not include Plaintiffs. SAC, ¶235-37. Once such distributions are made, there will be nothing left to pay a judgment in this case. SAC, ¶238. *See Megabank Financial v. Alpha Gamma Rho*, 841 P.2d 318 (Colo. App. 1992) (fraudulent transfer occurs when debtor's action make it impossible for creditor to collect on its claim). The SAC further alleges that all the parties to the 2013 Asset Sale were well-aware of this lawsuit at the time of the sale, and that they took actions they knew would render Archstone unable to satisfy its obligations, conspiring to engage in a fraudulent transfer or aiding and abetting a fraudulent transfer. SAC, ¶¶239-48.

## **CONCLUSION**

For all the foregoing reasons, the Defendants' motions to dismiss should be denied. In the alternative, should the Court find the allegations of the SAC to be deficient, Plaintiffs respectfully request leave to amend.

Dated: April 4, 2014

Respectfully submitted,

By: /s/ Kara A. Elgersma
Kenneth A. Wexler
Kara A. Elgersma

Wexler Wallace LLP
55 W. Monroe Street, Suite 3300
Chicago, Illinois 60603
(312) 346-2222 – Telephone
(312) 346-0022 – Facsimile
kaw@wexlerwallace.com
kae@wexlerwallace.com

Lee Squitieri
Squitieri & Fearon, LLP
32 E. 57th Street, 12th Floor
New York, New York 10022
(212) 421-6492 – Telephone
(212) 421-6553 – Facsimile
lee@sfclasslaw.com

Diane Vaksdal Smith
Burg Simpson
40 Inverness Drive East
Englewood, Colorado 80112
(303) 792-5595 – Telephone
(303) 708-0527 – Facsimile
dsmith@burgsimpson.com

***Counsel for Plaintiffs Steven A. Stender, Harold Silver and Infinity Clark Street Operating, L.L.C.***

## CERTIFICATE OF SERVICE

I, Kara A. Elgersma, hereby certify that I electronically filed the foregoing Plaintiffs' Consolidated Opposition to Defendants' Motions to Dismiss the Second Amended Complaint with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

| | |
|---|---|
| Jonathan D. Polkes<br>Ashishi Dinesh Gandhi<br>Weil Gotshal & Manges, LLP- NY<br>767 5th Avenue<br>New York, NY 10153<br>Jonathan.polkes@weil.com<br>Ashish.gandhi@weil.com | Frederick J. Baumann<br>Alex C. Myers<br>Lewis Roca Rothgerber<br>1200 Seventeenth Street<br>Suite #3000<br>Denver, CO 80202-5855<br>fbaumann@LRRLaw.com<br>amyers@LRRLaw.com |

Date: April 4, 2014 /s/ Kara A. Elgersma