**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 07-cv-02503-WJM-MJW

STEVEN A. STENDER,
HAROLD SILVER, and
INFINITY CLARK STREET OPERATING, L.L.C.,
on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

ARCHSTONE-SMITH OPERATING TRUST *et al.*,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION, OVERRULING AS MOOT PLAINTIFFS' OBJECTION TO
MAGISTRATE JUDGE'S JULY 23, 2015 ORDER, AND DENYING AS MOOT
DEFENDANTS' REQUEST FOR ORAL ARGUMENT**

---

Before the Court is Plaintiffs' Motion for Class Certification ("Certification

Motion").  (ECF No. 396.)  For the reasons explained below, the Court grants the

Motion with respect to liability and denies it with respect to damages.[1]  This disposition

moots Defendants' request for oral argument.  (ECF No. 430.)

Also before the court is Plaintiffs' Objection (ECF No. 399) to United States

Magistrate Judge Michael J. Watanabe's July 23, 2015 Order (ECF No. 393) denying

Plaintiffs' motion to add an additional class representative (ECF No. 391).  As described

below, Plaintiffs' Objection is moot in light of the Court's partial grant of the Certification

---

[1]  Both parties filed their class certification papers, including all exhibits, entirely under seal (specifically, Restricted Access, Level 1).  *See* D.C.COLO.LCivR 7.2.  To the extent a brief or exhibit is quoted or summarized below, the Court has determined that the portion quoted or summarized does not meet the standards for Restricted Access set forth in D.C.COLO.LCivR 7.2(c)(2)–(4).

Motion.  Plaintiffs' Objection is therefore overruled as moot.

## I.  FACTUAL & PROCEDURAL BACKGROUND

### A.    Early Proceedings & Arbitration

Plaintiffs initiated this action on November 30, 2007 by filing a class action

Complaint alleging breach of contract and breach of fiduciary duty.  (ECF No. 1.)  The

case was originally assigned to former United States District Judge Edward Nottingham.

(ECF No. 2.)  In lieu of an answer, Defendants moved to dismiss all claims, arguing that

some claims were subject to an arbitration clause and others failed to state a claim

upon which relief could be granted.  (ECF No. 29.)  On September 30, 2008, Judge

Nottingham granted Defendants' motion, finding that Plaintiffs' claim relating to a tax

protection agreement ("TPA," discussed further below) was subject to arbitration.  (ECF

No. 76.)  Judge Nottingham also found that Plaintiffs failed to state a claim for breach of

fiduciary duty and dismissed those claims with prejudice.  (*Id.*)

Plaintiffs moved for reconsideration of the dismissal order, arguing that, because

Judge Nottingham found that Plaintiffs had failed to allege sufficient facts to state a

claim, they should be afforded the opportunity to file an amended complaint.  (ECF No.

78.)  While this motion was pending, the case was reassigned to United States District

Judge Robert E. Blackburn.  (ECF No. 81.)  Judge Blackburn granted Plaintiffs' motion

to reconsider, ruling that Plaintiffs should be allowed to file an amended complaint.

(ECF No. 101.)  However, Judge Blackburn did not accept Plaintiffs' tendered amended

complaint at that time, instead administratively closing the case pending conclusion of

the arbitration of the claim related to TPA.  (*Id.*)

Upon the undersigned's appointment, the case was again reassigned.  (ECF No. 131.)  The Court permitted Plaintiffs to file an amended complaint, but continued the stay of litigation until the arbitration was resolved and administratively closed the case.  (ECF Nos. 150, 159.)

**B.     The Second Amended Complaint**

Upon conclusion of the arbitration, the Court reopened this matter.  (ECF No. 188.)  On Defendants' motion, the Court confirmed the arbitrator's award in favor of Defendants.  (ECF Nos. 184, 243.)  Plaintiffs then filed their Second Amended Complaint, which is the operative pleading in this case.  (ECF No. 266.)

1.     Plaintiffs' Investment

The pertinent facts pled in the Second Amended Complaint are as follows.  Up until early 2007, Defendant Archstone REIT was one of the largest publicly held real estate investment trusts in the United States.[2]  (*Id.* ¶ 44.)  The Archstone REIT held nearly all of its assets in the Archstone UPREIT (formally known as the Archstone Smith Operating Trust).[3]  (*Id.*)  The Archstone REIT was the sole trustee of the Archstone UPREIT, and was responsible for its strategic direction, as well as

---

[2] A real estate investment trust is an entity that owns and manages income-producing real estate such as apartments, offices, and industrial space.  (*Id.* ¶ 69.)  A REIT generally does not pay corporate income taxes, which allows investors to enjoy the advantages of the corporate form (including limited liability and transferability of shares) without incurring the costs of double taxation.  (*Id.* ¶¶ 70–71.)

[3] UPREIT stands for "umbrella partnership real estate investment trust."  (*Id.* ¶ 72.)  An UPREIT is a REIT formed by combining properties from existing limited partnerships.  (*Id.*)  The original partners exchange properties held by the partnerships for an interest in a new transitional operating partnership.  (*Id.*)  Simultaneously, a corporation—usually a REIT—contributes cash that it raised in a public offering in exchange for a general partnership interest in the UPREIT.  (*Id.*)

management and administration of all the properties the Archstone UPREIT owned. (*Id.* ¶ 83.)  Archstone REIT owned about 89 percent of Archstone UPREIT's beneficial interests in the form of A-2 Common Units.  (*Id.* ¶¶ 44–45.)  The Archstone UPREIT was governed by a Declaration of Trust ("DOT").

In the late 1990s, Plaintiffs invested in various Archstone-predecessor UPREITS, receiving what are referred to as A-1 units.  (*Id.* ¶¶ 5, 76.)  As of May 2007, Plaintiffs and the proposed class held approximately 11 percent of the Archstone UPREIT in the form of A-1 units.  (*Id.* ¶ 45.)  The A-1 units were not investments in the Archstone REIT, but were common units in the Archstone UPREIT.  (*Id.* ¶ 5.)  Plaintiffs chose to invest in the A-1 units of the Archstone UPREIT in exchange for the contractual promise that, for some period of time after the transfer of their real estate holdings to Archstone, the UPREIT could not dispose of any interest in the properties in a manner that resulted in Plaintiffs realizing any taxable gain.  (*Id.* ¶ 76.)  If any such gain was realized, the UPREITs were obligated to reimburse Plaintiffs in that amount.  (*Id.*)  These contractual provisions were referred to as "tax protection agreements" or "TPAs." (*Id.*)  The TPAs allowed Plaintiffs to obtain the benefits of a broader portfolio of investments, without compromising their ability to plan for the tax consequences resulting from the disposition of any property.  (*Id.* ¶ 77.)

Plaintiffs were also drawn to contribute their capital to Archstone UPREIT because they would be able to redeem their units at will for cash or tradable common stock.  (*Id.* ¶¶ 78, 90.)  Plaintiffs found favorable the DOT's requirement that Archstone UPREIT distribute 100 percent of its taxable income to shareholders, because this

afforded the investor a regular cash flow.  (*Id.* ¶¶ 78–79.)

2.    The Merger

On May 2, 2007, Defendant Tishman-Lehman Partnership ("TLP") submitted a written indication of interest seeking to acquire the Archstone REIT and UPREIT for a cash purchase price of $64 per share.  (*Id.* ¶ 92.)  Two weeks later, Archstone REIT's board of trustees became aware of TLP's concerns regarding the "magnitude of the built-in gain associated with certain of Archstone's properties that are subject to tax protection agreements with operating trust unitholders and the magnitude of the increase in property taxes as a result of the transaction."  (*Id.* ¶ 93.)  On May 23, 2007, TLP rescinded its original offer of $64 per unit, and instead offered a price of $60 per unit.  (*Id.* ¶ 96.)  Allegedly, this price reduction was primarily driven by the magnitude and scope of the TPAs.  (*Id.*)  Archstone REIT negotiated with TLP over the purchase price, and those entities ultimately agreed on $60.75 per unit, conditioned on TLP's refusal to pay out a third-quarter dividend that was owed to A-1 unitholders.  (*Id.* ¶ 99.)

On May 29, 2007, Archstone REIT publicly announced that it had signed a contract to merge with TLP ("Merger Agreement") in a transaction valued at approximately $22.2 billion dollars (the "Merger").  (*Id.* ¶ 100.)  The Merger Agreement terminated the A-1 units and required holders thereof to choose between two options: a cash payout of $60.75 per unit or a one-for-one exchange for a newly created Series O unit.  (*Id.* ¶ 105.)  The Merger Agreement stated that River Acquisition (MD), LP assumed "all properties, rights, privileges, purposes and powers and debts, duties and liabilities" of the Archstone REIT.  (*Id.* ¶ 104.)  Because the Merger Agreement

eliminated the A-1 shares, River Acquisition assumed nothing with regard to the A-1 unitholders.  (*Id.*)

Plaintiffs contend that the Series O units had inferior economic characteristics to the A-1 units, including the possibility of the Series O units lacking tax deferred status. (*Id.* ¶ 122.)  Plaintiffs allege that the Merger failed to "acknowledge and account for the superior nature of the A-1 units over the A-2 units."  (*Id.* ¶ 126.)

After the Merger, Archstone REIT caused billions of dollars in assets held by Archstone UPREIT to be transferred to itself.  (*Id.* ¶ 124.)  The Archstone REIT then merged with the Tishman-Speyer Partnership, which became the sole trustee of the Archstone UPREIT.  (*Id.* ¶ 125.)  Plaintiffs allege that the "sole purpose of leveraging the assets was to permit an impermissible distribution to the A-2 Unitholders to fund the acquisition of the Archstone REIT."  (*Id.*)

3.    Plaintiffs' Claims

On these facts, Plaintiffs' Second Amended Complaint brought claims for breach of fiduciary duty, breach of contract, tortious interference with contract, civil conspiracy, unjust enrichment, and similar claims.  Defendants then filed a motion to dismiss the Second Amended Complaint.  (ECF No. 288.)  This Court granted that motion as to Plaintiffs' claims based on Archstone REIT's alleged breach of its fiduciary duty in its capacity as trustee.  (ECF No. 312 at 7–10.)  Plaintiffs also voluntarily dismissed certain causes of action.  (*Id.* at 19.)  The Court otherwise sustained the Second Amended Complaint, leaving causes of action for breach of fiduciary duty based on majority oppression of the minority A-1 unitholders (Claim 3), aiding and abetting the same

(Claim 4), breach of the DOT (Claim 5), tortious interference with the DOT (Claim 6), civil conspiracy (Claim 7), and unjust enrichment (Claim 8).

## II.  CLASS CERTIFICATION ANALYSIS

### A.     Legal Standard

As the parties seeking class certification, Plaintiffs must first demonstrate that all four prerequisites of Federal Rule of Civil Procedure 23(a) are clearly met.  *Shook v. El Paso Cnty.*, 386 F.3d 963, 971 (10th Cir. 2004); *see also Tabor v. Hilti, Inc.*, 703 F.3d 1206 (10th Cir. 2013).  These threshold elements consist of the following: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative party are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).

If Plaintiffs prove they have met these threshold requirements, they must then demonstrate that the action falls within one of the three categories set forth in Rule 23(b).  *Shook*, 386 F.3d at 971.  Here, Plaintiffs seek certification pursuant to Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

The party seeking to certify a class bears the strict burden of proving the requirements of Rule 23.  *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).  In determining the propriety of a class action, the question is not whether the plaintiffs

have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. *Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir. 1982). When deciding whether the proposed class meets the requirements of Rule 23, the Court accepts the plaintiffs' substantive allegations as true, though it need not blindly rely on conclusory allegations and may consider the legal and factual issues which the complaint presents. *Shook*, 386 F.3d at 968; *see also Vallario v. Vandehey*, 554 F.3d 1259, 1265 (10th Cir. 2009). The Court should not pass judgment on the merits of the case, but must conduct a "rigorous analysis" to ensure that the requirements of Rule 23 are met. *D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010).

The decision whether to grant or deny class certification "involves intensely practical considerations and therefore belongs within the discretion of the trial court." *Tabor*, 703 F.3d. at 1227.

## B.    Proposed Class

Plaintiffs propose the following Class definition: "[A]ll persons or entities who owned Class A-1 common units ('A-1 Units,' and their holders, 'A-1 Unitholders') of the Archstone-Smith Operating Trust ('ASOT'), an umbrella partnership real estate investment trust, at the time of the Merger." (ECF No. 397 at 10.)[4]

## C.    Rule 23(a)

The Court's first task is to ensure that the Federal Rule of Civil Procedure 23(a) requirements are satisfied as to the proposed Class: (1) the class is so numerous that

---

[4] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination.

joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy").  The Court will address each of these considerations in turn.

      1.    <u>Numerosity</u>

Plaintiffs contend there are as many as 1,071 Class members.  (ECF No. 397 at 34.)  Defendants claim there are 813 Class members (ECF No. 413 at 15), but Defendants do *not* argue that 813 is insufficiently numerous.  Given that even 813 Class members would make joinder impracticable, and given Defendants' non-opposition on this point, the Court finds that the numerosity requirement is satisfied.

      2.    <u>Commonality</u>

Defendants similarly do not contest Plaintiffs' assertion that there are questions of law or fact common to the Class.  Because such questions appear on the face of the Second Amended Complaint (*e.g.*, whether majority shareholders oppressed minority shareholders, whether the DOT was breached, etc.), and in light of Defendants' non-opposition on this point, the Court finds that the commonality requirement is satisfied.

      3.    <u>Typicality & Adequacy</u>

The  typicality and adequacy requirements of Rule 23(a) "tend to merge."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 162 n.13 (1982).  Accordingly, with respect to the named Plaintiffs, the Court will analyze these two requirements together.

      a.    *Stender*

Plaintiff Stender was an A-1 unitholder who, at the time of the Merger, elected to

take cash for his A-1 units rather than the new Series O shares.  (ECF No. 266 ¶ 26.)

Defendants attack Stender's typicality and adequacy through the "unique defense"

doctrine: "class certification is inappropriate where a putative class representative is

subject to unique defenses which threaten to become the focus of the litigation."  *Gary*

*Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176,

180 (2d Cir. 1990); *see also In re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672, 687 (D. Colo.

2014) ("The reason why a lead plaintiff's unique defense is detrimental to the class is

that the lead plaintiff might devote time and effort to the defense at the expense of

issues that are common and controlling for the class." (internal quotation marks

omitted)).  Given that Stender was a party to the arbitration proceeding described in

Part I.A, *supra*, Defendants claim that Stender will be "barred by collateral estoppel

from relitigating legal and factual issues decided" in that arbitration.  (ECF No. 413 at

25.)

Arbitration can indeed have a collateral estoppel effect.  *See Coffey v. Dean*

*Witter Reynolds Inc.*, 961 F.2d 922, 925 n.4 (10th Cir. 1992).  Evaluating the extent to

which Stender may be collaterally estopped requires a brief summary of the question

resolved in arbitration.

At issue in the arbitration was a specific TPA section requiring Archstone to

indemnify A-1 unitholders if Archstone agreed to any merger "that results in [the A-1

unitholder] being required to recognize part or all of the [taxable] gain" on a property

contributed by the unitholder to the REIT.  (ECF No. 397-32 at 87.)  The arbitration

claimants (including Stender) argued that their choice at the Merger between cash and

10

Series O units was no real choice.  (ECF No. 184-1 at 4.)  Although Series O units, in theory, preserved the tax-deferred characteristics of the A-1 units, the claimants asserted that "the Series O Unit was so economically inferior that it provided no reasonable alternative to the cash option," and so the claimants were effectively "required to take the cash, thereby recognizing taxable gain." (*Id.*)  The claimants accordingly sought damages equal to the taxes paid.  (*Id.* at 3; *see also* ECF No. 397-32 at 91.)

The arbitrator ruled against claimants, concluding that the Series O unit "was a bona fide investment alternative, and, therefore, the merger did not result in Claimants being <u>required</u> to recognize taxable gain by choosing the cash option."  (ECF No. 184-1 at 5–6 (underscoring in original); *see also id.* at 9.)  The arbitrator also rejected an alternative argument, *i.e.*, that the TPA did not permit Archstone to offer anything other than cash combined with tax indemnification.  (*Id.* at 9–10.)  Finally, the arbitrator appeared to rule against the claimants on the question of whether the DOT permitted the Merger without an approving vote from the A-1 unitholders.  (*Id.* at 10–11.)  But the arbitrator also stated, "Even if Claimants could establish that their voting rights . . . were violated, . . . Claimants might choose to assert a claim for breach . . . in an appropriate forum.  However, such a claim is not within the scope of this arbitration."  (*Id.* at 11 n.4.)

Defendants moved in this Court to confirm that arbitration award.  (ECF No. 184.)  Although the Court granted the motion, it agreed with Plaintiffs that the arbitrator's concluding analysis regarding A-1 unitholders' right to vote on the merger was dicta and therefore would not bind Plaintiffs in this lawsuit.  (ECF No. 243 at 9–10.)

11

Defendants now argue that the arbitration result will infect every portion of this case as it relates to Stender.  "No matter how Plaintiffs attempt to disguise them," Defendants say, "their allegations and claimed damages derived from the alleged tax-related consequences of the [Merger].  But Mr. Stender . . . has already litigated and lost in arbitration in which he sought exactly those tax-related damages."  (ECF No. 413 at 25.)  In support, Defendants offer two items of evidence.

The first item is Stender's deposition testimony, where Stender made statements such as "the Tax Protection Agreement is a critical component of our claims."  (ECF No. 413-6 at 3; *see also* ECF No. 413 at 27 & n.22.)  Defendants appear to be attempting to portray Stender as doggedly holding on to tax indemnification despite the arbitration.  Having thoroughly reviewed the Stender deposition excerpts submitted by Defendants, the Court finds that Defendants quotations are highly selective and do not fairly portray Stender's position.  For instance, with respect to the TPA being "a critical component of our claims," Stender's actual testimony was as follows: "I think the fact that they [Archstone] ignored the Tax Protection Agreement is a critical component of our claims.  I think it constitutes, to my way of thinking, and oppression of the minority."  (ECF No. 413-6 at 3.)  Thus, the "critical component" is not the TPA itself, but Archstone's choice to "ignore" it when negotiating the Merger, *i.e.*, to disregard the interests of the A-1 unitholders, who were in the minority.  This is not an attempt to resurrect the matters decided in arbitration.  It is simply one Plaintiff's understanding of Plaintiffs' Claim 3 for breach of fiduciary duty based on majority oppression.  Moreover, Stender was asked at least four times whether tax indemnification damages were still at issue, and he answered "no" each time.  (ECF No. 413-6 at 4, 5, 6, 7.)

12

The second item comes from the report of Plaintiffs' damages expert, Evan Cohen.  The Court will discuss Cohen's report in greater detail when it addresses whether individual damages questions overwhelm common questions.  (*See* Part II.D.1, *infra*.)  For present purposes, it suffices to note that one of the ways Cohen measured Plaintiffs' alleged damages was through calculating the difference between the Series O units or cash, on the one hand, and "the after-tax value of the A-1 Units assuming there was no [Merger]," on the other.  (ECF No. 397-30 ¶ 12.)  In calculating the A-1 units' value, Cohen considered, among other things, the value to an investor of the A-1 units' tax-protected status.  (*Id.* ¶¶ 34–44.)  Defendants claim that this is some sort of backdoor attempt to resurrect the tax indemnification damages rejected in the arbitration, and therefore Stender may not rely on the Cohen report.  (ECF No. 413 at 27–28.)

Without prejudging the overall relevance or validity of Cohen's choice to calculate the value to an investor of the A-1 units' tax-protected status, the Court sees a meaningful distinction between damages based in part on that value and damages based on breach of a tax indemnification requirement.  Tax indemnification damages (now foreclosed by the arbitration) presumably would have been a question of how much in taxes each affected unitholder actually paid.  By contrast, Cohen attempted to calculate the per-unit value an investor would ascribe to the tax protections, which seems little different than calculating the per-unit value of a unit's other features, such as guaranteed distributions.  Thus, the Court is not convinced that collateral estoppel arising from the arbitration will be a "unique defense" to Stender that threatens to become the focus of this lawsuit.  The Court accordingly rejects Defendants' challenge

13

to Stender's typicality and adequacy.

      b.    *Infinity*

Plaintiff Infinity Clark Street Operating ("Infinity") is an Illinois business entity that accepted Series O units rather than cash.  (ECF No. 266 ¶ 28.)  Defendants argue that Infinity "is an atypical and inadequate representative" because it "elected to take Series O Units to have standing here," and continues to hold those units (rather than redeeming them) to maintain standing.  (ECF No. 413 at 30.)  This supposedly "puts Infinity on far different footing from the other putative class members that chose Series O Units, and continue[] to hold them, ostensibly for bona fide investment purposes (including tax deferral), not for strategic litigation reasons."  (*Id.*)

The Court disagrees.  The premise underlying Defendants' argument is that some A-1 unitholders who took the Series O units did so without reservation.  That may be true, but all it really tells us is that some Class members may have no interest in bringing a lawsuit like this one.  That is probably always the case with class actions.  It does not show that Infinity is an atypical or inadequate representative.

Defendants also argue—and Plaintiffs do not contest—that Infinity is in privity with Stender because Stender controls (or previously controlled) Infinity, and therefore the arbitration result binds Infinity as well.  (ECF No. 413 at 30–31.)  But for the reasons explained above, Defendants have not shown that collateral estoppel arising from the arbitration will have any serious effect on this lawsuit.  Thus, the Court rejects Defendants' challenge to Infinity's typicality and adequacy.

      c.    *Silver*

Plaintiff Silver took Series O units rather than cash.  (ECF No. 266 ¶ 27.)  Silver,

14

however, would not be a typical or adequate Class representative.

"Plaintiffs may be found to be inadequate representatives where they are not familiar with the basic elements of their claims, [or] have an almost total lack of personal knowledge of their claims . . . ." *City P'ship Co. v. Jones Intercable, Inc.*, 213 F.R.D. 576, 583–84 (D. Colo. 2002) (citations omitted). Such is the case here, as shown by the following excerpts from Silver's deposition:

> Q.   Do you understand that you potentially may be a
>      class representative in this action?
>
> A.   I don't understand what that means.
>
> * * *
>
> Q.    Okay. I'm going to—have you ever reviewed any of
>      the Complaints that have been filed in this action?
>
> A.   No.
>
> Q.   Okay. Do you have an understanding of what the
>      allegations are in this action?
>
> A.   No.
>
> Q.   Do you have an understanding of what the claims are
>      in this action?
>
> A.   No.
>
> Q.   Do you have an understanding of who the class is,
>      the proposed class is, in this action?
>
> A.   Just by this [referring to the Second Amended
>      Complaint]. No.
>
> * * *
>
> Q.    . . . And it says [referring to Silver's verification of
>      interrogatory responses], "I, Harold Silver, have read
>      the foregoing responses to Defendants' first set of

15

Interrogatories to Plaintiffs and do swear under penalty of perjury that they are true and correct to the best of my knowledge and recollection."  Okay.

Now, what did you do, Mr. Silver, to make sure that these responses were true?

A.    Nothing.

Q.    And what did you do to make sure that they were correct, to the best of your knowledge and recollection?

A.    Nothing.

(ECF No. 413-2 at 3, 11, 14.)  Even Silver's own counsel, at the end of the deposition, could not elicit a helpful response:

Q.    I have a question for you, Mr. Silver.

A.    Sure.

Q.    Do you have an understanding as to whose behalf this lawsuit is for?

[Objection.]

A.    For me.

Q.    Anyone else?

A.    No.

(*Id.* at 15.)

Not surprisingly, Plaintiffs' Certification Motion contains a declaration from Silver, attempting to explain his deposition testimony.  (ECF No. 397-73.)  Silver begins by noting that he is 89 years old.  (*Id.* ¶ 1.)  He then goes on to explain that he "found the process" of his deposition "to be long and confusing":

The lawyers questioning me handed to me legal documents

16

several times and then asked me what I thought were confusing questions about them.  They asked me what appeared to [be] the same question in different forms; they confronted me with my prior answers and asked questions about those; sometimes when they spoke there was more than one question in the same sentence; the questions were long and had lots of different phrases, including some with legal terms which I thought I understood but maybe did not.  At the same time, my lawyer was saying "objection" quite often.  Sometimes he would say[,] "Objection, you can answer the question[,]" as questions were posed to me, and at the same time as I was being shown documents.  At the time, I was not sure whether I had seen those documents or not or whether I had spoken to [class counsel] about them.  Because of my confusion, some of my answers were just plain wrong.

I have reviewed my deposition transcript since my June 2 deposition.  I think it has a lot of errors, where I thought I understood the question, but now see that I did not.  Although I have not had a chance to review the entire transcript of the approximately 6 hour deposition in detail, one thing I saw that struck me.  I was asked multiple times whether I was or wanted to be a "class representative" and in the heat of the deposition, I just did not understand what that meant.  The answer I gave was incorrect.  As I have told [class counsel] when we first met and many times since, I want to help with the case in any way that I can.  As far as I know, I have done everything I have been asked to do in that regard [and] will continue to do so.

(*Id.* ¶¶ 8–9.)

In the context of summary judgment, the Tenth Circuit is clear that declarations

contradicting one's deposition testimony are highly suspect and may be disregarded

after considering the following factors: "[1] whether the [declarant] was cross-examined

during his earlier testimony, [2] whether the [declarant] had access to the pertinent

evidence at the time of his earlier testimony or whether the [declaration] was based on

newly discovered evidence, and [3] whether the earlier testimony reflects confusion

which the [declaration] attempts to explain." *Burns v. Bd. of Cnty. Comm'rs of Jackson Cnty.*, 330 F.3d 1275, 1282 (10th Cir. 2003).   The Court sees no reason why these same considerations should not apply to a class certification motion, and none of these considerations favors Silver.   His cross-examination elicited the same lack of knowledge as the direct examination, there is no newly discovered evidence, and the testimony does not reflect confusion.   To be sure, Silver now *claims* he was confused, but "his answers to the direct questions posed by counsel do not reflect any obvious confusion."   *Id.*

"A lead plaintiff must . . . possess a minimum threshold of knowledge about the case which, considering the nature of the claim, is sufficient to make reasonable decisions at critical stages of the litigation."   *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 176 (S.D.N.Y. 2008).   Plaintiffs have not demonstrated that Silver meets that standard.   The Court agrees with Defendants that Silver would not be an adequate class representative.   He will be dismissed as a named plaintiff.

4.     Adequacy of Class Counsel

When considering adequacy of class counsel, the Court "must consider":

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class[.]

Fed. R. Civ. P. 23(g)(1)(A).   Furthermore, this Court "may consider any other matter

18

pertinent to counsel's ability to fairly and adequately represent the interests of the class."  *Id.* 23(g)(1)(B).

Defendants do not challenge Plaintiffs' counsel's experience with class actions, knowledge of the applicable law, or resources, and the record demonstrates that these considerations run in counsel's favor.  (*See* ECF Nos. 397-51, 397-52.)  Defendants instead focus their challenge on counsel's investigation and subsequent handling of the case.  Specifically: (1) "for more than four years, Plaintiffs' counsel propped up Mr. Silver as a putative class representative, although they must have known (or should have known with minimal diligence)" of his unsuitability; (2) Plaintiffs' counsel unsuccessfully opposed a motion to compel discovery responses, leading to a Rule 37(a)(5)(A) award of fees against Plaintiffs (*see* ECF Nos. 360, 377); and (3) Plaintiffs' counsel allegedly failed to instruct Silver to preserve his tax returns, and Silver has since shredded them.  (ECF No. 413 at 34–37.)

The Court does not condone inadequate investigation or treating discovery obligations lightly.  Under the circumstances, however, the Court does not find that these accusations, taken individually or collectively, disqualify Plaintiffs' counsel. Accordingly, the Court finds Plaintiffs' counsel to be adequate and qualified to represent the Class, and counsel is therefore appointed to do so.

## D.     Rule 23(b)(3)

Plaintiffs have satisfied the Rule 23(a) factors.  Plaintiffs must now establish that their proposed class action matches one of the scenarios described in Rule 23(b). Plaintiffs argue for the scenario described in Rule 23(b)(3): "questions of law or fact

common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  The Court will address these considerations in turn.

      1.   Predominance of Common Questions

Defendants argue that individual questions regarding damages predominate over common issues.  (ECF No. 413 at 38–54.)  Evaluating this argument requires some extended discussion of class action damages generally and Plaintiffs' theory of damages in this case.

Broadly speaking, class action damages generally fall into two categories: aggregate damages (sometimes called classwide damages) and individual damages. *See* William B. Rubenstein, *Newberg on Class Actions* § 12:2 (5th ed., Sept. 2015 update) ("*Newberg*").  Aggregate damages are, in essence, a lump sum awarded in favor of the class, supposedly representing all of the harm done to the class, without inquiring into any particular class member's injury.  *Id.*  Individual damages, as the label suggests, represent damages calculated according to individual class members' respective circumstances.  *Id.*  Individual damages obviously increase the risk that individual issues will predominate over common classwide issues, and so plaintiffs seeking individual damages "must [demonstrate] a single or common *method* that can be used to measure and quantify the damages of each class member."  *Id.* § 12:4 (emphasis in original).

Here, Plaintiffs have selected the aggregate approach, as detailed in their

expert's (Cohen's) report.  (ECF No. 397-30.)  Plaintiffs asked Cohen to calculate (1) the "damages, if any, . . . incurred by the A-1 Unitholders from being forced to relinquish their A-1 Units and receive either cash or O Units"; and (2) "the per unit damages incurred by A-1 Unitholders from the difference in value between the initial $64.00 per share acquisition offer price . . . and the final purchase price of $60.75 per share[,] based on different assumptions about the share of that difference which is attributable to the A-1 Units."  (*Id.* ¶ 10.)

Cohen's analysis of the first question proceeded on the assumption that the proper measure of damages is essentially as follows:  On the date the A-1 Unitholders were required to elect between Series O units or $60.75 in cash, what was the difference between the value of an A-1 unit and the value of a Series O unit (for those unitholders who took them) or $60.75 (for those who took cash)?  (*Id.* ¶¶ 11–12.) Cohen made his calculations based on the after-tax value of the A-1 units, Series O units, and cash, "because a damages award will be made in cash and I need to determine the cash-equivalent value of what was held before and after the [Merger]." (*Id.* ¶ 12.)

Calculating after-tax value required three explicit assumptions about each A-1 unit holder's tax status:

1. all unitholders were subject to the highest federal marginal tax rate for individuals in 2007 (35%);

2. all unitholders were subject to the federal long-term capital gains rate in 2007 (15%); and

3. all unitholders paid a "weighted average state tax rate" on ordinary income

and capital gains, respectively.

(*Id.* ¶¶ 18–19.)  Implicit in Cohen's analysis (because it receives no discussion) is the additional assumption that no unitholder ever took deductions or offsets.

Calculating after-tax value also required a significant assumption about each unitholders' investment.  Because calculating capital gains requires knowing the tax basis of an A-1 unit, and because tax basis turns on the value of each unitholder's property at the time he or she contributed it to the REIT, Cohen assumed an average basis for all A-1 units.  (*Id.* ¶¶ 32–33.)

Cohen, furthermore, was required to split his valuation into two categories: one for A-1 units that would eventually generate taxable gains (itself requiring a further assumption about "when and how the taxpayer will eventually pay the capital gains tax"), and another for A-1 units on which no capital gains tax would be assessed (because, *e.g.*, the unitholder could die, triggering a tax basis step-up for his or her heirs).  (*Id.* ¶¶ 42–43.)  Working from these and other assumptions, Cohen determined that each A-1 unit was worth $29.79 if taxes were eventually assessed, and $46.65 if taxes could be permanently deferred.  (*Id.* ¶ 45.)

Cohen then went on to apply some of these assumptions, and yet more assumptions, to estimate the value of a Series O unit.  Of particular importance was an assumption that, beginning in 2012, no Series O unitholder would hold such a unit for more than three additional years, and so "one-third of shareholders would redeem their shares in each of [2012, 2013, and 2014]."  (*Id.* ¶ 55.)  This, among other things, led Cohen to value the Series O unit at less than zero, specifically, –$1.60.  (*Id.* ¶¶ 55–56.)

In the end, Cohen's damages calculation ranges from approximately $661 million to almost $1.4 billion.  (*Id.* ¶ 64.)

Cohen's analysis goes on to additional issues, but the foregoing is enough to frame the parties' arguments.  Plaintiffs' characterize Cohen's analysis as "an empirical, formulaic analysis by which damages can be calculated on a class-wide basis."  (ECF No. 397 at 43.)  Plaintiffs further state that "the use of aggregate damages is an efficient class action mechanism that avoids manageability problems at trial."  (*Id.* at 42–43.)  Defendants, by contrast, argue that any after-tax valuation "is an inherently individual exercise that depends on each taxpayer's unique circumstances."  (ECF No. 413 at 39.)  Defendants insist that, in contrast to Cohen's analysis, "[d]etermining the actual total damages requires a bottom-up approach—incorporating the individual considerations and adding up each individual's damages, to reach a true total of damages."  (*Id.* at 43.)  At bottom, Plaintiffs and Defendants disagree over whether aggregate damages can be the appropriate method for calculating damages in this case.

Generally speaking, aggregate damages are "well-established" in the class action case law and "[t]he fact that damage calculations would require individualized inquiries does not defeat certification.  Rather, as long as there is a common formula to the class, predominance is satisfied."  *Newberg* § 12:5 (footnotes omitted).  Indeed, the Tenth Circuit recently affirmed a class-action verdict where the plaintiffs' expert used statistical extrapolation "to approximate damages."  *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1257 (10th Cir. 2014), *petition for cert. filed* (No. 14-1091, Mar. 10, 2015).

The question, then, is whether Plaintiffs have presented "a common formula to the class" that "approximate[s] damages." The answer is no. "Approximate" is obviously a flexible word. Courts have said, for example, that "the damages awards [must] roughly reflect the aggregate amount owed to class members." *Seijas v. Republic of Argentina*, 606 F.3d 53, 58–59 (2d Cir. 2010). But "roughly" is no more helpful than "approximate." That said, when aggregate damages calculations are admittedly "inflated" and "likely to result in an astronomical damages figure that does not accurately reflect the number of plaintiffs actually injured by defendants and that bears little or no relationship to the amount of economic harm actually caused by defendants," such damages are not an appropriate basis on which to certify a class action. *Id.* (internal quotation marks omitted).

Considering all of the circumstances, the Court concludes that Cohen's analysis does not "approximate" any damages Defendants may owe. Cohen's estimates turn on several momentous assumptions, to the point where there can be no confidence that his final figures are anywhere close to the harm the Class allegedly suffered. For example, it is beyond belief that not one of the 800+ Class members had tax deductions or offsets during the relevant time period. Closely related to the foregoing is the fact that applying (assumed) marginal tax rates is almost never likely to be accurate given the many ways that an individual's effective tax rate can vary from year to year. A "weighted average tax rate" is also particularly troubling, as is Cohen's assumption that all A-1 unitholders had the same tax basis in the properties they contributed to the REIT. Potentially hundreds of millions of dollars are at stake in every one of these assumptions.

24

In sum, Plaintiffs have failed to demonstrate that aggregate damages are appropriate under the circumstances, and the very assumptions Cohen was required to make show that individual damages issues would surely overwhelm common issues (*i.e.*, of liability) if this class action were certified as to both liability and damages.  The Court therefore will not certify this proposed class action on the question of damages. *Cf. Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 588 (S.D.N.Y. 2013) ("there are due process implications for defendants, which render the so-called 'trial by formula' approach, whereby representative testimony is utilized to determine damages for an entire class, inappropriate where individualized issues of proof overwhelm damages calculations"), *aff'd*, 602 F. App'x 3 (2d Cir. 2015); *see also Kase v. Salomon Smith Barney, Inc.*, 218 F.R.D. 149, 157 (S.D. Tex. 2003) (finding "the issue of damages . . . not well suited for class treatment" where it would "necessitate examining [individual plaintiffs'] tax returns for every year within the class period").

Nonetheless, this Court may still certify as to the question of liability only.  *See* Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1220 (10th Cir. 2013) ("at the outset, a class may be certified for liability purposes only, leaving individual damages calculations to subsequent proceedings" (internal quotation marks omitted)); *Newberg* § 4:54 ("a class may also be certified solely on the basis of common liability, with individualized damages determinations left to subsequent proceedings").  The Court will therefore continue with its analysis to determine if a class action would be the superior method

25

for judging liability.[5]

## 2.    Superiority of a Class Action

Defendants argue that "[t]he putative class members are already organized into partnerships" which "provide a natural organizational structure for the putative class members that completely eliminates the need for the class action mechanism." (ECF No. 413 at 54–55.)  Defendants further argue that, under Plaintiffs' own damages theories, the available recovery to the various partnerships is quite high, and therefore supposedly a sufficient incentive for individual lawsuits.  (*Id.* at 55–56.)

All of this may be true, but Plaintiffs claim, with colorable support, that the theories of liability they propose are the same as to all partnerships (ECF No. 397 at 40–42), and Defendants do not attempt to refute this.  It would thus be more efficient to resolve liability questions as to all partnerships at once rather than in separate proceedings.  Accordingly, the Court finds that a class action would be superior to individual lawsuits on the question of liability.

---

[5] The parties spar over the meaning and application of the Supreme Court's recent decision in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).  (*Compare* ECF No. 397 at 46–48 *with* ECF No. 413 at 43–47.)  *Comcast* is an enigmatic opinion.  *See Newberg* § 4:54 (discussing various views of and difficulties with the *Comcast* opinion).  At its broadest, *Comcast* could be read to state that class certification is impossible (even as to liability) without a common damages formula applicable to all class members.  *See Jacob*, 293 F.R.D. at 581, 583 (exploring this view).  The Tenth Circuit, however, continues to endorse the possibility of certifying a class as to liability only if individualized damages issues would otherwise predominate.  *See Wallace B. Roderick*, 725 F.3d at 1220.  Moreover, the Tenth Circuit has interpreted *Comcast* fairly narrowly.  *See Urethane*, 768 F.3d at 1258 (stating that *Comcast* "was premised on the majority's conclusion that," given certain circumstances unique to that case, "without a way to measure damages on a class-wide basis, individualized questions would inevitably overwhelm questions common to the class" (internal quotation marks omitted)).  The Court therefore finds that *Comcast* is no barrier to considering partial certification.

**E.      Scope of Certification**

The Court will certify the Class as proposed by Plaintiffs on the question of

liability.  Plaintiffs propose, however, that the Court should also certify the class at least

as to unjust enrichment damages, which Cohen calculated simply by multiplying the

number of A-1 units by $3.25 (the difference between the original offer price of $64.00

per share and the ultimate price of $60.75 per share).  (ECF No. 424 at 9, 30.)  Given

the history of this case and the parties' willingness to fight most every issue, the Court

is frankly concerned that a distinction between unjust enrichment damages and other

damages would become just another battleground.  In addition, without prejudging the

issue, the Court is not convinced that Plaintiffs are entitled to unjust enrichment

damages without first resolving liability and damages on their other theories.  And

finally, if it eventually appears that Plaintiffs may indeed recover on an unjust

enrichment theory, and if Cohen's simple calculation turns out to be the appropriate

measure, then certifying the class as to that particular matter would be a fairly simple

process at a later date.

Nonetheless, the Court understands that Plaintiffs' unjust enrichment theory

turns in part on how much of the $3.25 price drop was attributable to the A-1 units' tax

protected status.  (*See* ECF No. 397-31 ¶ 63.)  Although that factors into Cohen's

unjust enrichment damages calculation, the Court does not mean to foreclose discovery

on that question, because it is also relevant to the question of liability (*i.e.*, if the price

drop was not at all attributable to the A-1 units' tax protected status, then it would

appear that Plaintiffs' unjust enrichment theory fails).

Finally, certifying as to liability only does not foreclose arguments from

27

Defendants that Plaintiffs could not have been damaged under any conceivable circumstance.  (*See, e.g.*, ECF No. 413 at 29 (arguing that "Series O Unitholders likely suffered no conceivable damages" because of Series O units' current value).)  Again, such an argument goes to liability as well, and therefore remains a valid area to explore in this phase of the case.

## III.  RULE 72(a) OBJECTION ANALYSIS

Following Silver's deposition, Plaintiffs naturally began to worry about whether this Court would confirm him as an appropriate class representative.  Out of caution, Plaintiffs then moved to amend the complaint to add a new named plaintiff.  (ECF No. 391.)  This Court referred to that motion to the Magistrate Judge.  (ECF No. 392.)  The Magistrate Judge denied the motion, reasoning that if Silver is indeed vulnerable to attack, Plaintiffs' counsel should have known that long ago.  (ECF No. 393 at 2.)  The Magistrate Judge further found that allowing amendment would unduly delay the case given that Plaintiffs' class certification motion was due the following week.  (*Id.* at 2–3.)

Plaintiffs filed a Rule 72(a) Objection to the Magistrate Judge's ruling.  (ECF No. 399.)  Plaintiffs nonetheless stated that the relief they request "may well be mooted by the Court's decision" on the Certification Motion.  (*Id.* at 2.)  Elaborating, Plaintiffs stated that

> it isn't necessary for the Court to decide Plaintiffs' objection at this time.  Mr. Silver is an adequate class representative. Even if the Court determines otherwise, there are two other named plaintiffs.  One of them (Infinity Clark Street Operating LLC) received Series O Units like Mr. Silver.  The other (Steven A. Stender) received cash.  Either Plaintiff can represent the Class as a whole in that both have the same interest in proving Defendants' liability.  Thus, Plaintiffs

> believe that the need for an additional Plaintiff will never come to pass.

(*Id.* at 3–4 (footnotes omitted).)

Given that the Court has approved of Stender and Infinity as class representatives, the Court accepts Plaintiffs' invitation to overrule their objection as moot.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.   Plaintiffs' Motion for Class Certification (ECF No. 396) is GRANTED as to liability questions and otherwise DENIED;

2.   The Court CERTIFIES the following class: "All persons or entities who owned Class A-1 common units of the Archstone-Smith Operating Trust, an umbrella partnership real estate investment trust, at the time of the Merger";

3.   Pursuant to Federal Rule of Civil Procedure 23(g), Wexler Wallace LLP and Squitieri & Fearon, LLP, are APPOINTED as class counsel;

4.   Plaintiff Harold Silver is DISMISSED as a named plaintiff and the case caption shall so reflect in future filings;

5.   Plaintiffs' Objection to Magistrate Judge Watanabe's July 23, 2015 Order (ECF No. 399) is OVERRULED AS MOOT; and

6.   The Archstone Defendants' Request for Oral Argument (ECF No. 430) on Plaintiffs' Motion for Class Certification is DENIED AS MOOT.

Dated this 28th day of September, 2015.

BY THE COURT:

_____

William J. Martínez
United States District Judge