**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 07-cv-2503-WJM-MJW

STEVEN A. STENDER, and
INFINITY CLARK STREET OPERATING, L.L.C.,
on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

ARCHSTONE-SMITH OPERATING TRUST *et al.*,

      Defendants.

---

## ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

---

This is a class action certified as to liability only. (*See* ECF No. 434.) Plaintiffs Steven A. Stender ("Stender") and Infinity Clark Street Operating, L.L.C. ("Infinity"), along with the other members of the Plaintiff Class (collectively, "Plaintiffs"), owned preferred equity interests in a real estate investment trust that underwent a complicated merger in 2007. Plaintiffs claim that the merger was structured to impermissibly eliminate their interests, causing them (collectively) about $1 billion in damages.

Before the Court are four motions for summary judgment filed by the following groups of Defendants:

- the "Tishman Defendants" (Tishman Speyer Development Corporation ("Tishman"), along with the "River Entities," namely, River Holding, LP, River Acquisition (MD), LP, River Trust Acquisition (MD), LLC, and Archstone MultiFamily Series I Trust) (ECF No. 565);

- the "Individual Defendants" (Caroline Brower, Stephen R. Demeritt, Ernest

A. Gerardi, Jr., Ruth Ann M. Gillis, Ned S. Holmes, Robert P. Kogod, Charles Mueller, Jr., Alfred G. Neely, James H. Polk, III, Mark Schumacher, John C. Schweitzer, R. Scot Sellers, and Robert H. Smith) (ECF No. 570);[1]

- the "2013 Defendants" (AvalonBay Communities, Inc., Equity Residential, and ERP Operating Limited Partnership) along with Archstone Enterprise LP, Archstone Inc., and Lehman Brothers Holdings Inc.—entities which, for some unexplained reason, do not fit within any larger group (ECF No. 571); and

- the "Archstone Defendants" (Archstone-Smith Trust and Archstone-Smith Operating Trust) (ECF No. 576 (public entry); ECF No. 572 (restricted entry)).

These four motions are comprehensive—they address all remaining causes of action asserted against all Defendants.

For the reasons explained below, the Court finds no genuine dispute of material fact that the terms of the 2007 merger were permissible, contrary to Plaintiffs' position. Accordingly, all four motions are granted and the Court directs entry of final judgment.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is

---

[1] Plaintiffs concede they have no basis for continuing to assert liability against Neely and Schumacher (ECF No. 586 at 24 n.14), so those Individual Defendants are dismissed from this action regardless of the substantive outcome of the Individual Defendants' summary judgment motion.

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTS

The following facts are undisputed except where attributed to a party or otherwise noted.[2]

### A. REITs, UPREITs, and TPAs

This case involves an investment vehicle known as real estate investment trust, more commonly known as a "REIT," and its sibling, an umbrella partnership real estate investment trust, or "UPREIT." A traditional REIT owns and usually operates a portfolio of income-producing real property. (ECF No. 575 ¶ 1.) For various reasons, REITs are

---

[2] Much of the material submitted in these summary judgment proceedings was filed under Restricted Access, Level 1. *See* D.C.COLO.LCivR 7.2. To the extent such a filing is quoted or summarized below, the Court has determined that the portion quoted or summarized does not meet the standards for Restricted Access set forth in D.C.COLO.LCivR 7.2(c)(2)–(4).

often seen as desirable investments, including because the Internal Revenue Code requires REITs to distribute at least 90% of their taxable income to shareholders each year.  (*Id.* ¶ 2.)

Some REITs actually take the form of two legally separate entities, a REIT and an UPREIT.  First an UPREIT is formed, which is an entity taxed as a partnership for federal income tax purposes, and it owns and operates the income-producing properties.  (*Id.* ¶ 4.)  If legally formed as a trust under state law, the UPREIT is commonly known as an "OT," short for "operating trust."  (*Id.* ¶ 5.)  Then a REIT is formed to invest exclusively in the operating trust's (*i.e.*, the UPREIT's) partnership interests, usually known as "units."  (ECF No. 575-2 at 8.)[3]  In such a structure, the REIT is sometimes known as the "parent REIT."  (*Id.*)

The REIT-UPREIT structure tends to attract investment from individuals and entities that already own income-producing properties, particularly if the REIT organizes as a publicly traded corporation.  An income-producing property owner can contribute properties to the UPREIT (the operating trust) in exchange for partnership units and, in most cases, the right to redeem those units for the parent REIT's publicly traded common stock, or for cash.  Thus, the contributor diversifies his, her, or its real estate investments and gains the option of relatively easy liquidity.  (*Id.* at 9.)

Another attractive aspect of the REIT-UPREIT structure, from a contributor's perspective, is tax deferral:

> If a property contributor were to sell appreciated real

---

[3] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination, particularly in exhibits and in briefs with prefatory material (such as a table of contents).

> property for cash or exchange it for REIT stock, that
> transaction would be treated as an immediately taxable sale.
> On the other hand, the contribution of appreciated real
> property to an UPREIT for [partnership] units is tax-deferred
> under [the Internal Revenue Code], which means the
> contributor can defer recognition of any taxable gain on the
> property to a later date.

(*Id.*)

However, a contributor loses managerial control over the contributed property. (*Id.* at 10.) Moreover, "[i]n virtually all cases," the various contributors form a minority class of unitholders "because the majority of the capital in the [operating trust] comes from public investors" and, consequently, "the majority of the [UPREIT's partnership] units are owned by the [parent] REIT." (*Id.* at 8.) Given contributors' desire for tax deferral and their understanding that they no longer will control the disposition of their properties, contributors frequently bargain for "tax protection agreements," or "TPAs," that require the UPREIT to indemnify the contributor for the tax consequences of any decision to sell the contributor's property. (*Id.* at 10; *see also* ECF No. 592 ¶¶ 29–31.)

**B.     Archstone, the Operating Trust, A-1 Units, and A-2 Units**

This case revolves around a particular REIT-UPREIT pair (both organized under Maryland law), namely: Defendant Archstone-Smith Trust, the publicly traded parent REIT ("Archstone"); and Archstone-Smith Operating Trust, the UPREIT that actually owned and managed the properties ("Operating Trust"). Plaintiffs were all contributors of property to the Operating Trust (either directly or through the merger of a previous UPREIT into the Operating Trust). (*See* ECF No. 575 ¶¶ 13–16, 18–22, 37, 39–42.)

In exchange for their contributions, Plaintiffs received "A-1 units," representing their investment in the Operating Trust. (ECF No. 592 ¶ 26.) One or more TPAs were

linked to this investment, thus preserving (for a specified amount of time) Plaintiffs' preference for tax deferral. (*Id.* ¶ 26.) A-1 units also carried with them other benefits. These included the right to redeem A-1 units for cash or Archstone common stock (ECF No. 575-46 at 56, § 6.6) and quarterly distributions of 100% of the Operating Trust's "Available Cash" (*id.* at 33, § 3.1).

Archstone's investment was represented by "A-2 units." (ECF No. 575 ¶¶ 53–54.) At all times relevant to this lawsuit, Archstone owned a majority of all Operating Trust units. In the year 2007—the crucial year, as will shortly become clear—Archstone's A-2 units represented about 89% of all A-1 and A-2 units outstanding in the aggregate. (*Id.* ¶ 273.)

## C. The Possibility of a Go-Private Transaction

In April 2007, Archstone was approached by two potential buyers interested in taking Archstone private. (*Id.* ¶ 119.) One of these suitors was a partnership between Defendant Tishman Speyer Development Corporation and Defendant Lehman Brothers Holdings Inc. ("Tishman-Lehman"). (*Id.*) The other suitor was Blackstone, a non-party to this litigation. (*Id.*)

On April 30, 2007, Blackstone submitted a non-binding indication of interest to acquire Archstone and the Operating Trust for $62.50 per share and unit. (ECF No. 592 ¶ 227.) On May 2, 2007, Tishman-Lehman submitted a non-binding indication of interest to acquire Archstone and the Operating Trust for $64.00 per share and unit. (*Id.* ¶ 163.)

## D. Annex A and Hogan's Advice

From the outset, Archstone and its suitors envisioned a transaction by which a

new UPREIT formed by one of the suitors would merge into the Operating Trust, after which Archstone would itself merge into a new REIT.  (*See* ECF No. 593-16 at 3, 5.) This contemplated structure required the parties to consult "Annex A" to the "Declaration of Trust"—the document that governed Archstone's, the Operating Trust's, and the A-1 unitholders' various rights and responsibilities with respect to each other.  (*See* ECF No. 575-46.)  Annex A's section 5.1A(3) empowered "the Trustee" (Archstone) to take various actions, including "the merger or other combination of the [Operating] Trust with or into another entity . . . subject to any prior approval only to the extent required by Section 5.3 hereof."  (*Id.* at 40.)

Archstone hired the law firm of Hogan & Hartson (now Hogan Lovells) ("Hogan") to advise it regarding the legal aspects of the potential transaction, including Annex A's approval requirements.  (ECF No. 575 ¶ 122.)  On May 8, 2007, Hogan sent a "Discussion Outline of Proposed Transaction Structure" to Archstone, explaining its preliminary analysis.  (ECF No. 593-16.)[4]  Under the heading "Corporate Consent Requirements; Appraisal Rights," the discussion outline advised that the merger of an outside entity into the Operating Trust required only a "[m]ajority vote of holders of Units of all classes entitled to vote (A-1 and A-2 units) as a single class."  (*Id.* at 6.)  The discussion outline drew this requirement from Annex A's section 5.3B(ii), which reads in relevant part:

> The Trustee may not, directly or indirectly, cause the
> [Operating] Trust to sell, exchange, transfer or otherwise

---

[4] Archstone and its various directors and officers who have been sued here asserted an advice-of-counsel defense based on what they learned from Hogan.  Thus, they waived the attorney-client privilege, and Hogan's communications with Archstone were subject to discovery.  (*See generally* ECF No. 486.)

> dispose of all or substantially all of the Trust's assets in a single transaction or a series of related transactions (including by way of merger (including a triangular merger), or other combination with any other Persons) except as follows: . . . (ii) if such merger, sale or other transaction is in connection with a Termination Transaction permitted under Section [9.2B] hereof and is approved by the Unitholders holding at least a majority of the then outstanding Units entitled to vote thereon (including any Class A-2 Units held by the Trustee) . . . .

(ECF No. 575-46 at 44.)  The cross-referenced section 9.2B reads, in relevant part:

> The Parent REIT [*i.e.*, Archstone] shall not engage in any merger (including a triangular merger), consolidation or other combination with or into another person . . . ("<u>Termination Transaction</u>"), unless . . . (iii) in connection with such termination transaction all [Operating Trust] Unitholders either will receive, or will have the right to elect to receive, for each Unit an amount of cash, securities, or other property equal to [the per-share consideration offered to Archstone's common shareholders] . . . .

(*Id.* at 63 (underscoring in original).)  In other words, reading sections 5.3B(ii) and 9.2B(iii) together, Archstone could eliminate the Operating Trust by way of merger if (1) a majority of A-1 and A-2 unitholders voted in favor of it, (2) Archstone itself was undergoing a Termination Transaction, and (3) the Operating Trust unitholders received at least the option to cash out on the same terms as Archstone's shareholders.

Hogan's May 8, 2007 outline also discussed matters on which a separate vote of only A-1 unitholders might be required.  (ECF No. 593-16 at 4–6.)  Hogan noted A-1 units' various benefits (such as preferred distributions) and stated that "[t]he better reading of [Annex A] is that an amendment to Annex A could not be effected as part of the merger vote, but would require compliance with the applicable amendment vote as well."  (ECF No. 593-16 at 4.)  This is a reference to Annex A's sections 12.3 and 12.4.  Section 12.3 states that various provisions of Annex A "may only be amended with the

approval of the holders of at least a majority of the Class A-1 Units outstanding and entitled to vote thereon." (ECF No. 575-46 at 73.) Among the provisions subject to this requirement is one regarding how to calculate distributions if the parent REIT is not publicly traded (the intended result of the proposed merger). (*Id.* (referring to § 3.1E).) Section 12.4 requires individual unitholder approval from any unitholder "adversely affected" by an "amendment" that would, among other things, "amend" provisions regarding the Trustee's powers, and calculation of distributions when the parent REIT is publicly traded. (*Id.*)

The Archstone Defendants claim that Hogan's discussion of sections 12.3 and 12.4 was prompted solely by the then-assumed transaction terms, which did not turn out to be the final terms. (*See* ECF No. 604 ¶¶ 135–47.) The Archstone Defendants say that they originally foresaw a merger in which A-1 units would persist, as reflected on the Hogan outline's first page, which announces that "Class A-1 . . . Unitholders will be entitled to elect to receive one of the following forms of consideration: [1] Class A-1 unit[s] . . . [2] Cash equal to per share merger consideration . . . [or 3] Preferred Unit[s] [*i.e.*, a new class of preferred security, explained later in the discussion outline]." (ECF No. 593-16 at 3; *see also* ECF 575 ¶ 168.) As discussed in more detail below (Part IV.A.5), Plaintiffs view Hogan's recitation of these three options and its discussion of sections 12.3 and 12.4 as at least implied attorney advice that any merger, under the circumstances, must preserve the A-1 units and call for the A-1 unitholders' vote to effect any relevant change to the benefits of an A-1 unit. Nonetheless, Hogan further opined that, although a suitor may want to have some of the A-1 unitholders' rights "amended, [the] closing of the merger should not be conditioned on a successful vote by

9

the A-1 holders." (ECF No. 593-16 at 5.)

**E.    Due Diligence, Hogan's Continuing Advice, and the First Draft of the Merger Agreement**

On May 9, 2007, Blackstone and Tishman-Lehman commenced their due diligence. (ECF No. 592 ¶ 230.) One of the documents these parties received was a "Draft and Preliminary" spreadsheet from an Archstone internal tax professional estimating the total amount of liability Archstone or its successor might incur if it sold every property subject to a TPA. (*Id.* ¶ 221; ECF No. 593-26 at 3.) The estimate at that time was approximately $1.044 billion. (*Id.*)

On May 14, 2007, Hogan sent to Archstone an updated discussion outline. (ECF No. 593-17.) This discussion outline continued to reflect a transaction in which A-1 unitholders would receive three options: keep their A-1 units, exchange them for cash, or exchange them for a new preferred unit. (*Id.* at 3.) Those choosing to retain their A-1 units would do so "subject to any amendments that are made with a vote of unitholder; many of the essential economic rights of Class A-1 Units cannot be changed without the approval of each affected holder." (*Id.*) Nonetheless, Hogan continued to advise that "[t]here would not be a separate vote of Class A-1 Unitholders to approve the Operating Trust Merger, which can be approved by a vote of all common unitholders, including [Archstone], voting as a single class." (*Id.* at 4.)

On May 15, 2007, Archstone made available to Blackstone and Tishman-Lehman a draft merger agreement. (ECF No. 575 ¶ 196.) This draft proposed that A-1 unitholders receive the three choices reflected in the Hogan discussion outlines. (*Id.* ¶ 197.) According to Plaintiffs, giving A-1 unitholders the right to *elect* to cash out was desirable from Archstone's and the suitors' perspectives because the other option

10

available under section 9.2B(iii) of Annex A—a forced buyout—would have triggered the various TPAs. (ECF No. 592 ¶¶ 13–14.) As noted, Archstone estimated at the time that the liability under the TPAs would have been $1.044 billion.

The May 15 draft also proposed the same merger structure that had been presumed since the beginning of discussions, namely, that an entity created by the buyer would merge into the Operating Trust, after which Archstone would merge into another entity created by the buyer. (ECF No. 593-18 § 2.01.) The first step in this process—a new entity merging into the Operating Trust—was again desirable from a tax standpoint, because it would prevent characterizing the merger as a sale of the Operating Trust's assets, thus avoiding the TPAs. (ECF No. 593-102 at 32–33.)

Also on May 15, 2007, Archstone's board of directors ("Board") received a report from its financial advisor for the proposed transaction, Morgan Stanley, that Blackstone might not be able to "get comfortable with" various aspects of the proposed deal, including "the amount of built-in gain that is tax protected" (ECF No. 593-6 at 3)—apparently referring to the $1.044 billion estimate.

On May 17, 2007, Defendant Brower (Archstone's general counsel) e-mailed Hogan and stated, among other things, that Blackstone representatives informed her "it's 'pencils down' if they have to have the A-1 Units in the deal - it sucks out too much of their upside." (ECF No. 593-43 at 2.)[5] May 17 also saw the circulation of a third discussion outline from Hogan. (ECF No. 593-20.) The May 17 outline is materially identical to the May 14 outline.

---

[5] Brower testified at her deposition in this case that she interpreted Blackstone's statement as directed more at the TPAs than at the A-1 units as such. (ECF No. 605-7 at 23.)

**F.      Continuing Worries About Tax Protection Consequences**

On May 19, 2007, Blackstone informed an Archstone representative that it would not be submitting a formal bid.  (ECF No. 604 ¶ 235.)  A Morgan Stanley representative informed the full Archstone Board of this development at a special meeting held on May 21, 2007.  (ECF No. 593-8 at 2.)  According to Morgan Stanley, Blackstone "attributed this decision primarily to various costs associated with the [Operating Trust's] tax protection obligations and increases in real estate taxes due to reassessments that it and its advisors had evaluated during their diligence."  (*Id.*)

Morgan Stanley further informed the Board that Tishman-Lehman "was also facing some challenges due to the higher than expected costs associated with the [Operating Trust's] tax protection obligations and the impact of such costs on their ability to sell certain of the assets."  (*Id.*)  Tishman-Lehman still planned to submit a bid, but for "less than the originally indicated price of $64.00 per share."  (*Id.*)  The Board then had an "extensive discussion" about the tax protection obligations "and possible ways to increase the purchase price that [Tishman-Lehman] could be willing to pay based on the number of unitholders of the [Operating Trust] that elect to receive cash in the Transaction, thereby potentially reducing the overall tax protection-related costs for [Tishman-Lehman]."  (*Id.* at 3.)  Morgan Stanley and Hogan were directed "to further analyze whether such [a] mechanism would be feasible."  (*Id.*)

The next day, Hogan informed Morgan Stanley that it had "developed a method through which the cash price paid per share in a merger could be increased to reflect any potential savings that a bidder may realize in future tax protection payments if a greater percentage of Class A-1 units elect cash."  (ECF No. 593-15 at 5.)  Plaintiffs

claim that on or about this same day, Morgan Stanley forwarded this proposal to Tishman-Lehman, which rejected it along with any notion that there would be "tax protection sharing."  (ECF No. 592 ¶ 242.)

**G.    Final Negotiations, the Merger Agreement, and the Advent of Series O Units**

Sometime on May 21, 22, or 23, 2007, Tishman-Lehman "informed Archstone that the option of retaining A-1 Units was a 'dealbreaker' and that [it] would not purchase a company in which [it] did not own all the equity."  (ECF No. 575 ¶ 222.)  On May 22, 2007, Tishman-Lehman sent back a marked up version of the proposed merger agreement.  (ECF No. 593-23 at 3.)  Then, on May 23, 2007, Tishman-Lehman submitted a formal bid of $60.00 per share.  (ECF No. 575 ¶ 223.)

The Board held a special meeting later that same day to discuss the bid.  (*Id.* ¶ 226.)  In advance of this meeting, the Board received Hogan's summary of Tishman-Lehman's marked up draft.  (ECF No. 593-24.)  Hogan noted that Tishman-Lehman's "proposal provides only two choices for A-1 unitholders: cash or newly issued preferred units. . . .  [Tishman-Lehman] has not yet submitted a proposal regarding the terms of the new preferred units."  (*Id.* at 4.)  Hogan also noted that Tishman-Lehman proposed some amendments to the Declaration of Trust but it was "unclear from their mark-up what they intend to amend and the basis for concluding that such amendment will not require a separate vote of the Class A-1 unitholders."  (*Id.* at 5.)

At the Board meeting itself, Morgan Stanley explained that Tishman-Lehman's offer of $60.00 per share (down from its initial indication of interest at $64.00) was motivated by the "previously stated reasons of higher than expected tax protection costs, rising cost of debt financings, lower than expected value of the development

pipeline and other unfavorable market conditions." (ECF No. 575-122 at 3.) The Board

instructed Morgan Stanley to make a counter offer of $62.00 per share, along with "a

mechanism for increasing the consideration based on the election of the unitholders

[whether to cash out or not]" and a demand that the new preferred unit be offered on

"market terms." (*Id.* at 3–4; *see also* ECF No. 575-123 at 2.)

The Board met again on May 24, 2007—twice, in fact. (ECF No. 575 ¶ 231.) At

the first meeting, the Board heard from Morgan Stanley that Tishman-Lehman had

considered the counteroffer and had raised its bid to $61.00 per share. (ECF No. 575-

123 at 2.) However, Tishman-Lehman "would not consider [Archstone's] proposed

mechanism for increasing the merger consideration based on the results of the

unitholder election." (*Id.*) In addition, Tishman-Lehman had not yet fully worked out the

terms of the new preferred units, but expected that they would have a preferential

distribution rate of 6% per annum. (*Id.* at 3.) Morgan Stanley "expressed its views that

the 6% coupon rate being proposed was within the range of market rates in light of the

likely capital structure and leverage of the [Operating Trust] post-closing." (*Id.*) After

discussion of other matters related to the proposal, the Board went into executive

session and authorized Morgan Stanley to accept the offer of $61.00 per share subject

to, among other things, "receipt of a final term sheet for the preferred units that reflected

market terms." (*Id.* at 4.)

The Board convened again that evening to hear a report from Morgan Stanley

regarding its discussion with Tishman-Lehman about Archstone accepting the $61.00

offer. (ECF No. 575-124 at 2.) Morgan Stanley stated that Tishman-Lehman's $61.00

offer was conditioned on the Operating Trust not paying its announced second-quarter

14

dividend.  (*Id.*)  This prompted the Board to discuss $60.75 per share "as a compromise to split the difference."  (*Id.* at 3.)  The Board authorized Morgan Stanley to convey the $60.75 proposal subject to, among other things, "satisfactory terms of the preferred units" and withdrawal of the demand to withhold the second-quarter dividend.  (*Id.*)

By the evening of Friday, May 25, 2007, Archstone and Tishman-Lehman had "a handshake at $60.75."  (ECF No. 575-126 at 2.)  The following Monday (May 28, 2007), the Board learned of the merger's near-final structure.  As had been proposed from the beginning of discussions, a Tishman-Lehman entity would merge into the Operating Trust, after which Archstone would merge into another Tishman-Lehman entity.  (ECF No. 575-127 at 3.)  Archstone's common shareholders would be bought out at $60.75 per share.  (*Id.*)  The Operating Trust's A-1 unitholders would "be offered the opportunity to (a) exchange their Class A-1 common units for cash equal to $60.75 per unit; or (b) exchange their Class A-1 common units for newly issued preferred units."  (*Id.* at 3–4.)

The "newly issued preferred units" came to be known as Series O units and, as expected, were substantially different from A-1 units.  For example, they would carry a 6% coupon rate, as had been proposed the week earlier, and the Board would have much more discretion whether to issue a dividend at all.  (ECF No. 593-39 at 33.)  The ability to redeem Series O units for cash would also be substantially more limited.  (*Id.* at 36.)  However, unitholders that elected Series O units would maintain tax protection, while unitholders that elected cash would incur a taxable gain that Archstone and Tishman-Lehman believed would fall outside any applicable TPA—in other words, Archstone and Tishman-Lehman expected that the unitholder would be required to pay

the tax.  (*Id.* at 28.)  If a unitholder did not make an affirmative election by a specified date before the merger's closing, that unitholder's A-1 units would automatically convert to Series O units upon closing.  (*Id.* at 3, 28.)

The Board met on May 28 and, among other things, authorized Archstone, as Trustee for the Operating Trust and holder of all A-2 units, to vote in favor of the merger, as they believed to be required by section 5.3B(ii) of Annex A.  (ECF No. 575 ¶ 266.) The various parties finally executed the merger agreement on the morning of May 29, 2007.  (ECF No. 593-39 at 19.)  Then, in August 2007, Archstone in fact voted its A-2 units (approximately 89% of all outstanding units in the Operating Trust) in favor of the merger.  (ECF No. 575 ¶¶ 272–73.)

With the merger process fully in motion, the Operating Trust eventually mailed an "Election Form Package" to all A-1 unitholders, informing them that they had until September 18, 2007, to elect to receive $60.75 per unit, or otherwise their A-1 units would be converted to Series O units.  (ECF No. 575 ¶¶ 274–75; ECF No. 575-138.) Prior to the deadline, Plaintiff Stender elected cash, and Plaintiff Infinity elected Series O units.  (ECF No. 575 ¶¶ 276–77; *see also* ECF Nos. 575-139 & -140.)

## H.  Closing

On October 3, 2007, the Operating Trust filed "Series O Articles Supplementary" with Maryland's State Department of Assessments and Taxation ("SDAT"), a state agency apparently charged with recording documents related to corporate charters. (ECF No. 575 ¶ 279.)  This document announced that "25,000,000 authorized but unissued shares of beneficial interest [in the Operating Trust]" were being "classified . . . as Series O Preferred Units."  (ECF No. 575-142 at 3.)  It further announced that, "[o]n

the Closing Date, Series O Preferred Units shall be issued by the [Operating] Trust in exchange for Class A-1 common units in the Trust outstanding immediately prior to the Operating Trust Merger Effective Time (as defined in the Merger Agreement)." (*Id.*) The Merger Agreement defined "Operating Trust Merger Effective Time" as the time when "the Operating Trust Articles of Merger have been accepted for record by the SDAT." (ECF No. 593-25 at 21.)

That time came the next day, October 4, 2007, when the Operating Trust Articles of Merger ("Articles of Merger") were accepted by SDAT. (ECF No. 575-145 at 2.) The Articles of Merger announced that, as of the "Effective Time" (*i.e.*, acceptance of the Articles of Merger by SDAT), all A-1 units "issued and outstanding immediately prior to [acceptance of the document by SDAT] shall be converted into the right to receive" Series O units or $60.75 per A-1 unit. (*Id.* at 3, 4, 6.) At that point, said the Articles of Merger, all A-1 units "shall automatically be canceled and ceased to exist." (*Id.*)[6]

About thirty minutes after filing the Articles of Merger, Archstone filed an Amended Declaration of Trust. (ECF No. 592 ¶ 200.) According to Plaintiffs, "[t]he terms of the Amended DOT were materially different from the terms of the [previous] DOT," including with respect to many of the Annex A provisions previously discussed. (*Id.* ¶¶ 205–06.)

According to Plaintiffs, another relevant transaction took place on the same day, after the Articles of Merger had been filed. Plaintiffs claim that Tishman-Lehman "directed the Trustee to transfer $9.1 billion in assets from [the Operating Trust] to

---

[6] In reality, it appears the time for election had passed and all those who had not made a timely election were to receive Series O units automatically.

17

[Archstone]." (*Id.* ¶ 285.) Then, all of those assets were sold "and the cash proceeds were distributed to [Archstone]." (*Id.* ¶ 286.)

The following day, October 5, 2007, the remaining components of the merger closed, with Archstone being absorbed into a Tishman-Lehman entity (one of the Defendant River Entities). (ECF No. 575 ¶ 284.)

## III. RELEVANT PROCEDURAL HISTORY

Plaintiffs instituted this lawsuit on November 30, 2007, alleging breach of the pre-merger Declaration of Trust (specifically, of Annex A), breach of fiduciary duties (majority oppression of minority shareholders), and breach of fiduciary duties (self-dealing). (ECF No. 1 at 25–29.) The case was originally drawn to then-Chief Judge Edward W. Nottingham.

In January 2008, Defendants moved to dismiss or stay in favor of arbitration. (ECF No. 29.) Defendants argued, in essence, that: (1) Plaintiffs were suing, at least in part, to be indemnified for the tax consequences of the merger; and (2) the Declaration of Trust required arbitration of any tax-related dispute between unitholders and the Operating Trust. (*Id.* at 3–8.) In September 2008, Judge Nottingham resolved that motion, agreeing with Defendants that, "at least to the extent count one alleges a breach of the tax deferral provisions of Archstone UPREIT's Declaration of Trust, it must be stayed for arbitration." (ECF No. 76 at 22, 23.)

This case was then stayed pending arbitration. During that stay, the matter was reassigned to Judge Robert E. Blackburn. (ECF No. 81.) The case was then reassigned to the undersigned, upon his appointment to the bench, in February 2011, while the arbitration was still in progress. (ECF No. 131.)

18

The arbitration finally concluded with a written decision in March 2013. (*See* ECF No. 184-1.) Primarily at issue in the arbitration was a section of the applicable TPA that triggered tax protection if a merger or similar transaction "results in an [A-1 Unit Holder] being required to recognize part or all of the gain that would have been recognized for federal income tax purposes upon a fully taxable disposition of one or more Protected Properties." (*Id.* at 3 (internal quotation marks omitted; alteration in original).) The arbitration claimants (including Plaintiff Stender) argued that their choice between cash and Series O units was not a real choice. (*Id.* at 4.) Although Series O units, in theory, preserved the tax-deferred characteristics of the A-1 units, the claimants asserted that "the Series O Unit was so economically inferior that it provided no reasonable alternative to the cash option," and so the claimants were effectively "required to take the cash, thereby recognizing taxable gain." (*Id.*) The claimants accordingly sought damages equal to the taxes paid. (*Id.* at 3; *see also* ECF No. 397-32 at 91.) The arbitrator ruled against claimants, concluding that the Series O unit "was a bona fide investment alternative, and, therefore, the merger did not result in Claimants being <u>required</u> to recognize taxable gain by choosing the cash option." (ECF No. 184-1 at 5–6 (underscoring in original); *see also id.* at 9.)

This Court confirmed the arbitration award in November 2013. (ECF No. 243.) It then granted Plaintiffs leave to file their Second Amended Complaint. (ECF No. 261.) Plaintiffs filed that complaint in December 2013 (ECF No. 266), and it remains the operative complaint today.

Plaintiffs' Second Amended Complaint asserts eight causes of action, as

follows:[7]

- Count 1, against Archstone "as Trustee and any of its Successors-in-Interest," for breach of the fiduciary duties a trustee owes to the trust.

- Count 2, against the Individual Defendants and Tishman, for aiding and abetting the breaches of fiduciary duty alleged in Count 1.

- Count 3, against Archstone "and any of its Successors-in-Interest," for breach of fiduciary duties through majority oppression of minority shareholders, namely, the A-1 unitholders.

- Count 4, against the Individual Defendants and Tishman, for aiding and abetting the breaches of fiduciary duty alleged in Count 3.

- Count 5, against Archstone, the Operating Trust, "and any of their Successors-in-Interest," for breach of contract, namely, the Declaration of Trust.

- Count 6, against Tishman, the River Entities, and "any of their Successors-in-Interest," for tortious interference with contract, namely, the Declaration of Trust.

- Count 7, against Tishman, for civil conspiracy to commit tortious interference with the Declaration of Trust.

- Count 8, against Tishman, the River Entities, "and their Successors-in-Interest," for unjust enrichment, based on the terms of the merger.

---

[7] The Second Amended Complaint actually claims to assert fifteen causes of action. However, there is no Count 9 (the document skips from Count 8 to Count 10); Plaintiffs voluntarily dismissed Counts 10, 11, and 12 (*see* ECF Nos. 300, 304); and Counts 13, 14, and 15 are inserted for appellate preservation purposes only (*see* ECF No. 266 at 63 n.7).

(ECF No. 266 at 45–59.)  The 2013 Defendants and Lehman Brothers are the "Successors-in-Interest" referred to in the various causes of action.

This Court eventually dismissed Plaintiffs' Count 1, finding that Maryland REITs are generally governed by corporate fiduciary duties, not trust duties.  (ECF No. 312 at 7–10.)  The Court likewise dismissed Count 2, given that it depended on establishing the breach alleged in Count 1.  (*Id.* at 10.)  Thus, as of today, only Counts 3–8 remain for decision.

## IV. ANALYSIS

Plaintiffs' contract-based claims are the foundation of Plaintiffs' other claims.  The Court will discuss the contract claims first, followed by Plaintiffs' fiduciary duty claims, and finally Plaintiffs' unjust enrichment claim.

## A.    Contract Claims (Counts 5–7)

This case turns almost entirely on what Annex A permitted the Operating Trust to do during the merger process in 2007.  More specifically, the parties primarily dispute whether Annex A permitted the Operating Trust to eliminate all A-1 units as part of the merger.  If the answer is yes, then, according to the Archstone Defendants, Plaintiffs received everything to which Annex A entitled them, and their contract cause of action fails.  If the answer is no, then, according to Plaintiffs, Defendants forced Series O units upon them—there was no real choice, they say, because they would receive Series O units by default—and Series O units stripped them of their rights under Annex A without the protection of a vote, in violation of Annex A.[8]

---

[8] Now that summary judgment proceedings have crystallized Plaintiffs' theory of breach, there is a serious question whether Plaintiffs may pursue this theory in the wake of the arbitration decision.  Stender and Infinity made their elections between cash and Series O units

Maryland law governs Annex A. (ECF No. 575-46 at 75, § 13.9.) To the extent matters of corporate governance and shareholder relations inform the contract analysis, and to the extent Maryland law does not directly speak to the question, Maryland frequently deems the "decisions of the Delaware Supreme Court and Court of Chancery to be highly persuasive." *Kramer v. Liberty Prop. Tr.*, 968 A.2d 120, 134 (Md. 2009) (footnote omitted); *see also Jolly Roger Fund LP v. Sizeler Prop. Inv'rs, Inc.*, 2005 WL 2989343, at *3 (D. Md. Nov. 3, 2005) ("With respect to corporate governance issues, Maryland courts often look to Delaware caselaw.").[9] Applying this law, the Court finds that no part of Annex A, or the Declaration of Trust generally, was breached.

1. <u>Common Ground</u>

Although the parties hotly dispute the legal effect and overall legality of the Archstone Defendants' actions during the merger process, certain key facts are undisputed, as is all of the potentially relevant contractual language. *First*, section 5.1A(3) of Annex A permitted Archstone, as Trustee for the Operating Trust, to carry out "a merger or other combination of the [Operating] Trust with or into another entity . . .

---

in September 2007, while their A-1 units remained in existence, and the arbitrator ruled that the choice between cash and Series O units was real, not illusory. (*See* ECF No. 184-1 at 5–6, 9.) Although the arbitrator framed his ruling in terms of the language of the TPA, there is a fair argument that Plaintiffs are collaterally estopped from asserting any theory based on the notion that their election was a false choice. *Cf. Coffey v. Dean Witter Reynolds Inc.*, 961 F.2d 922, 925 n.4 (10th Cir. 1992) (arbitration can have a collateral estoppel effect). And if Plaintiffs are so estopped, then by their own legitimate choice—and not by operation of the merger—they no longer possessed any A-1 units at the time the Operating Trust amended the Declaration of Trust in a manner that, according to Plaintiffs, was a breach of contract. Thus, they may lack standing to assert their current theory of breach. The Court declines to reach this question, however, given its conclusions below regarding the Operating Trust's ability to eliminate A-1 units.

[9] Recognizing this, the various parties' briefs frequently draw upon Delaware law. (*See, e.g.*, ECF No. 570 at 20, 22 n.11; ECF No. 572 at 14, 26 & n.6; ECF No. 586 at 9 n.3, 10 n.4, 23 n.11; ECF No. 588 at 32 n.36, 35 n.39.)

subject to any prior approval only to the extent required by Section 5.3 hereof." (ECF No. 575-46 at 40.) *Second*, the only portion of section 5.3 to which any party has pointed as even arguably applicable to the contract claims is section 5.3B(ii), which provides that Archstone may engage in a merger involving the Operating Trust "if such merger, sale or other transaction is in connection with a Termination Transaction permitted under Section [9.2B] hereof and is approved by the Unitholders holding at least a majority of the then outstanding Units entitled to vote thereon (including any Class A-2 Units held by the Trustee)." (*Id.* at 44.) *Third*, "a majority of the then outstanding Units entitled to vote thereon (including any Class A-2 Units held by the Trustee)" voted in favor of the merger in August 2007. *Fourth*, section 9.2B(iii) states that Archstone may engage in a Termination Transaction if all Operating Trust unitholders "either will receive, or will have the right to elect to receive" the same per-share consideration offered to Archstone's common shareholders. (*Id.* at 63.) *Fifth*, all A-1 unitholders were offered an opportunity to accept $60.75 per unit, which was the same per-share consideration being offered to Archstone's common shareholders.

From the Archstone Defendants' perspective, this is the end of the case—Annex A allowed Archstone to take certain actions and there is no genuine dispute that it took those actions. Plaintiffs challenge whether Archstone's actions truly fulfilled Annex A's requirements, but each of these arguments partially turns on the answer to the overarching inquiry: did Archstone have power to eliminate the A-1 units through the merger, without a vote of all A-1 unitholders under section 12.3 and/or consent of all "affected" unitholders under section 12.4? Annex A actually has nothing to say about that directly. However, some of the smaller disputes about its meaning nonetheless

inform the answer.  Thus, the Court will first resolve the meaning of the disputed portions of Annex A, to the extent that meaning may be discerned without answering the larger question regarding the ability to terminate A-1 units.

    2.   <u>Reverse Merger</u>

The parties' contest whether Annex A permits the sort of "reverse merger" that took place when a Tishman-Lehman entity (one of the River Entities) merged into the Operating Trust, leaving the Operating Trust as the surviving entity (in contrast to a "forward merger," in which the Operating Trust would have merged into another entity and then ceased to exist).[10]

Plaintiffs argue that Annex A does not contemplate reverse merger because the language of section 5.3B (which generally addresses mergers) speaks in terms of selling or otherwise offloading the Operating Trust's assets.  (ECF No. 588 at 17–18.) To repeat, section 5.3B reads in relevant part as follows:

> The Trustee may not, directly or indirectly, cause the [Operating] Trust to sell, exchange, transfer or otherwise dispose of all or substantially all of the Trust's assets in a single transaction or a series of related transactions (including by way of merger (including a triangular merger), or other combination with any other Persons) except as follows: . . . (ii) if such merger, sale or other transaction is in connection with a Termination Transaction permitted under Section [9.2B] hereof and is approved by the Unitholders

---

[10] In the Court's understanding, "reverse merger" usually refers to what is otherwise known as a reverse takeover or reverse IPO, where a private company avoids the process of going public by merging into an existing public company.  Here, the merger of a Tishman-Lehman entity into the Operating Trust was most closely akin to a reverse *triangular* merger: "A merger in which the acquiring corporation's subsidiary is absorbed into the target corporation, which becomes a new subsidiary of the acquiring corporation."  Black's Law Dictionary, *s.v.* "merger" (sub-definition for "reverse triangular merger") (10th ed. 2014).  Annex A specifically contemplates triangular mergers, but no party makes any argument in this regard.  The Court will therefore ignore this distinction and accept the parties' terminology as used in the their briefs.

holding at least a majority of the then outstanding Units
entitled to vote thereon (including any Class A-2 Units held
by the Trustee) . . . .

(ECF No. 575-46 at 44.)  Plaintiff is correct that "sell," "exchange," "transfer," and

"otherwise dispose of" appear, by their respective ordinary meanings, to address a

transaction like a forward merger, not a reverse merger.  And since the various terms

are not otherwise contractually defined, this ordinary meaning controls.  *See, e.g.*,

*Metro. Life Ins. Co. v. Promenade Towers Mut. Hous. Corp.*, 581 A.2d 846, 854 (Md.

Spec. App. 1990) ("The key terms emphasized supra are not defined in the contract, so

we must ascribe to them their ordinary meanings."), *aff'd*, 597 A.2d 1377 (Md. 1991).

From Plaintiffs' perspective, this means that whatever Archstone may have had

power to do under section 5.3B (and the cross-referenced section 9.2B) is irrelevant

because those sections were inapplicable.  Therefore, Plaintiffs say, the A-1 unitholder

approval requirements in Sections 12.3 and 12.4 continue to apply at least by default,

and needed to be followed because the Series O unit was forced upon them in place of

the A-1 unit, in effect amending their rights under Annex A.

This argument assumes that the Series O unit was, in effect, an amendment to

the A-1 unit—which in turn assumes that A-1 units could not be eliminated by merger.

The Court will address that matter below.  To the extent the argument stands apart from

these assumptions, Plaintiffs fail to recognize that the power to engage in mergers

comes from section 5.1A(3), which permits the Trustee to carry out "a merger or other

combination of the [Operating] Trust *with or into* another entity . . . subject to any prior

approval only to the extent required by Section 5.3 hereof."  (ECF No. 575-46 at 40

(emphasis added).)  If this language is broad enough to encompass reverse mergers,

25

then the fact that section 5.3B appears to address only forward mergers means only that there is no "extent" to which "prior approval" is "required by Section 5.3B" for reverse mergers.

"With or into" are not defined terms, and so must be interpreted according to their ordinary meaning. "Into" plainly contemplates a forward merger. The only question is whether "with" in its ordinary sense can encompass a reverse merger. Like most prepositions, "with" can have many meanings. In context, it appears to "indicate combination, accompaniment, presence, or addition." Merriam-Webster Online, *s.v.* "with" (definition 4a), *at* https://www.merriam-webster.com/dictionary/with (last accessed Aug. 15, 2017). Plaintiffs have presented no argument how this definition, or any reasonable alternative definition, fails to encompass a reverse merger. They have accordingly forfeited any such argument. Even if the case were otherwise, the Court finds that this definition, particularly its reference to "addition," easily accommodates a reverse merger.

Given this, the steps Archstone took under sections 5.3B (a vote of all unitholders) and 9.2B (providing A-1 unitholders a chance to cash out) were actually unnecessary. Nonetheless, Hogan's advice to Archstone assumed that section 5.3B(ii), and therefore also section 9.2B(iii), applied to the planned reverse merger, and Archstone proceeded accordingly. Furthermore, the Archstone Defendants' expert on these sorts of transactions testified in his deposition that "the safe[st] and best way to protect the unitholders is to comply with—is to take the position that 5.3B applies in [reverse merger] transaction[s]." (ECF No. 593-102 at 12–13.) Otherwise, Annex A "would basically give the trustee full authority to do the reverse merger transaction

without any vote, which I think is a less favorable interpretation, you know, for the unitholders than having to follow 5.3B." (*Id.* at 15.) Thus, he said, "most advisors to REITs" would counsel compliance with sections 5.3B and 9.2B regardless of the merger form. (*Id.* at 12.) Given this, the Court will assume for argument's sake that sections 5.3B and 9.2B governed Archstone's actions with respect to the merger, and the Court will proceed to the parties' next dispute, which centers on section 9.2B.

      3.    <u>"The Right to Elect to Receive"</u>

In connection with a merger that would eliminate Archstone, section 9.2B(iii) required that the Operating Trust's A-1 unitholders either "receive" the same per-share consideration offered to Archstone's common shareholders (*i.e.*, they are bought out, without a choice), or that they be granted "the right to elect to receive" such consideration (*i.e.*, a chance to cash out). (ECF No. 575-46 at 63.) There is no genuine dispute that Archstone offered all A-1 unitholders a chance to cash out for $60.75 per share, which was the same amount at which Archstone's common shareholders were being bought out.

Plaintiffs argue, however, that section 9.2B(iii) was not truly fulfilled because A-1 unitholders received, in reality, a right to take $60.75 per share to avoid ending up with economically inferior Series O units after the merger. (ECF No. 588 at 15.) Thus, Plaintiffs' say, "[Archstone] breached Section 9.2B." (*Id.*)[11]

Plaintiffs' argument only works under two assumptions. The first is that

---

[11] This argument is not inconsistent with Plaintiffs' position that section 5.3B does not apply to reverse mergers. Although section 5.3B(ii) links itself to section 9.2B, nothing in Annex A necessarily prevents section 9.2B from applying of its own force whenever Archstone (the parent REIT) engages in a Termination Transaction involving itself.

Archstone had no right (or did not properly exercise its right) to terminate A-1 units and issue Series O units instead. As noted, that is the most important question presented here, and the Court will address it below. The second assumption is that "the right to elect to receive" in section 9.2B(iii) must mean the right to elect *between* receiving the buyout compensation or *keeping one's A-1 units.* Nothing in Annex A suggests this construction. If Archstone has no right to eliminate A-1 units in a merger save through a forced buyout, then, as a practical matter, "the right to elect to receive" would *operate* as if it bore the construction Plaintiffs now advocate—but Annex A does not itself require or even suggest this construction.

From Annex A's perspective, Archstone did what was required: it gave A-1 unitholders a choice to cash out or not. Archstone *also* told A-1 unitholders that they would receive Series O units if they did not cash out, but section 9.2B(iii) has nothing specifically to say about that. Thus, Archstone did not breach section 9.2B(iii) by offering cash and otherwise requiring acceptance of Series O units.

        4.    <u>Amendment vs. Termination</u>

Having dispensed with the foregoing, the Court is left with the central question of Archstone's ability to outright terminate A-1 units as part of a merger transaction. The Archstone Defendants claim that Archstone possessed authority to do so, and therefore whatever followed such termination (here, the issuance of Series O units and an amended Declaration of Trust) was in no sense an amendment to A-1 unitholders' rights under Annex A because no A-1 units existed after the merger. Plaintiffs take the opposite view, *i.e.*, that Archstone could not eliminate A-1 units, except perhaps through a forced buyout (referring to the "will receive" clause of section 9.2B(iii)), and Archstone

breached sections 12.3 and 12.4 of Annex A because it "unilaterally amended A-1 Unitholders' rights by forcing them to relinquish their Units, converting them into Series O Units which differed from A-1 Units in the very respects that mandated a vote or consent under Sections 12.3 and 12.4."  (ECF No. 588 at 12 (footnote omitted).)

The Archstone Defendants claim that this dispute can be easily resolved by reference to the canon of "the specific trumps the general."  (ECF No. 572 at 24.)  *See also Fed. Ins. Co. v. Allstate Ins. Co.*, 341 A.2d 399, 407 (Md. 1975) ("Where two clauses or parts of a written agreement are apparently in conflict, and one is general in character and the other is specific, the specific stipulation will take precedence over the general, and control it.").  Archstone further notes that the Declaration of Trust itself requires that "more specific provisions shall control over general provisions" to the extent they "appear to be in conflict."  (ECF No. 575-46 at 13, art. 7, § 1.)  According to Archstone, the provisions governing merger (sections 5.1A(3), 5.3B, and 9.2B) are more specific than the general provisions governing amendment (sections 12.3 and 12.4), and therefore the merger provisions control.

This argument misses the point.  None of these sections, and nothing else in Annex A, directly addresses Archstone's power to terminate A-1 units as part of a merger.  Thus, it does not matter whether the merger provisions are more specific than the amendment provisions.

The Court agrees, however, with a separate argument advanced by the Archstone Defendants.  The A-1 units were, functionally speaking, a form of preferred stock.  A-1 units brought preferential distribution rights but also limited control over corporate governance.  *Cf.* Black's Law Dictionary, *s.v.* "preferred stock" (10th ed. 2014)

("A class of stock giving its holder a preferential claim to dividends and to corporate assets upon liquidation but that usu. carries no voting rights.").[12]  The Court of Appeals of Maryland (that state's highest court) announced long ago that "the ownership of stock in a Maryland corporation entails the possibility of . . . the termination of the ownership of the stock by merger or consolidation." *Am. Gen. Corp. v. Camp*, 190 A. 225, 229 (Md. 1937).  Speaking of preferred stock specifically, the Delaware Supreme Court declared it "settled" under that state's law "that minority stock interests may be eliminated by merger.  And, where a merger of corporations is permitted by law, a shareholder's preferential rights are subject to defeasance.[13]  Stockholders are charged with knowledge of this possibility at the time they acquire their shares." *Rothschild Int'l Corp. v. Liggett Grp. Inc.*, 474 A.2d 133, 136–37 (Del. 1984).

With this background, the proper and crucial question is *not* whether Annex A empowered Archstone to terminate the A-1 units, but whether anything in Annex A (or the Declaration of Trust generally) *limited* the power to do so that was already presumed under governing state law.  *Cf. Poling v. CapLease, Inc.*, 2016 WL 1749803, at *1 (Md. Spec. App. May 3, 2016) (in a challenge to whether a REIT's governing documents permitted a cash-out merger that eliminated minority shareholders, holding that a search for specific authority in those governing documents "has the analysis

---

[12] In a footnote, Plaintiffs insist that they owned "partnership units," not preferred stock. (ECF No. 588 at 20 n.16.)  This distinction may be important for tax purposes.  Nonetheless, the Court has already held that, from a corporate governance perspective, Maryland REITs are governed by Maryland's corporate laws.  (ECF No. 312 at 8–9.)  Plaintiffs offer no reason not to similarly treat unitholders' relations vis-à-vis the REIT under Maryland corporate-law principles.

[13] "An annulment or abrogation."  Black's Law Dictionary, *s.v.* "defeasance" (definition 1) (10th ed. 2014).

inverted," and that the proper question was whether the governing documents limited the default powers granted to the REIT under Maryland corporate law), *cert. denied*, 144 A.3d 711 (Md. 2016).  Plaintiffs do not put forth any arguments in this regard, other than a continual insistence that the merger's conversion of A-1 units to Series O units should be viewed as an "amendment" subject to sections 12.3 and 12.4.  Plaintiffs' position on that is clear, but it does not become correct by frequent repetition.  The A-1 units were never amended.  They were terminated, as Maryland law permitted in the context of a merger.

     5.    <u>The Significance of Hogan's Advice</u>

Plaintiffs nonetheless insist that their view of the transaction must be correct because, they say, it was also Hogan's view.  (*See* ECF No. 588 at 10, 11, 13, 14, 19.) As described above (Parts II.D–E), Hogan provided Archstone with three "discussion outlines" during Archstone's negotiations with Tishman-Lehman (and, for a time, with Blackstone).  All three of those discussion outlines describe a transaction in which A-1 unitholders could choose between keeping their A-1 units, cashing out at the same price as Archstone common shareholders, or taking a new preferred unit of some sort. Elsewhere, all three of those discussion outlines also describe the amendment voting requirements contained in sections 12.3 and 12.4.

Plaintiffs characterize the discussion outlines as "Hogan's proposed deal structure" (ECF 586 at 17), citing no evidence supporting the notion that Hogan itself came up with a deal structure.  In any event, Plaintiffs apparently view Hogan's discussion outlines as tantamount to an opinion of counsel that the only permissible reverse merger into the Operating Trust, other than one in which A-1 unitholders were

forced to cash out, would be one in which A-1 unitholders have the choice to keep their A-1 units, after which A-1 unitholders would receive a vote under sections 12.3 and/or 12.4 on any amendments to the Declaration of Trust.

There are fundamental problems with Plaintiffs' position that would prevent any reasonable jury from adopting Plaintiffs' view of Hogan's communications. First, from the outset, Hogan believed that the reverse merger into the Operating Trust was governed by section 5.3B. (ECF No. 593-16 at 6 (discussing the "Corporate Consent Requirements" of the "Operating Trust Merger" proposed transaction and specifically noting the requirements of sections 5.3B(ii)).) This is the opposite of Plaintiffs' current claim that section 5.3B does not apply to reverse mergers. In other words, under Plaintiffs' theory of the case, Hogan's advice was at least partially wrong.

Second, there can be no reasonable dispute that Hogan was providing advice concerning the *proposed* structure of the transaction in question, not advice about the *required* structure of any similar transaction. This is evident in Hogan's recitation of the *three* options A-1 unitholders would receive: keep their A-1 units, cash out like Archstone common shareholders, *or receive a new preferred unit*. Plaintiffs imply that the first two options are required by section 9.2B(iii), although Hogan nowhere says so.[14] But Plaintiffs then fail to explain where the third option comes from. Plaintiffs point to nothing in Annex A or the Declaration of Trust where some sort of new preferred unit must be part of a Termination Transaction. The only reasonable

_____

[14] The only specific advice Hogan gave about section 9.2B is as follows: "In connection with the transaction, Unitholders will have the right to receive, or elect to receive, the same consideration per Unit as the per Share consideration in the REIT Merger (this structure provides for this)." (ECF No. 593-16 at 7.) Notably, Hogan did not say that 9.2B required a choice between cashing out or keeping the A-1 units.

interpretation under the circumstances is that Hogan was simply repeating the terms of the transaction as then contemplated—and *then* giving advice on those proposed terms.

In that context, where the proposed transaction contemplated preserving the A-1 units, Hogan was correct that sections 12.3 and 12.4 applied to any amendment of A-1 unitholders' "key economic rights."  (ECF No. 593-16 at 5.)  But Hogan said nothing about whether A-1 units must be preserved, or what requirements might apply in a transaction that eliminated A-1 units.  Thus, Plaintiffs' repeated invocation of Hogan's advice fails to inform the question on which Plaintiffs' contract claim ultimately turns.

6. Other Alleged Breaches

Plaintiffs have two additional theories of breach.  Both are without merit.

a. *Section 9.2B's Successor Signature Requirement*

Plaintiffs point to the final sentence of section 9.2B, which the Court has not previously discussed, and which reads as follows:

> The Trustee shall not enter into an agreement or other arrangement providing for or facilitating the creation of a Parent REIT other than the Trustee, unless the successor Parent REIT executes and delivers a counterpart to this Agreement in which such Parent REIT successor agrees to be fully bound by all of the terms and conditions contained herein that are applicable to a Parent REIT.

(ECF No. 575-46 at 64.)  Plaintiffs argue that the successor entity into which Archstone merged did not fulfill this requirement.  (ECF No. 588 at 16–17.)

The obvious answer to this argument would appear to be that the requirement no longer existed at the relevant time.  As of the acceptance of the Operating Trust Articles of Merger by SDAT, all A-1 units ceased to exist, and Archstone amended the Declaration of Trust about thirty minutes later.  (*See* Part II.H, above.)  Annex A of the

amended Declaration of Trust does not contain the above-quoted sentence.  (*See* ECF No. 593-61 at 54.)  Thus, when Archstone merged into a Tishman-Lehman entity the following day, the version of Annex A in force at the time did not require the signature of a successor parent REIT.

Archstone, however, does not advance this argument.  Archstone instead points to the phrase "other than the Trustee" from the above-quoted sentence.  According to Archstone, "there was no need to have a new REIT countersign the [Declaration of Trust] because the 2007 Transaction did not create a new Parent REIT 'other than the trustee'—*i.e.*, [Archstone] and its successors."  (ECF No. 572 at 22–23.)  Archstone's argument relies on Annex A's definition of Trustee: "'<u>Trustee</u>' means [Archstone] *or its successors* as trustee(s) of the Trust."  (ECF No. 575-46 at 28 (underscoring in original; emphasis added).)  "Successor" is undefined, but in this context is normally defined as "[a] corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation."  Black's Law Dictionary, *s.v.* "successor" (definition 2) (10th ed. 2014).

Plaintiffs do not argue that this definition fails to encompass the Tishman-Lehman entity into which Archstone merged.  To the contrary, Plaintiffs agree that the new entity "was named the successor in documents filed with SDAT," although they view this assertion as somehow refuting the Archstone Defendants' argument rather than supporting it.  (ECF No. 588 at 16.)

Plaintiffs *also* fail to raise what, to this Court, would be the most obvious response, namely, Annex A appears to be in irreconcilable conflict as to how the last sentence of section 9.2B would ever be triggered.  On the one hand, "Trustee" is

defined to include "successors." On the other hand, section 9.2B speaks of the need for the "successor Parent REIT" to countersign the Declaration of Trust—yet there appears to be no circumstance in which a successor could be considered an entity "other than the Trustee," and so the signature requirement is completely nullified. Thus, there is a reasonable argument that the only way to save the last sentence of section 9.2B from nullification is to re-interpret "Trustee" in that context to refer only to Archstone. But again, Plaintiffs do not make any such argument.

The Court thankfully need not wade into this dispute as framed. According to Plaintiffs, the reason why the last sentence of section 9.2B matters to this litigation is that a countersignature "would have protected A-1 Unitholders from unauthorized changes to their rights." (ECF No. 588 at 16–17.) This argument hinges on the notion that the merger could not extinguish A-1 units. (*See id.* at 16 (criticizing Archstone's allegedly "circular argument that [the successor REIT] did not need to agree to be bound by the [Declaration of Trust] covering A-1 Unitholders' rights because the Transaction eliminated A-1 Units").) But, as noted, the A-1 units were already lawfully extinguished a day before Archstone merged into its Tishman-Lehman successor. Accordingly, there were no longer any rights with respect to A-1 units that a countersigning successor would need to protect. Plaintiffs' argument based on the last sentence of section 9.2B therefore fails.

> b. *The $9.1 Billion Distribution*

As noted in Part II.H, above, Plaintiffs claim that Tishman-Lehman caused the Operating Trust to transfer $9.1 billion in assets to Archstone. This allegedly happened on October 4, 2007, after the Operating Trust Articles of Merger had been filed. Then,

Plaintiffs say, Archstone sold those assets and kept the proceeds. Plaintiffs allege that A-1 unitholders were entitled to 10.8% of those proceeds under their interpretation of section 3.1 of Annex A (a lengthy and complicated section whose precise terms are irrelevant to resolving Plaintiffs' argument). (ECF No. 588 at 24.)

Plaintiffs' argument again turns on the continuing existence of A-1 units. But such units did not exist at the time of the alleged asset transfer and sale. Consequently, Plaintiffs' argument lacks merit.[15]

---

[15] Archstone argues that this entire line of argument based on section 3.1 should be considered forfeited because it was raised for the first time very late in the case. (ECF No. 572 at 29–30.) However, Plaintiffs' Second Amended Complaint contains the following allegation:

> Immediately after the forced elimination of the A-1 Units, the Archstone REIT, in conjunction with and at the direction of Tishman and Lehman, caused billions of dollars in assets held by the Archstone UPREIT to be distributed to the Archstone REIT as part of the Merger consideration. This distribution could not have been effected had the A-1 Unitholders been permitted to retain the economic rights to which they were entitled in the Archstone UPREIT.

(ECF No. 266 ¶ 124.) Thus, this particular theory has been known to Defendants for several years now.

However, it appears Plaintiffs are also trying to introduce a contradictory theory, *i.e.*, that the A-1 units were *not* "eliminat[ed]" before the alleged $9.1 billion transfer, but instead persisted in some sense until the formal closing of the entire transaction on October 5, 2007—contrary to the Operating Trust Articles of Merger, which declared the A-1 units to have ceased to exist as of the filing of those articles on October 4. Thus, according to Plaintiffs, the distribution happened while they still possessed A-1 units and were still entitled to their 10.8%. (*See* ECF No. 588 at 24.)

To the extent Plaintiffs assert this theory, the Court agrees with Archstone that it is asserted far too late. Plaintiffs filed this case in November 2007. They filed their Second Amended Complaint in December 2013. And they first hinted at this new theory in September 2016. (*See* ECF No. 538 at 14–15.) By then, fact discovery had been closed for over a month and the parties were in the middle of expert discovery. (*See* ECF No. 529.) Opening summary judgment briefs were due at the end of November 2016 (*see* ECF No. 549), which was a relatively short amount of time in light of the massive record this case has generated and the still-ongoing expert discovery. To be evaluated seriously, Plaintiffs' new theory likely would have required re-opening fact discovery to explore whatever events Plaintiffs claim caused the A-1 units to continue in existence after their declared termination. In a case as old as this one,

\* \* \*

For all of the foregoing reasons, the Court finds that the Archstone Defendants are entitled to judgment as a matter of law against Plaintiffs on Plaintiffs' breach of contract cause of action (Count 5). Furthermore, an underlying breach of contract is an element of any claim for tortious interference with contract under Maryland law. *See Fowler v. Printers II, Inc.*, 598 A.2d 794, 802 (Md. Spec. App. 1991). Consequently, all Defendants named under Plaintiffs' claim for tortious interference with contract (Count 6) and Plaintiffs' claim for civil conspiracy to commit tortious interference (Count 7) are entitled to judgment as a matter of law.

## B. Fiduciary Duty Claims (Counts 3 & 4)

Plaintiffs additionally claim that the Archstone Defendants breached their fiduciary duties toward A-1 unitholders when they negotiated and approved the merger, and that the Individual Defendants and Tishman aided and abetted this breach. Understanding Plaintiffs' claim first requires some background on how this Court has addressed it previously, particularly at the class certification stage.

### 1. Discussion of "Reasonable Expectations" in Prior Filings

Plaintiffs have long acknowledged that their fiduciary duty claim turns in large part on their "reasonable expectations" as minority shareholders. (*See* ECF No. 299 at 15.) In opposition to Plaintiffs' Motion for Class Certification (ECF No. 396), the Archstone Defendants argued that the reasonable expectations standard would require

---

re-opening discovery so late in the day would have caused significant prejudice to Defendants. *See Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090–91 (10th Cir. 1991) ("a late shift in the thrust of the case" may be ignored if it would "prejudice the other party in maintaining his defense upon the merits," including where the new theory would "require[e] the court to grant further time for discovery" (internal quotation marks omitted)).

an inquiry into every A-1 unitholder's individual expectations, and thus class certification was inappropriate. (ECF No. 413 at 51–54.) The Court rejected this argument, finding that it was based on an underlying premise that is probably true in every class action, namely, that some potential class members may have no interest in bringing a lawsuit. (ECF No. 434 at 14.) The Court then went on to certify a class of all A-1 unitholders, but only as to liability, not damages. (*Id.* at 19–28.)

The Archstone Defendants soon moved to reconsider the portion of that Order regarding liability, arguing that the Court had misunderstood their reasonable expectations challenge. (*See* ECF No. 440.) The Court ordered Plaintiffs to respond, and to "particularly address whether a fiduciary duty claim based on majority oppression requires discovery into the 'reasonable expectations' of each minority shareholder." (ECF No. 443.) Plaintiffs answered in the negative: "Under Maryland law, reasonable expectations are embodied in contracts to which shareholders are parties. The reasonable expectations of Plaintiffs and the Class were thus memorialized in the Declaration of Trust ('DOT') and any other agreements defining the relationships of the parties. Subjective concerns are irrelevant to the inquiry . . . ." (ECF No. 447 at 2; *see also id.* at 3 n.9 ("Regardless of when or why or the basis for making their investments, *the reasonable expectations that are the subject of this lawsuit are memorialized in the DOT*, which is uniform as to every A-1 Unitholder." (emphasis added)).)

The Court agreed with Plaintiffs' position: "In this case, given the size of the minority (800+ Unitholders), the majority's understanding of the minority's expectations would naturally flow mostly, perhaps entirely, from the Declaration of Trust and its connected agreements. Thus, class certification remains appropriate with respect to

liability on Plaintiffs' fiduciary duty claim." (ECF No. 449 at 5 (citation omitted).) This ruling has since informed the parties' various arguments.[16]

2.    Plaintiffs' Reasonable Expectations

The Court agrees with the Archstone Defendants that, under the foregoing standard, Plaintiffs' fiduciary duty claim cannot survive.

First, as already noted above (Part IV.A.4), the background law in Maryland is that "the ownership of stock in a Maryland corporation entails the possibility of . . . the termination of the ownership of the stock by merger or consolidation." *Camp*, 190 A. at 229. Moreover, the Delaware Supreme Court (which Maryland deems "highly persuasive" in matters of corporate law, *Kramer*, 968 A.2d at 134) has held "that minority stock interests may be eliminated by merger," and "[s]tockholders are charged with knowledge of this possibility at the time they acquire their shares." *Rothschild*, 474 A.2d at 136–37. Thus, Plaintiffs must point to something in Annex A, or elsewhere in the Declaration of Trust, creating expectations that differ from those which otherwise exist as a matter of law. Plaintiffs attempt to meet this burden by citing to all of the various provisions previously discussed (*e.g.*, sections 5.3B, 9.2B, 12.3, and 12.4), but their arguments in this regard depend on their erroneous interpretations of those various sections. (ECF No. 588 at 28–29.) Moreover, Plaintiffs' argument is far more akin to a "reasonable expectations" claim under the law of *insurance*—what a reasonable

---

[16] In summary judgment briefing, Plaintiffs cite Maryland case law asserting that acting as permitted under a contract does not necessarily excuse a breach of fiduciary duty. (*See* ECF No. 588 at 31–32 & n.36.) But as just noted, the Court accepted Plaintiffs' argument that the governing contracts would establish the expectations whose frustration might lead to a breach of fiduciary duty. Plaintiffs are now judicially estopped from arguing to the contrary—otherwise, they would be "prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

policyholder might expect in light of its purposes and language—and not the law of fiduciary duty. *Cf. Sheets v. Brethren Mut. Ins. Co.*, 679 A.2d 540, 549 (Md. 1996); 7 Steven Plitt *et al.*, *Couch on Insurance* § 102:16 (3d ed., June 2017 update).

Plaintiffs also struggle to deal with a portion of Annex A not previously discussed in this Order, section 5.8B, a rather astonishing provision that significantly undercuts any A-1 unitholder's potential expectations:

> The Unitholders . . . expressly acknowledge that the Trustee is acting on behalf of the [Operating] Trust and the Trustee's shareholders collectively, that the Trustee is under no obligation to consider the separate interests of the other Unitholders (including, without limitation, the tax consequences to the other Unitholders) in deciding whether to cause the [Operating] Trust to take (or decline to take) any actions, and that the Trustee shall not be liable for monetary damages for losses sustained, liabilities incurred or benefits not derived by Unitholders in connection with such decisions . . . , unless the Trustee acted in bad faith and the act or omission was material to the matter giving rise to the loss, liability or benefit not derived.

(ECF No. 575-46 at 51.)  Plaintiffs' only response to the Archstone Defendants' argument based on section 5.8B (*see* ECF No. 572 at 35) is to point out the bad faith exception in the final clause (ECF No. 588 at 36).  According to Plaintiffs, the Archstone Defendants displayed bad faith by "[1] ignoring known conflicts and [2] agreeing to a deal structured contrary to the only written advice Hogan provided (not even questioning whether the alternative, materially different structure was permissible), and [3] removing from the process the only Board members who might consider the transaction from the standpoint of A-1 Unitholders."  (*Id.*)

In the context of a majority oppression claim in Maryland, bad faith refers to the majority's "use [of its] voting power for [its] own benefit or for a purpose adverse to the

interests of the corporation and its stockholders." *Mona v. Mona Elec. Grp., Inc.*, 934 A.2d 450, 464 (Md. Spec. App. 2007) (citing *Cooperative Milk Serv. v. Hepner*, 81 A.2d 219, 224 (Md. 1951)). Plaintiffs do not explain how their theories of bad faith show some sort of self-dealing, or a purpose adverse to the corporation and its stockholders generally (as opposed to adverse to A-1 unitholder specifically). In any event, all three theories fail on their own terms. This is shown most clearly by first addressing the second theory, followed by the first and third.

Plaintiffs' second theory (ignoring Hogan's advice) has already been thoroughly discussed above (Part IV.A.5) in the context of Plaintiffs' contract claims. Plaintiffs raise it again in the context of fiduciary duty to show at least a genuine dispute of material fact about bad faith because the Archstone Defendants allegedly ignored Hogan's advice about the proper structure of the transaction. (*See* ECF No. 588 at 34–35; *see also* ECF No. 586 at 7, 11, 14, 17–19.) The Court has already concluded that Plaintiffs have no basis for characterizing Hogan's "discussion outlines" as an opinion letter by counsel about how Annex A requires the merger to be structured. Thus, the Archstone Defendants' alleged choice to ignore Hogan's advice cannot show bad faith because the Archstone Defendants never received the advice Plaintiffs claim they received.

Turning back to Plaintiff's first theory ("ignoring known conflicts"), Plaintiffs here refer to the fact that Hogan and Morgan Stanley were retained on a partial contingency basis. (*See* ECF No. 588 at 26.) Specifically, Morgan Stanley was to receive a $25 million fee if the merger closed; and Hogan was to receive an $8 million fee if the merger closed, or otherwise actual hours worked minus ten percent. (ECF No. 592 ¶¶ 337, 340; ECF No. 604 ¶ 337.) According to Plaintiffs' corporate governance expert,

the contingency structure "incentivized Morgan Stanley to consummate the deal even if the terms on which it was advising and opining were not necessarily in the best interests of A-1 Unitholders," and similarly "incentivized Hogan to give advice or encourage [Archstone] to consummate the deal on terms that might conflict with the interests of A-1 Unitholders." (ECF No. 592 ¶¶ 338, 341.)

Plaintiffs appear to be saying that the Archstone Defendants displayed bad faith by surrounding themselves at the beginning of the negotiation process with so-called "yes men." Plaintiffs fail to cite any case in which a similar approach was deemed evidence of bad faith, and on this record it could be no more than a scintilla of bad faith evidence. In any event, it is irrelevant under the terms of Annex A. If Morgan Stanley and Hogan helped the Archstone Defendants to close a transaction that was "not necessarily in the best interests of the A-1 Unitholders" or which "conflict[ed] with the interests of the A-1 Unitholders" (*id.*), section 5.8B exculpates the Archstone Defendants because they were "under no obligation to consider the separate interests" of the A-1 unitholders (ECF No. 575-46 at 51).

Plaintiffs second theory seems to embrace an additional alleged conflict of interest, based on an incident during the negotiation process when Morgan Stanley declined to provide a separate fairness opinion as to the effect of the proposed merger on A-1 unitholders. (*See* ECF No. 592 ¶¶ 348, 350.) In the words of Defendant Brower, Archstone's general counsel, in a May 17, 2007 e-mail to Hogan: "Morgan says they can't issue a fairness opinion with respect to the [A-1] unit holders ('can't' in the sense that it puts them in a conflict since they are issuing the fairness opinion with respect to the [Archstone] shareholders . . . .)." (ECF No. 593-43 at 2.) Plaintiffs seem to believe

that this was at least evidence of Archstone's knowledge that Archstone's common shareholders' interests conflicted with those of the Operating Trust's A-1 unitholders. However, section 5.8B addresses the situation and declares that Archstone does not need to consider the A-1 unitholders' separate interests.

Plaintiffs' third theory ("removing from the process the only Board members who might consider the transaction from the standpoint of A-1 Unitholders") runs into the same problem. Plaintiffs here refer to the fact that Board members holding A-1 units recused themselves from certain Board discussions about the influence of the TPAs on the potential merger, and about "alternate forms of consideration that may be offered to the [A-1] unitholders." (ECF No. 592 ¶ 362 (internal quotation marks omitted); *see also id.* ¶¶ 312–14.) But section 5.8B specifically excuses Archstone from "consider[ing] the transaction from the standpoint of A-1 Unitholders." Thus, this may not be the basis of a bad faith claim.

Plaintiffs have failed to raise a genuine issue of material fact regarding bad faith. Moreover, to the extent Plaintiffs' claim reduces to simple dissatisfaction with the negotiated per-share compensation ($60.75, as opposed to the original offer of $64.00), there is no fiduciary duty claim when "the plaintiffs' fundamental grievance [is] one of inadequate price." *Walk v. Baltimore & Ohio R.R.*, 847 F.2d 1100, 1108 (4th Cir. 1988) (applying Maryland law), *judgment vacated on other grounds*, 492 U.S. 914 (1989). Thus, all defendants subject to Plaintiffs' fiduciary duty claims (Counts 3 and 4) are entitled to judgment as a matter of law on those claims.[17]

---

[17] The foregoing analysis makes liability for breach of fiduciary duty essentially congruent with liability for breach of contract. That is the consequence of Plaintiffs' position that the Declaration of Trust would establish their reasonable expectations. Nonetheless, now that

43

## C.  Unjust Enrichment (Count 8)

Plaintiffs' final remaining claim is for unjust enrichment, asserted against the

entities that bought Archstone and the Operating Trust (Tishman and the River Entities,

the latter of which were created specifically to carry out the transaction).  This claim fails

for two reasons, one legal and one factual.

On the legal side, it has become clear through these summary judgment

---

the record and the parties' arguments have been fully developed, the Court is inclined to reconsider an earlier ruling regarding the applicability of a majority oppression claim under the circumstances.  In a number of filings, the Archstone Defendants noted in passing that the authority on which Plaintiffs have relied to frame their majority oppression claim has only been applied to closely held entities, and neither Archstone nor the Operating Trust are closely held entities.  (ECF No. 305 at 7 & n.5; ECF No. 51 at 18 n.10.)  When the Archstone Defendants became more insistent about this point in their Motion to Reconsider the Court's Class Certification Order, the Court held that

> [t]he question of whether an oppression claim can apply to a non-closely held entity is not something to be addressed only by way of oblique distinction in a reply brief footnote.  Indeed, it would seem to be an obvious and primary argument.  But in eight years of litigation, Defendants have never put forth that argument and have certainly forfeited it by this point.

(ECF No. 449 at 3–4.)  The Court stands by its ruling that the Archstone Defendants should have raised this argument earlier.  Nonetheless, these summary judgment proceedings have better illuminated the reasons why an answer to the underlying question—whether a majority oppression claim may arise in the context of an entity that is not closely held—should not be avoided.

To the extent "reasonable expectations" encompasses extra-contractual expectations (as Maryland case law at times suggests), a majority oppression claim may be fairly adjudicated in the context of a closely held corporation, where majority shareholders usually know the minority shareholders personally.  But in the context of large entities like Archstone and the Operating Trust, such personal familiarity is nearly impossible and not even expected.  Thus, "reasonable expectations" and its attendant inquiries may only be judged by documents such as governing contracts.  As noted, however, this forces the parties to present arguments that appear to invoke the insurance law doctrine of reasonable expectations, which (to this Court's knowledge) has no connection to reasonable expectations in a fiduciary duty context, despite employing the same phrase.  In any event, it collapses the distinction between breach of contract and breach of fiduciary duty.  Consequently, the Court sees good reason to reevaluate whether a majority oppression claim can exist as against entities such as Archstone and the Operating Trust.  But because Plaintiffs' argument fails on its own merits, the Court need not call for further briefing on this point.

proceedings that Plaintiffs' claim reduces to no more than the contention that Tishman-Lehman struck too good of a deal for itself when bargaining to purchase Archstone and the Operating Trust.  (*See* ECF No. 266 ¶¶ 226–29 (asserting that Tishman-Lehman unjustly accepted a benefit based on paying $60.75 per share to buy out A-1 unitholders, which was allegedly far less than the true value of A-1 units).)  This, of course, was not a benefit conferred by the A-1 unitholders on Tishman-Lehman.  *See Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295, 936 A.2d 343, 351 (2007) (first element of an unjust enrichment claims is "[a] benefit conferred upon the defendant by the plaintiff").  Moreover, the Court is confident Maryland courts would agree with the Southern District of New York's observation that unjust enrichment is rarely a license to reevaluate the fairness of the bargain: "Where parties bargain at arms length and reach express contractual agreements, and where both parties are commercial equals, the Court may not permit recovery on a theory of unjust enrichment or quasi contract based upon an *ex post facto* judicial analysis of who profited the most from the transactions." *City of Yonkers v. Otis Elevator Co.*, 649 F. Supp. 716, 734 (S.D.N.Y. 1986) (applying New York law), *aff'd*, 844 F.2d 42 (2d Cir. 1988).

On the factual side, Plaintiffs' claims turn on the supposed right to keep their A-1 units despite the merger, and the attendant continuing existence of A-1 units after the merger.  (ECF No. 266 ¶¶ 220, 224.)  As explained above, no such right existed and therefore the A-1 units were extinguished.  The Court will grant judgment as a matter of law against Plaintiffs on their unjust enrichment claim (Count 8).

## V. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendants' Motions for Summary Judgment (ECF Nos. 565, 570, 571, and 576) are GRANTED;

2. The Final Trial Preparation Conference currently set for December 18, 2017 at 11:00 a.m., and the 14-day jury trial scheduled to begin on January 16, 2018, are VACATED;

3. The Clerk shall enter final judgment in favor of all Defendants and against Plaintiffs and the Plaintiff Class, and shall terminate this case; and

4. Defendants shall have their costs upon compliance with D.C.COLO.LCivR 54.1.

Dated this 25th day of August, 2017.

BY THE COURT:

_____

William J. Martinez
United States District Judge